**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------   x
                                                               :
In re:                                                         :      Chapter 11
                                                               :
FREDERICK'S OF HOLLYWOOD, INC., et al.,¹                       :      Case No. 15-_____ (__)
                                                               :
                                                               :
                                    Debtors.                   :      (Joint Administration Requested)
------------------------------------------------------------   x
```

**DECLARATION OF WILLIAM SONCINI
IN SUPPORT OF CHAPTER 11 PETITIONS AND
FIRST DAY PLEADINGS OF FREDERICK'S OF HOLLYWOOD, INC.
AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION**

I, William Soncini, hereby declare under penalty of perjury:

1.      I am the Chief Operating Officer of each of the other above-captioned debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors"), and have served in such capacity since July 2014.

2.      I have over 35 years of experience in the retail fashion industry.  Before joining the Debtors, from May 2010 to July 2014, I was President and Chief Executive Officer of Second Time Around, an upscale women's consignment company with 50 retail stores in 11 states.  From 2006 to 2010, I was Senior Vice President at Everything But Water, a nationwide women's specialty swim and resort wear retailer based in Florida.  I also previously held executive positions with various retailers, including Rag Shop, G&G Retail, FAO Schwarz, Natural Wonders, Kay-Bee Toy, and Victoria's Secret.

---

¹      The debtors in these chapter 11 cases and the last four digits of each debtor's taxpayer identification number are as follows:  (i) FOHG Holdings, LLC (7902); (ii) Frederick's of Hollywood Group Inc. (3042); (iii) FOH Holdings, Inc. (5442); (iv) Frederick's of Hollywood, Inc. (6265); (v) Frederick's of Hollywood Stores, Inc. (8882); and (vi) Hollywood Mail Order, LLC (5205).  The debtors' principal offices are located at 6464 W. Sunset Blvd., Suite 1150, Los Angeles, CA 90028.

3.      Concurrently with the filing of this declaration (the "Declaration") on the date hereof (the "Petition Date"), each of the Debtors has filed in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code").

4.      The Debtors have requested certain relief in "first day" applications and motions filed with the Court (collectively, the "First Day Pleadings")[2] in order to minimize certain of the potential adverse effects of the commencement of these chapter 11 cases and to maximize the value of their estates.  I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that led to the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions for relief and the First Day Pleadings.

5.      Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management and other personnel, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

6.      I am familiar with the contents of each First Day Pleading (including the exhibits to such motions) and believe the relief sought in each First Day Pleading will allow for an orderly transition of the Debtors into these chapter 11 cases and permit the Debtors to sell substantially all of their assets in a manner that maximizes the value of their businesses.  Further, it is my belief that the relief sought in the First Day Pleadings is in each case narrowly tailored

---

[2]      Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Pleadings or the Prepetition Credit Agreement (as defined herein), as applicable.

and necessary to achieve the goals identified above, and, accordingly, best serves the interests of the Debtors' estates and their stakeholders.

7.      Parts I and II of this Declaration provide an overview of the Debtors' businesses, organizational structure, and capital structure.   Part III provides an overview of the circumstances leading to the commencement of these chapter 11 cases. Part IV discusses the objectives of the chapter 11 cases, and Part V discusses the bases for relief sought in the First Day Pleadings, which the Debtors believe are critical to administering these chapter 11 cases and preserving and maximizing the value of the Debtors' estates.

## I.      Description of the Debtors

### A.      The Debtors' Businesses

8.      The Debtors sell high quality women's apparel and related products under their proprietary Frederick's of Hollywood® brand.   The Debtors' major merchandise categories are foundations (including various types of undergarments), lingerie (including daywear and sleepwear), ready-to-wear (dresses and sportswear), and accessories (including shoes, handbags, jewelry, personal care products, and novelties).   The Debtors' target consumer base is women aged 18-45, and their exclusive product offerings and collections include Seduction by Frederick's of Hollywood and the Hollywood Exxtreme Cleavage® bra.

9.      The origins of the Debtors' businesses can be traced to 1946, when Frederick Mellinger started a mail order catalog selling lingerie.   One year later, Mr. Mellinger opened a retail store in Hollywood, California selling lingerie and other women's fashion apparel under the store name "Frederick's of Hollywood."   From its small beginnings, the Frederick's of Hollywood brand gained enormous popularity, and, by the 1950's, was modeled by several Hollywood icons, including Betty Page.   From there, the Debtors expanded, and continued to grow their brand, their mail order catalog business, and their retail store presence.   At its height,

the Debtors operated over 200 retail stores across the United States, as well as maintained a robust mail catalog and an e-commerce business through their website at www.fredericks.com. Since their inception, the Debtors have remained a market leader and innovator in the female fashion and lingerie industry.

### B.    Previous Chapter 11 Cases

10.    In September 1997, the Debtors' retail and direct businesses were sold pursuant to a highly leveraged buyout (the "LBO"), pursuant to which approximately $70 million was paid to the Debtors' former shareholders and to professionals in connection with the transaction. Following the LBO, however, the Debtors suffered losses in profits and were unable to service their debt obligations.  Facing a cash flow crisis, the Debtors commenced chapter 11 cases in the United States Bankruptcy Court for the Central District of California in July 2000 and listed approximately $66.3 million in assets and $67 million in liabilities (consisting of approximately $32 million in secured debt).  In December 2002, the bankruptcy court confirmed the Debtors' chapter 11 plan of reorganization which provided, among other things, the Debtors' then-existing secured lenders with 80% of the reorganized company's common stock, two tranches of new term loans, and 70% of litigation proceeds.  The plan also provided holders of general unsecured claims with 6% of the reorganized company's common stock and 30% of the proceeds of certain litigation claims.  The reorganized company emerged from bankruptcy on January 7, 2003.

11.    Thereafter, in January 2008, a subsidiary of Movie Star, Inc., a designer and wholesale manufacturer of women's intimate apparel, including sleepwear, robes, leisurewear, and daywear, merged with and into FOH Holdings, Inc., the then-parent company of Frederick's of Hollywood, Inc.   Upon consummation of the merger, Movie Star, Inc. was renamed Frederick's of Hollywood Group Inc. and was subsequently publicly traded on the American Stock Exchange (currently known as the "NYSE MKT") under the symbol "FOH."

C.    **Going-Private Transaction**

12.    In February 2013, the Debtors' stock was suspended from the NYSE MKT due to continued non-compliance with the NYSE MKT's stockholder's equity requirements.  Upon delisting from the NYSE MKT, the Debtors' stock was publicly listed on the OTCQB as Frederick's of Hollywood Group Inc. (symbol:  "FOHL").  On May 30, 2014, in the face of growing liquidity issues and concerns about their ability to continue operating as a publicly listed company and a going concern, the Debtors were taken private by a consortium consisting of HGI Funding, LLC, a wholly owned subsidiary of Harbinger Group Inc., Tokarz Investments, LLC, TTG Apparel, LLC, Arsenal Group, LLC, Fursa Alternatives Strategies LLC, and William F. Harley III (collectively, the "Consortium") for an aggregate transaction value of approximately $24.8 million (the "Going-Private Transaction").

13.    Under the terms of the Going-Private Transaction, each member of the Consortium, which had already beneficially owned approximately 88.9% of the Debtors' common stock in the aggregate, agreed to exchange the preferred and/or common shares it held in the Debtors for equity units in FOHG Holdings, LLC.  In order for the Consortium to acquire a 100% stake in the Debtors, the Debtors' remaining other shareholders were cashed out in the Going-Private Transaction at a price of $.27 per share.  The Going-Private Transaction resulted in the Debtors' becoming privately-held by the Consortium and the Debtors' stock no longer being registered with the SEC or listed on OTCQB.

D.    **Organizational Structure**

14.    A chart showing the Debtors' organizational structure as of the Petition Date is attached hereto as **Exhibit A**.  As reflected in the chart, FOHG Holdings, LLC, a Delaware limited liability company formed to effectuate the Going-Private Transaction, owns 100% of the interests in Frederick's of Hollywood Group Inc., a New York corporation.  Frederick's of

Hollywood Group Inc., in turn, owns 100% of the interests in FOH Holdings, Inc., a Delaware corporation. FOH Holdings, Inc., in turn, owns 100% of the interests in Frederick's of Hollywood, Inc., a Delaware corporation. Frederick's of Hollywood, Inc. owns 100% of the equity in both (i) Hollywood Mail Order, LLC, a Nevada limited liability company that manages the Debtors' e-commerce business, and (ii) Frederick's of Hollywood Stores, Inc., a Nevada corporation that manages all of the Debtors' retail stores.

15.    The Debtors' principal offices are located at 6464 W. Sunset Blvd., Suite 1150, Los Angeles, CA 90028. The Debtors also lease a facility in Phoenix, Arizona, where the Debtors operate their nationwide distribution center (the "Arizona Distribution Center"). The Arizona Distribution Center currently serves as a distribution facility for the Debtors' e-commerce business.

## II.    Prepetition Indebtedness[3]

16.    As of the Petition Date, the Debtors' unaudited balance sheets reflected total assets of approximately $36.5 million and total liabilities of approximately $106 million. The Debtors' material debt obligations principally consist of approximately $33 million in loans under a secured credit agreement, $16.2 million in unsecured promissory notes, and $56.7 million in trade debt and liabilities to landlords.

### A.    Secured Debt

17.    Certain of the Debtors are party to that certain Credit and Security Agreement, dated as of May 31, 2012 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement"), by and among Frederick's of Hollywood Group, Inc. ("Group"), FOH Holdings, Inc. ("Parent"), Frederick's of Hollywood, Inc. ("Frederick's"),

---

[3]    The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.

Frederick's of Hollywood Stores, Inc. ("Stores"), and Hollywood Mail Order, LLC ("Mail Order" and, collectively with Group, Parent, Frederick's, and Stores, the "Borrowers"), as borrowers, the lenders party thereto (the "Prepetition Secured Lenders"), and Salus Capital Partners, LLC ("SCP"), in its capacity as administrative and collateral agent. Salus CLO 2012-1, Ltd. ("Salus CLO") and Front Street Re (Cayman) Ltd. ("Front Street"), the existing lenders under the Prepetition Credit Agreement, and SCP are affiliates of HGI Global Holdings, LLC ("HGI Global"), the largest holder of the Debtors' equity interests.

18.    Under the Prepetition Credit Agreement, the Debtors have outstanding funded debt for borrowed money in the approximate aggregate principal amount of $32,988,000, consisting of (i) approximately $16,465,000 in respect of a Line of Credit, consisting of (x) approximately $2,465,000 of outstanding revolving loans (the "Revolving Loans"), and (y) $14,000,000 in respect of a first-in last-out advance (the "FILO Advance"), and (ii) $16,523,000 outstanding in respect of a term loan (the "Term Loans" and, collectively with the Revolving Loans and the FILO Advance, the "Prepetition Credit Facility").    Borrowings under the Prepetition Credit Facility bear interest at a rate per annum equal to, (i) with respect to the Revolving Loans, the Prime Rate plus 8%, (ii) with respect to the FILO Advance, the LIBOR Rate plus 15.5%, and (iii) with respect to the Term Loans, the LIBOR Rate plus 17.5%.[4] Following the occurrence of an Event of Default under the Prepetition Credit Agreement, any amounts received on account of the Obligations thereunder, following the payment of fees, indemnities, expenses, and principal and interest on any Overadvances, will be applied in the following order:    first, to payment of interest and fees on the Revolving Loans; second, to payment of interest and fees on the FILO Advance; third, to payment of principal of the

---

[4]    Each of these interest rates includes 4% of default interest, which is currently being assessed under the Prepetition Credit Agreement.

Revolving Loans; fourth, to payment of principal of the FILO Advance; and fifth, to payment of interest, fees, and principal of the Term Loans.

19.     Pursuant to (i) the Prepetition Credit Agreement, (ii) that certain Copyright Security Agreement, dated as of May 31, 2012, by and among Frederick's, Mail Order, and SCP, (iii) that certain Trademark Security Agreement, dated as of May 31, 2012, by and among Group, Frederick's, and SCP, and (iv) that certain Pledge Agreement, dated as of May 31, 2012, by and among Group, Parent, Frederick's, and SCP, the Borrowers' obligations under the Prepetition Credit Facility are secured by first-priority, perfected security interests in substantially all of the Borrowers' assets (including intellectual property such as trademarks and copyrights, as well as shares and membership interests of the Borrowers that are subsidiaries of other Borrowers, and up to 65% of the outstanding capital stock of any of their foreign subsidiaries).  The Prepetition Credit Facility matures on May 31, 2015.

**B.**     **Unsecured Debt**

**a.**     **Promissory Notes**

20.     As of the Petition Date, the Debtors have outstanding unsecured funded debt for borrowed money in the aggregate principal amount of approximately $16.2 million.  These obligations arise under (i) that certain Demand Promissory Note, dated as of July 3, 2014 (as amended, restated, supplemented, or otherwise modified from time to time, the "July Note"), by and among Group and HGI Global, (ii) that certain Demand Promissory Note, dated as of September 9, 2014 (as amended, restated, supplemented, or otherwise modified from time to time, the "September Note"), by and among Group and HGI Global, (iii) that certain Demand Promissory Note, dated as of November 19, 2014 (as amended, restated, supplemented, or otherwise modified from time to time, the "November Note"), by and among Group and HGI Global, and (iv) that certain Demand Promissory Note, dated as of January 28, 2015 (as

amended, restated, supplemented, or otherwise modified from time to time, the "January Note" and, collectively with the July Note, the September Note, and the November Note, the "Unsecured Notes"), by and among Group and HGI Global.

21.     The Debtors have outstanding unsecured funded debt for borrowed money under the Unsecured Notes in the aggregate amount of $17,453,239, consisting of (i) $10,890,000 outstanding under the July Note, (ii) $2,706,250 under the September Note, (iii) $3,162,500 under the November Note, and (iv) $694,489 under the January Note.  Borrowings under the July Note bear interest at 12% payable-in-kind, whereas borrowings under the September Note, November Note, and January Note bear interest at 15% payable-in-kind.

22.     Pursuant to the terms of the Unsecured Notes as well as that certain Subordination Agreement, dated as of December 15, 2014, by and among HGI Global and the Prepetition Secured Lenders, (i) the July Note is subordinated to the Prepetition Credit Agreement, (ii) the September Note is subordinated to the Prepetition Credit Agreement and the July Note, (iii) the November Note is subordinated to the Prepetition Credit Agreement, the July Note, and the September Note, and (iv) the January Note is subordinated to the Prepetition Credit Agreement, the July Note, the September Note, and the November Note.

23.     The Unsecured Notes mature or have matured, (i) with respect to the July Note, on December 30, 2014, (ii) with respect to the September Note, on September 9, 2015, (iii) with respect to the November Note, on November 30, 2015, and (iv) with respect to the January Note, on September 30, 2015.

### b.  Trade Debt

24.     As of the Petition Date, the Debtors estimate that they have approximately $56.7 million of unsecured trade debt and other outstanding operating expenses including liabilities to certain of their landlords.  Of this amount, approximately $10.5 million is due to

HGI Funding, LLC ("HGI Funding") pursuant to separate Accounts Receivable Purchase Agreements by and among HGI Funding and certain of the Borrowers' vendors (the "Vendors"), whereby HGI Funding purchased certain accounts receivable of the Vendors for which the Borrowers are the account debtor.

### III.    Key Events Leading to Commencement of the Chapter 11 Cases

#### A.    Recent Liquidity and Operational Concerns

25.    Notwithstanding their prominence in the female apparel industry, over the course of the past decade, the Debtors have experienced a significant overall decline in their financial performance.  This downturn can be attributed to declining revenues as a result of poor sales, increasing expenses, and the burden of servicing their debt.  The Debtors' sales have been in a sustained period of decline due, in large part, to increased competition from other apparel retailers and brands, decreased foot traffic in shopping malls (where most of the Debtors' retail stores were located), as well as weak discretionary spending by the Debtors' target consumers due to the lackluster economic environment since the economic recession in 2008.  As sales declined, the Debtors' expenses increased as a result of several onerous leases, and the rising cost of wholesale inventory.

26.    As a result of these and other factors, the Debtors have not had a profitable fiscal year ("FY") since FY 2007.  The following chart illustrates the Debtors' recent financial performance.

| Summary Results of Operations (Dollars in Millions) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Fiscal Year Ending July | | | | | | | | | Cumulative Net Loss |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015[5] | |
| **Total Revenue** | $182.2 | $141.8 | $133.9 | $119.6 | $111.4 | $86.5 | $81.0 | $50.5 | |
| **Net Loss[6]** | $(15.4) | $(13.5) | $(8.8) | $(10.3) | $(6.4) | $(22.5) | $(29.7) | $(57.4) | **$(164.0)** |

27.     As indicated above, in each year beginning with FY 2009, the Debtors' aggregate sales have decreased from the prior year, and in each year starting in FY 2008, the Debtors have generated cumulative net losses totaling $165.9 million through February 2015.

**B.    Initial Turnaround Activities**

28.     In July 2014, after nearly a decade of declining financial performance outlined above, the Debtors hired Lori Greeley, a former executive at Victoria's Secret for 24 years, as Chief Executive Officer, and myself, as Chief Operating Officer, to spearhead a revitalization of the Debtors' brand and businesses.  Ms. Greeley and I looked to restore to the Frederick's of Hollywood brand the confidence, wit, and irreverence for which it was known for in its heyday, and to capture a larger part of the $16 billion American lingerie industry.

29.     Consistent with that goal, and due to the Debtors' significant indebtedness, the magnitude of overall losses, and the pervasiveness of losses across their store base, in the Fall of 2014, the Debtors' management and board of directors began a review of strategic options that resulted in the closing of 25 stores.  The Debtors ultimately retained liquidation firm Great American Group, LLC to assist in liquidating inventory from their closing retail stores.  In addition to the store closings, the Debtors reduced the size of their corporate senior management staff by 6 and corporate staff by 35, focused on reducing store payroll and staff rescheduling, cut

---

[5]    The reference to 2015 refers to the seven months ended March 28, 2015.

[6]    The net losses do not include losses from discontinued operations of $20.6 million, $12.4 million, and $1.7 million in 2009, 2010, and 2011, respectively.

store expenses, and renegotiated certain of their leases with the assistance of A&G Realty Partners, a real estate consulting group specializing in, among other things, retail dispositions, asset sales, and lease restructurings.

### C. Forbearance Agreement

30.     Despite these cost rationalization efforts, the Debtors' chronic liquidity problems persisted and they were unable to comply with the terms of the Prepetition Credit Agreement in the 4th Quarter of 2014.  As such, on December 15, 2014, the Borrowers and the Prepetition Secured Lenders entered into a forbearance agreement to the Prepetition Credit Agreement (as amended from time to time, the "Forbearance Agreement"), whereby the Prepetition Secured Lenders agreed, subject to the Borrowers' compliance with certain terms and conditions set forth in the Forbearance Agreement, to forbear, until January 23, 2015, from exercising their rights and remedies under the Prepetition Credit Agreement as a result of the occurrence of certain specified Events of Default.  In addition, the Prepetition Secured Lenders also agreed to suspend the testing of the minimum Availability covenant in order to afford the Borrowers time to prepare and implement a strategy to reposition and turnaround their businesses.

31.     In that regard, the Forbearance Agreement required the Borrowers to, among other things, (i) engage a brand consultant to explore strategies for the "Frederick's of Hollywood" brand, (ii) engage a restructuring advisor, (iii) engage a nationally known retail liquidation firm to immediately begin to develop and implement a program to liquidate the Borrowers' Inventory and other assets located at the Borrowers' retail stores outside of a bankruptcy proceeding, and (iv) continue to engage A&G Realty Partners as a real estate consultant for the purpose of developing and implementing a retail store liquidation program, consisting of either terminating or renegotiating their retail store leases.  The Forbearance Agreement also required the Borrowers to maintain certain minimum inventory levels.

32.     Pursuant to the Forbearance Agreement, the Borrowers also agreed to deliver revised and updated Projections evidencing the consummation of the retail store liquidation program developed by the liquidation consultant and the closure of certain specified retail stores under various scenarios.  In consideration of the Prepetition Secured Lenders' agreement to forbear until January 23, 2015 (along with the other accommodations provided under the Forbearance Agreement), the Borrowers paid the Prepetition Secured Lenders a forbearance fee in the amount of $25,000.

33.     Notwithstanding the foregoing, additional Events of Default occurred under the Prepetition Credit Agreement as a result of the Borrowers' failure to maintain the minimum inventory levels for the periods (i) from December 27, 2014 through January 2, 2015, (ii) from January 3, 2015 through January 9, 2015, and (iii) from January 10, 2015 through January 16, 2015.  Accordingly, on January 29, 2015, the Borrowers and the Prepetition Secured Lenders entered into that certain letter agreement, which, among other things, extended the forbearance period from January 23, 2015 through February 28, 2015, provided for a revised schedule of minimum inventory levels, and provided that, during the extended forbearance period, the minimum Availability requirement of the Prepetition Credit Agreement would not be implemented.  In consideration of these concessions, the Borrowers paid the Prepetition Secured Lenders an additional forbearance fee in the amount of $30,000.

34.     The forbearance period was subsequently extended to March 6, 2015, and then again to March 31, 2015, pursuant to two separate letter agreements by and among the Borrowers and the Prepetition Secured Lenders, dated as of February 26, 2015 and March 6, 2015, respectively.  In consideration of the final extension of the forbearance period, the

Borrowers paid the Prepetition Secured Lenders an additional forbearance fee in the amount of $30,000.

35.    Following the expiration of the Forbearance Agreement, the Debtors required additional funds to meet critical obligations and preserve the value of their businesses so as to enable them to finalize the negotiation of a restructuring transaction.    Notwithstanding the expiration of the Forbearance Agreement and the continued existence of certain Events of Default, Salus CLO agreed to fund a discretionary advance in the amount of $1,117,658 on March 31, 2015 to enable the Debtors to meet their short term liquidity objectives.

36.    Given that the discretionary advance described above left the Debtors with extremely limited availability under their Prepetition Credit Agreement, the Debtors approached Front Street, which at that time owned a 100% participation interest in the then outstanding junior tranche of the FILO Advance (the "Tranche A-2 Advance"), regarding a supplemental advance.  Following good faith negotiations, the Borrowers, Salus CLO, and SCP entered into an amendment to the Prepetition Credit Agreement, dated as of April 8, 2015, and Front Street and SCP entered into that letter agreement, dated as of April 8, 2015, whereby (i) the Tranche A-2 Advance was converted from a FILO Advance into Term Loans, and (ii) Front Street funded an incremental term loan to the Borrowers in the amount of $1,822,742.85.    Thereafter, the Borrowers, Front Street, Salus CLO, and SCP entered into a final amendment to the Prepetition Credit Agreement, dated as of April 17, 2015, pursuant to which Front Street funded an incremental term loan to the Borrowers in the amount of $1,200,000.  Taken together, the additional $3,022,742.85 enabled the Debtors to meet their immediate and critical financing needs and provided a bridge to the commencement of these chapter 11 cases.

### D.    Strategic Review and Sale Process[7]

37.    In December 2014, in accordance with the restructuring initiatives described above, the Debtors' management and board of directors concluded that the Debtors' store portfolio was unlikely to produce positive cash flow in the foreseeable future, and the Debtors would need a significant infusion of capital.  Absent a significant infusion of new capital, it was unlikely that the Debtors' retail stores could continue to be operated as a going concern, and sale options would need to be explored.

38.    As a result, the Debtors engaged Consensus Advisory Services LLC ("Consensus") to conduct a review of the Debtors' strategic alternatives, including an exploration of possible refinancing, restructuring, or sale options.   The Debtors directed Consensus to develop, with the Debtors, informational materials about the Debtors and reach out to parties who were likely to find the Debtors' brand name and other intellectual property valuable to their core businesses and who could add strategic or operational value (in addition to capital) to the business going forward.

39.    Consensus's efforts in this endeavor were substantial, and included tasks such as (i) developing a contact list of over 70 potentially interested parties meeting this criteria, (ii) developing with management an 18-page marketing document describing the Debtors' history, brand attributes, and strategic opportunities, (iii) contacting nearly all of the potentially

---

[7]    On the date hereof, the Debtors are filing the Debtors' Motion for Entry of an Order (I)(A) Approving Procedures in Connection with Sale of Substantially All of Certain Debtors' Assets, (B) Approving Stalking Horse Protections, (C) Scheduling Related Auction and Hearing to Consider Approval of Sale, (D) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (E) Approving Form and Manner of Notice Thereof, and (II)(A) Authorizing Sale of Substantially All of Certain Debtors' Assets Pursuant to Successful Bidder's Asset Purchase Agreement, Free and Clear of Liens, Claims, Encumbrances, and Other Interests, and (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto (the "Sale Motion") and the declaration of Michael A. O'Hara, the Chief Executive Officer and Managing Member of Consensus Advisory Services LLC and its affiliated entities, the Debtors' investment banker  (the "O'Hara Declaration"), in connection therewith, which include extensive discussion of the prepetition marketing and sale process.  This summary of the marketing and sale process is qualified by reference to the Sale Motion and the O'Hara Declaration.

interested parties set forth on the contact list (plus others who later emerged), (iv) negotiating to completion 24 confidentiality agreements, (v) compiling, managing, and revising an online data room where interested parties who signed confidentiality agreements could review financial information, contracts, leases, intellectual property, and other data pertaining to the Debtors, and (vi) holding multiple conversations with potentially interested parties and negotiating terms with those interested in transacting.

40.    In mid-February 2015, Consensus, on behalf of the Debtors, invited 21 parties who had signed confidentiality agreements to submit strategic proposals to the Debtors.  The Debtors received five written and one verbal strategic proposal submissions on or around March 2, 2015.  With the exception of one proposal, which merely offered strategic operating assistance, all proposals received contemplated acquiring all or a portion of the Debtors' assets. None of the proposals contemplated a viable refinancing or recapitalization of the Debtors' capital structure.  Following receipt of these proposals, the Debtors and Consensus participated in multiple meetings and calls with the various parties, and explored a multitude of factors related to each potential transaction, including certainty of closing, financial wherewithal, speed of the transaction, closing conditions, as well as purchase price and other consideration.

41.    After extensive analysis of the benefits and risks of each proposed transaction, the Debtors ultimately determined that the offer presented by Authentic Brands Group, LLC ("ABG," or the "Stalking Horse Purchaser") was the best available alternative to maximize value for the Debtors' stakeholders under the circumstances.  Pursuant to the Stalking Horse Purchaser's proposal, ABG would acquire the Debtors' e-commerce business, including the Debtors' intellectual property and all inventory maintained in their retail and e-commerce business, for cash consideration of $22.5 million, subject to certain purchase price adjustments,

and the right to receive 25% of Frederick's of Hollywood brand related revenues (the "Brand Revenues") in perpetuity, net of expenses, after the Stalking Horse Purchaser first receives $10 million in Brand Revenues, pursuant to the terms of a revenue sharing agreement (the "Revenue Sharing Agreement").  Notably, the Stalking Horse Purchaser's proposal permitted the Debtors to solicit higher or better proposals pursuant to a section 363 sale process in chapter 11, subject to certain bid protections for the Stalking Horse Purchaser.

42.    While the Debtors had explored all possible restructuring scenarios, including options that would have enabled them to maintain or sell their retail stores as a going concern, given the sustained and ongoing losses associated with the operation of such stores, the Debtors determined that the Stalking Horse Purchaser's offer was superior to any other available alternative and provided the best opportunity to minimize ongoing losses and maximize value for their stakeholders.[8]  Therefore, following substantial and good-faith negotiations, the Debtors and the Stalking Horse Purchaser agreed to the terms of an asset purchase agreement (the "Stalking Horse Agreement") and the Revenue Sharing Agreement on April 13, 2015.

43.    As noted above, the Stalking Horse Agreement contemplates the sale of all inventory maintained in both the Debtors' retail and e-commerce businesses.  As such, the Stalking Horse Agreement prohibits the Debtors from selling any further inventory at their retail stores as of the Petition Date.  Given such prohibition on the continued sale of inventory at their retail stores, and in order to curtail the substantial ongoing losses associated with the continued operation of such stores, the Debtors, in the exercise of their business judgment, determined to close their retail stores in advance of the Petition Date.  Accordingly, in the days following the execution of the Stalking Horse Agreement, the Debtors terminated their retail store operations,

---

[8]    In the fiscal year ended July 2014, the Debtors' physical retail stores generated an operating loss of $6.6 million on sales of $51.0 million.

transferred all inventory maintained at their retail stores to their e-commerce business, and surrendered their leased premises to the applicable landlords. The Debtors intend to continue to conduct their e-commerce business in the ordinary course during the pendency of the sale process while in chapter 11.

44.    In addition to contemplating the sale of their e-commerce business and related assets, the Stalking Horse Agreement permits the Debtors to further market their assets and solicit alternative proposals pursuant to bidding procedures. Accordingly, the Debtors have filed the Sale Motion seeking, among other things, approval of bidding procedures that set the deadline and requirements for submitting a competing, qualified bid, the procedures for conducting an auction, if any, and the criteria for determining the highest and otherwise best qualified bid for the assets.

### E.    Postpetition Financing

45.    In anticipation of commencing these chapter 11 cases, the Debtors consulted with their advisors regarding postpetition financing, as the Debtors' financial projections indicated that the Debtors lacked the liquidity necessary to administer the chapter 11 cases, fund ordinary course operations during the pendency of the chapter 11 cases, and consummate the sale process in chapter 11.

46.    The Debtors identified the Prepetition Secured Lenders as the most likely source of postpetition financing, given the Prepetition Secured Lenders' liens on substantially all of the Debtors' assets, their history with the Debtors, and their support of the sale process, and engaged in negotiations with respect to a proposed postpetition financing facility (the "DIP Facility") with Salus Capital Partners, LLC as the DIP agent (the "DIP Agent"). After good faith negotiations with the DIP Agent, the Debtors ultimately concluded that the proposed DIP Facility is the best postpetition financing option available to the Debtors. Accordingly, on the date hereof, the

Debtors have filed a motion seeking approval of the DIP Facility, which will provide sufficient liquidity to allow the Debtors to implement the sale process, operate its e-commerce business in the ordinary course, and fund the orderly administration of the chapter 11 cases.

## IV.    The Chapter 11 Cases

### A.    Objectives of the Chapter 11 Cases

47.    The Debtors have commenced these chapter 11 cases to effectuate a sale of substantially all of their assets to the Stalking Horse Purchaser, subject to higher or better offers received in connection with the proposed sale process.  The Debtors believe that the proposed sale, which will be subject to an open and competitive market process during these chapter 11 cases, represents the best strategy to maximize value for their various stakeholders.

### B.    Chapter 11 Plan Process

48.    Prior to the Petition Date, in connection with the negotiation of the Stalking Horse Agreement, the Debtors reached out to certain of their key landlords and other large unsecured creditors to apprise them of the Debtors' restructuring efforts and to attempt to garner support for the framework of a consensual chapter 11 plan.  Although these early discussions did not result in an agreement, the Debtors intend to continue this dialogue in the early stages of these chapter 11 cases in hopes of reaching an accord that will reduce the length and expense of these chapter 11 cases and maximize recoveries for stakeholders.

## V.    First Day Pleadings

49.    Concurrently with its chapter 11 petitions, the Debtors are filing the following First Day Pleadings:

   a.  Debtors' Motion for Entry of Order Directing Procedural Consolidation and Joint Administration of Chapter 11 Cases ("Joint Administration Motion");

b. Debtors' Motion for Entry of Order Authorizing the Debtors to File Consolidated List of Creditors in Lieu of Submitting Separate Mailing Matrix for Each Debtor ("Creditor Matrix Motion");

c. Debtors' Application for Entry of Order Authorizing Employment and Retention of Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective *Nunc Pro Tunc* to the Petition Date ("KCC Application");

d. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Operating Cash Management System, (B) Honor Certain Prepetition Obligations Relating Thereto, (C) Maintain Existing Business Forms, and (D) Continue Performing and Granting Administrative Priority for Intercompany Transactions, (II) Granting the Debtors an Extension to Comply With the Requirements of Section 345(b), and (III) Scheduling a Final Hearing ("Cash Management Motion");

e. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, and Other Compensation, and Employee Benefits, and (B) Continue Existing Employee Benefit Plans and Programs, (II) Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Relating to the Foregoing, and (III) Scheduling a Final Hearing ("Employee Wages Motion");

f. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A)  Continue Debtors' Insurance Programs, (B) Pay Certain Obligations in Respect Thereof Postpetition, (II) Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Relating to the Foregoing, and (III) Scheduling a Final Hearing ("Insurance Motion");

g. Debtors' Motion for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Scheduling a Final Hearing ("Utilities Motion");

h. Debtors' Motion for Entry of Order (I) Authorizing Debtors to Remit and Pay Certain Prepetition Taxes, Governmental Assessments, and Fees, and (II) Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Relating to the Foregoing ("Taxes Motion");

i. Debtors' Motion for Entry of Order (I) Authorizing Debtors to (A) Maintain Certain Customer Programs and (B) Honor or Pay Certain Prepetition Obligations Related Thereto, and (II) Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Relating to the Foregoing  ("Customer Programs Motion");

j.  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Certain Lien Holders, and (B) Critical Vendors and Service Providers, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, and (III) Scheduling a Final Hearing ("Vendors Motion");

k.  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Secured Financing Pursuant to Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), and 503(b) of The Bankruptcy Code, (II) Authorizing the Debtors to Use Cash Collateral Pursuant to Section 363 of The Bankruptcy Code, (III) Providing Adequate Protection to the Prepetition Lenders Pursuant to Sections 361, 362, and 363 of the Bankruptcy Code, (IV) Modifying the Automatic Stay Pursuant to Section 362(d) of the Bankruptcy Code, (V) Scheduling a Final Hearing, and (VI) Providing Related Relief ("DIP Motion");

l.  Debtors' Motion for Entry of an Order Expediting Consideration Of, and Shortening the Notice Period Applicable to, the Bid Procedures Component of the Debtors' Motion for Entry of an Order (I)(A) Approving Procedures in Connection with Sale of Substantially All of Certain Debtors' Assets, (B) Approving Stalking Horse Protections, (C) Scheduling Related Auction and Hearing to Consider Approval of Sale, (D) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (E) Approving Form and Manner of Notice Thereof, and (II)(A) Authorizing Sale of Substantially All of Certain Debtors' Assets Pursuant to Successful Bidder's Asset Purchase Agreement, Free and Clear of Liens, Claims, Encumbrances, and Other Interests, and (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto ("Motion to Shorten"); and

m.  Debtors' First Omnibus Motion for Entry of an Order Authorizing The Debtors (I) To Reject Certain Unexpired Non-Residential Real Property Leases Pursuant to 11 U.S.C. § 365, Effective *Nunc Pro Tunc* to the Petition Date, and (II) Abandon Any Remaining Personal Property Located at the Leased Premises ("Lease Rejection Motion").[9]

50.    As noted above, the relief sought in the various First Day Pleadings would allow the Debtors to, among other things, (i) establish certain administrative procedures to promote a seamless transition into these chapter 11 cases, (ii) ensure that the Debtors remain in compliance with the Stalking Horse Agreement, which requires the Debtors to continue to operate its e-commerce business in the ordinary course as they sell their assets in bankruptcy, and (iii) obtain

---

[9]    The Lease Rejection Motion will not be heard at the first day hearing.

debtor-in-possession financing and use cash collateral in the operation of the Debtors' businesses.

51.    I have reviewed each of the First Day Pleadings or had their contents explained to me, and I believe the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Pleadings.  In my opinion, approval of the relief sought in the First Day Pleadings will be critical to the Debtors' efforts to sell substantially all of their assets in bankruptcy in a manner that preserves and maximizes value for the benefit of all stakeholders.

52.    Several of the First Day Pleadings request authority to pay certain prepetition claims.  I am told by the Debtors' advisors that rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have limited their request for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

53.    Below is a brief discussion of the Debtors' operational First Day Pleadings and an explanation of why, in my belief, such motions are critical to the successful prosecution of these chapter 11 cases.  More fulsome descriptions of the facts regarding the Debtors' operations, and the bases for the relief requested in the operational motions, can be found in each relevant First Day Pleading.

**Cash Management Motion**

54.     Pursuant to the Cash Management Motion, the Debtors request authority to continue operating their Cash Management System, honor Bank Fees, maintain existing business forms, and to continue performing Intercompany Transactions in the ordinary course of business. The Debtors also request as 45-day extension to comply with the investment requirements of section 345(b) of the Bankruptcy Code.

55.     I believe that the relief requested in the Cash Management Motion is necessary and appropriate in order to avoid any interruptions to the operation of the Debtors' businesses.  I believe that authorizing the Debtors to, among other things, continue operating their Cash Management System, maintain existing business forms, and continue Intercompany Transactions is essential to the Debtors' operational stability and restructuring efforts.  The Debtors maintain a relatively complex Cash Management System, and some of the Debtors' most critical operations, including payroll, are funded via Intercompany Transactions.  In my opinion, continued use of the Cash Management System will facilitate the Debtors' chapter 11 cases by, among other things, avoiding administrative inefficiencies and expenses associated with disrupting this system and minimizing delays in the payment of postpetition obligations.  Moreover, I believe that allowing the Debtors to continue Intercompany Transactions, as well as to continue performing certain other status quo cash management operations, such as maintaining current business forms, will assure that the Debtors' businesses will be uninterrupted by the commencement of this bankruptcy, thereby ensuring the efficient administration of these chapter 11 cases, and maximizing the value of the Debtors' estates.

**Employee Wages Motion**

56.     Pursuant to the Employee Wages Motion, the Debtors request authority to pay prepetition Employee Obligations to all Employees and to continue existing Employee Benefit Programs for their Current Employees.

57.     I believe the relief requested in the Employee Wages Motion is necessary and appropriate in order to avoid any unnecessary disruptions to the Debtors' operations and any resulting deterioration in the value of the Debtors' estates.  I believe paying prepetition employee wages, benefits, severance, and other compensation, as well as continuing existing employee benefits for the Debtors' remaining staff, is necessary to ensure the Debtors' seamless transition into bankruptcy and the operational stability needed to sell the Debtors' assets in an efficient and effective manner.  In the absence of paying prepetition wages and benefits and continuing existing employee benefits, I believe the Debtors would face severe threats to the successful operation of their businesses, including employee attrition and turnover, loss of goodwill, and loss of morale, thereby impairing the Debtors' ability to continue operations and reducing the value of the Debtors' estates in a bankruptcy sale.  Therefore, I believe that such authorization is necessary to keep the Debtors' existing workforce intact in order to maximize the value of the bankruptcy estates for the benefit of all parties in interest in these chapter 11 cases.

**Insurance Motion**

58.     Pursuant to the Insurance Motion, the Debtors request authority to maintain and continue to honor certain Insurance Policies, and pay Insurance Obligations, whether such obligations relate to the period prior to or after the commencement of these chapter 11 cases, in the ordinary course of business.

59.     I believe that the relief requested in the Insurance Motion is necessary and appropriate because continuation of the Debtors' Insurance Programs and payment of the Debtors' Insurance Obligations are imperative to the Debtors' continued operation and preserving the value of the Debtors' estates.  It is essential for the Debtors to carry insurance in their day-to-day operations, or they run the risk of, among other harms, incurring financial responsibility and legal liability for potential occurrences not covered by insurance.  Moreover, in many cases, coverage provided by the Debtors' Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities.  Accordingly, maintaining the Debtors' Insurance Programs, and paying their Insurance Obligations, ensures that the value of the Debtors' estate is maximized for the benefit of all stakeholders.

**Utilities Motion**

60.     Pursuant to the Utilities Motion, the Debtors request that the Court determine adequate assurance of payment for future utility services, establish procedures for determining adequate assurance of payment, and prohibit Utility Companies from altering, refusing, or discontinuing utility services.

61.     I believe the relief requested in the Utilities Motion is necessary and appropriate because it will ensure that there is a process to address any utility provider that may make a demand to the Debtors for adequate assurance or otherwise threaten to alter, refuse, or discontinue utility service.  I am informed and believe that the proposed adequate assurance procedures are consistent with procedures that are typically approved in chapter 11 cases in this District.

**Taxes Motion**

62.     Pursuant to the Taxes Motion, the Debtors request authority to pay certain prepetition taxes, governmental assessments, and fees.

63.     I believe that the relief requested in the Taxes Motion is necessary and appropriate because the Debtors' failure to pay prepetition Taxes and Fees could materially and adversely impact their business operations and impair the value of the Debtors' estates. Specifically, if the Debtors were to delay paying prepetition Taxes and Fees, there is a risk that Governmental Authorities would assess penalty fees on the past due amounts, thereby increasing the size of the Debtors' financial liability, or that Governmental Authorities would pursue claims against the Debtors' officers and directors, thereby distracting them from the operation of their businesses and the administration of these chapter 11 cases.  Therefore, I believe that the ability to pay prepetition Taxes and Fees will greatly assist the Debtors in maximizing the value of their estates as they sell their assets in this bankruptcy.

**Customer Programs Motion**

64.     Pursuant to the Customer Programs Motion, the Debtors request authority to continue the Customer Programs and to honor and pay certain prepetition obligations related to the Customer Programs.

65.     I believe that the relief requested in the Customer Programs Motion is necessary and appropriate to preserve the value of the Debtors' estates.  I believe the ability to continue the Customer Programs and honor and pay the Customer Obligations in the ordinary course is critical to ensuring the continued operation of the Debtors' e-commerce business.  The Debtors operate in a highly competitive sector and much of the success and viability of the Debtors' business is dependent upon the loyalty and confidence of their customers.   Any failure to

maintain the Customer Programs or pay the Customer Obligations could result in the Debtors' losing support from their loyal customers, and could tarnish the Debtors' reputation in the marketplace. I believe that if the Debtors failed to honor the Customer Programs or pay the Customer Obligations in the ordinary course and without interruption, they would almost certainly suffer an irreparable loss of customer support and confidence and online sales would dwindle to the ultimate detriment of the Debtors' estates and all stakeholders.

### Vendors Motion

66.     Pursuant to the Vendors Motion, the Debtors request authority to pay Lien Claims and Critical Vendor Claims.

67.     I believe the relief requested in the Vendors Motion is necessary and appropriate in order to avoid any unnecessary disruptions to the Debtors' operations and any resulting deterioration in the value of the Debtors' estates. I believe paying Lien Claims and Critical Vendor Claims is critical to ensuring that the Debtors continue to operate and preserve their e-commerce in the ordinary course, which is expressly required under the Stalking Horse Agreement. In the absence of paying the Lien Claims and Critical Vendor Claims, the Debtors run the risk that certain vendors will refuse to provide them with postpetition services, which may lead to disruption of the Debtors' e-commerce business. Therefore, I believe that the relief requested is necessary to maximize the value of the Debtors' estates for the benefit of all stakeholders.

### DIP Motion

68.     Pursuant to the DIP Motion, the Debtors request authority to obtain an $11 million debtor-in-possession revolving credit facility, use cash collateral, and grant liens and superpriority administrative claims.

69.     In anticipation of the commencement of the chapter 11 cases, the Debtors identified the Prepetition Lenders as the most likely sources of postpetition financing, given their liens on substantially all of the Debtors' assets, involvement over the past several months with the Debtors' restructuring efforts, and support for an expedited chapter 11 sale process.  To that end, in March 2015, the Debtors and their advisors initiated a dialogue with these Prepetition Lenders regarding the possibility of the Prepetition Lenders providing debtor-in-possession financing to the Debtors.  The Prepetition Lenders expressed interest in providing the financing and advised the Debtors that they would not consent to being primed by a third-party lender.  In the weeks that followed, the Debtors and the Prepetition Lenders negotiated in good faith with respect to the terms and conditions of the financing and the use of cash collateral.  These negotiations ultimately resulted in the DIP Facility for which the Debtors are seeking approval.

70.     I believe the relief requested in the DIP Motion is necessary and appropriate because the Debtors need the funds to be provided pursuant to the DIP Facility to preserve the value of its estate.  Approval of the DIP Facility and the use of cash collateral will enable the Debtors to pursue approval of the sale of its assets without delay and in accordance with the tight timeline required under the Stalking Horse Agreement, while satisfying their current and ongoing operating expenses, including postpetition wages and salaries, utilities, taxes, and vendor costs.  Absent access to the DIP Facility and the use of cash collateral, the Debtors' operations would come to an immediate halt, resulting in irreparable harm to their businesses and, ultimately, their ability to pursue a sale of substantially all of their assets – a course of action that the Debtors believe to be the most expeditious and effective means of maximizing the value of the Debtors' estates.  Accordingly, I believe the proceeds of the DIP Facility and the

access to cash collateral are critical to support the Debtors' operations and restructuring activities through the pendency of the chapter 11 cases.

## Motion to Shorten

71.     Pursuant to the Motion to Shorten, the Debtors request that the Court schedule an expedited hearing on the bidding procedures.

72.     I believe the relief requested in the Motion to Shorten is necessary and appropriate because the Debtors' success in these chapter 11 cases depends on pursuing a sale of substantially all of the Debtors' assets on an expedited basis.   In my opinion, an expedited hearing to consider the bidding procedures is required to comply with the terms of the Stalking Horse Agreement and to enable the Debtors to efficiently and expeditiously sell their assets in order to maximize value for the Debtors' stakeholders.

## Lease Rejection Motion

73.     Pursuant to the Lease Rejection Motion, the Debtors request authority to reject certain unexpired leases of non-residential real property for 74 Leased Premises and to abandon any remaining personal property located at the Leased Premises.

74.     I believe the relief requested in the Lease Rejection Motion constitutes a reasonable exercise of the Debtors' sound business judgment.   Because the Debtors no longer maintain operational stores at the Leased Premises, I believe continued compliance with the terms of the Dark Store Leases would be burdensome and would provide no corresponding benefit to the Debtors, their estates, or the stakeholders in these chapter 11 cases.   Therefore, immediate rejection of the Dark Store Leases will prevent the estates from incurring unnecessary administrative expenses associated with the Debtors' obligations thereunder.

75.     In addition, the Debtors have reviewed the market value of the Dark Store Leases and determined that marketing the Dark Store Leases for assignment or sublease to a third party would not generate any significant value for their estates, particularly when factoring in marketing costs and the obligations to pay, among other things, postpetition rent, real estate taxes, utilities, insurance, and other related charges.   Accordingly, I believe that it is in the best interests of the Debtors and their estates to reject the Dark Store Leases immediately.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  April 20, 2015

/s/ William Soncini
William Soncini
Chief Operating Officer
Frederick's of Hollywood, Inc., et al.