**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------- x
                                    :

In re:                                    :       Chapter 11
                                    :

FREDERICK'S OF HOLLYWOOD, INC., *et al.*,[1]  :       Case No. 15-_____ (__)
                                   :
                                    :
                    Debtors.       :       (Joint Administration Requested)
---------------------------------------------------------------- x

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTORS TO (A) PAY PREPETITION WAGES,
SALARIES, AND OTHER COMPENSATION, AND EMPLOYEE BENEFITS,
AND (B) CONTINUE EXISTING EMPLOYEE BENEFIT PLANS AND
PROGRAMS, (II) AUTHORIZING BANKS AND FINANCIAL
INSTITUTIONS TO PAY ALL CHECKS AND ELECTRONIC
PAYMENT REQUESTS RELATING TO THE FOREGOING,
AND (III) SCHEDULING A FINAL HEARING**

Frederick's of Hollywood, Inc. and its affiliated debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors") hereby file this motion (the "Motion") seeking entry of interim and final orders, pursuant to sections 105, 363, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 2015-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** respectively, (i) authorizing the Debtors, in their sole discretion, to (a) pay prepetition wages, salaries, and other compensation, employee business expense allowances and reimbursements, third-party payroll processor expenses,

---

[1] The debtors in these chapter 11 cases and the last four digits of each debtor's taxpayer identification number are as follows: (i) FOHG Holdings, LLC (7902); (ii) Frederick's of Hollywood Group Inc. (3042); (iii) FOH Holdings, Inc. (5442); (iv) Frederick's of Hollywood, Inc. (6265); (v) Frederick's of Hollywood Stores, Inc. (8882); and (vi) Hollywood Mail Order, LLC (5205). The debtors' principal offices are located at 6464 W. Sunset Blvd., Suite 1150, Los Angeles, CA 90028.

severance, and employee benefits, and (b) continue certain of their existing employee benefit plans and programs, (ii) authorizing banks and other financial institutions to receive, process, honor, and pay all checks and electronic payment requests relating to the foregoing, (iii) scheduling a final hearing, and (iv) granting certain related relief, as described more fully herein. In support of this Motion, the Debtors respectfully state as follows:

**Jurisdiction**

1.  This court (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.

2.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background**

3.  On April 19, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No party has requested the appointment of a trustee or examiner and no committee has been appointed or designated in these chapter 11 cases. The Debtors' request for joint administration of these chapter 11 cases for procedural purposes only is currently pending.

4.  Tracing their origins to 1946, the Debtors sell high quality women's apparel and related products under their proprietary Frederick's of Hollywood® brand. Since their inception, the Debtors have remained a market leader and innovator in the female fashion and lingerie industry. The Debtors' major merchandise categories are foundations (including various types of undergarments), lingerie (including daywear and sleepwear), ready-to-wear (dresses and sportswear, including denim), and fragrance and accessories (including shoes, handbags, jewelry, personal care products, and novelties). At their height, the Debtors operated over 200 retail

stores across the United States, as well as maintained a robust mail catalog and an e-commerce business through their website at www.fredericks.com.

5.      The Debtors were compelled to commence these chapter 11 cases amidst a sustained decline in operating revenue attributable to increased competition from other apparel retailers and brands, decreased foot traffic in shopping malls, and weak discretionary spending by target consumers due to the recent economic downturn.  This confluence of factors, together with the rising cost of wholesale inventory and onerous real property lease terms, ultimately resulted in the cessation of the Debtors' retail store operations prior to the Petition Date.

6.      Through these chapter 11 cases, the Debtors seek to effectuate a sale of their e-commerce business – including their intellectual property and remaining inventory – pursuant to a competitive bidding process that will maximize value for their stakeholders and inure to the benefit of all parties in interest.

7.      Additional information regarding the Debtors' businesses, assets, capital structure, and the circumstances leading to the filing of these chapter 11 cases is set forth in the Declaration of William Soncini in Support of Chapter 11 Petitions and First Day Pleadings of Frederick's of Hollywood, Inc. and its Affiliated Debtors and Debtors in Possession (the "First Day Declaration"), which is being filed contemporaneously herewith and is incorporated by reference herein.

### Employee Compensation

8.      Before closing all of their stores, the Debtors employed approximately 668 employees, consisting of full-time salaried, hourly, and seasonal employees, of which 596 were terminated in the days immediately prior to the Petition Date (collectively, the "Terminated Employees").  Following the closing of their stores, as of the Petition Date, the Debtors

employed 31 full-time salaried employees, 39 full-time hourly employees, and 3 part-time hourly employees (the "Current Employees" and, together with the Terminated Employees, the "Employees").

9. The Current Employees consist of the Debtors' Chief Executive Officer ("CEO"), Chief Operating Officer ("COO"), and certain other merchandising, planning, web operations, warehouse, accounting, and information technology employees. The Current Employees' valuable skill sets, indispensable institutional knowledge, industry expertise, and overall familiarity and understanding of the Debtors' operations make them key to the success of these chapter 11 cases.

10. In the ordinary course of business, the Debtors pay and incur a number of obligations related to their employees, including, but not limited to: (i) wages and salaries; (ii) vacation and paid absences; (iii) employee business expense allowances and reimbursements; (iv) payroll taxes and processing fees; (v) employee severance; (vi) employee bonuses; (vii) employee benefits, as described below ((i)-(vii) together, the "Employee Obligations"). By this Motion, the Debtors seek authority to honor and pay prepetition Employee Obligations in the ordinary course of business to Current Employees, as well as to Terminated Employees, provided, however, that any such payments shall not exceed an aggregate cap of $12,475 per Employee, and provided, further, that such payments shall not exceed an aggregate cap of $1,058,000.

**I.    Wages and Salaries**

11. In the ordinary course, the Debtors pay all of their Current Employees on a bi-weekly basis on Friday, for the two weeks ended the previous Saturday. Prior to closing all of their stores, the Debtors' approximate aggregate gross payroll for all Employees was $544,583.

4

On April 8, 2015, the Debtors funded payroll due to be paid to Employees for the period of March 22, 2015 to April 4, 2015.

12.  The Debtors estimate that, as of the Petition Date, approximately $546,000 in wage and salary claims were outstanding (the "Prepetition Wages"). Of that, approximately $349,700 is outstanding to the Terminated Employees and $196,300 is outstanding to the Current Employees.

13.  By this Motion, the Debtors seek entry of an order authorizing the Debtors, in their sole discretion, to honor and pay the Prepetition Wages in the ordinary course of business to Current Employees, as well as to Terminated Employees, subject to an aggregate cap of $12,475 per Employee for all of such Employee's prepetition Employee Obligations.

## II. Vacation Pay and Certain Other Paid Time Off

14.  Vacation Policy. The Debtors provide paid vacation time to all full-time employees as well as to part-time associate sales managers. Vacation days are granted in proportion to the amount of time an employee has worked for one of the Debtors' businesses: (i) employees with 1-4 years of service are awarded 10 days per year; (ii) employees with 5-14 years of service are awarded 15 days per year; and (iii) employees with 15 or more years of service are awarded 20 days per year. Vacation days roll over and accrue from year to year, though, an employee stops earning extra vacation days once the available balance equals twice their annual allotted amount. Part-time associate sales managers earn vacation days at one-half of the amount earned by the Debtors' full-time employees. Seasonal and part-time employees do not earn any vacation, unless required by state or local law.

15.  Sick Days and Personal Days. Full-time employees are granted 6 paid "sick days" per year. Part-Time Associate Managers earn sick days at one-half the amount of the full-time employees. There is generally no accrual of unused sick days and any unused sick days at

5

the end of the calendar year are forfeited. Employees on medical leave may use up to 30 days of prior unused sick days. Seasonal and part-time employees do not earn any sick leave, unless required by state or local law. The Debtors also offer personal days to all full-time permanent employees, ranging from 1 day to 3 days per year. Personal days may be carried over, but may not exceed twice an employee's yearly allotted amount. Part-time associate sales managers are granted personal days at one-half of the amount granted to the Debtors' full-time employees.

16. As of the Petition Date, the Debtors' aggregate prepetition obligations to eligible Employees for accrued vacation, sick days, and personal days, totaled approximately $1,500,000 (collectively, the "Prepetition Vacation Obligations").

17. By this Motion, the Debtors seek entry of an order authorizing the Debtors, in their sole discretion, to honor and pay the Prepetition Vacation Obligations in the ordinary course of business to Current Employees, as well as to Terminated Employees, and to continue to provide these vacation, paid absence, and holiday benefits to the Current Employees as the Debtors move forward in these chapter 11 cases, subject to an aggregate cap of $12,475 per Employee for all of such Employee's prepetition Employee Obligations.

### III.     Business Expense Allowances and Reimbursements

18. In the ordinary course of business, the Debtors allow their employees to incur certain reasonable out-of-pocket business expenses in the ordinary course of business, such as necessary and authorized travel expenses and business entertainment expenses. Most of the Employees receiving allowances and reimbursement for expenses are those that travel for business, such as the Debtors' executive management and district managers. Most of these expenses are charged directly to the Debtors' corporate credit cards (the "Credit Cards") issued by American Express through the Debtors' corporate credit card program (the "Credit Card Program"). As of the Petition Date, approximately 15 Credit Cards have been issued. The

Debtors have policies in place that regulate the use of the Credit Cards and the Debtors' corporate headquarters is able, and does, monitor the use of the Credit Cards on a frequent and ongoing basis. The Debtors estimate that on average, and in the aggregate, approximately $30,000 is charged to the Credit Cards per month. As of the Petition Date, the Debtors do not believe they currently owe any outstanding amounts on account of the Credit Cards.

19. In addition, certain business expenses may be paid directly by employees and reimbursed upon review and approval by the Debtors. As of the Petition Date, the total in outstanding prepetition claims for expense reimbursement is approximately $3,000.

**IV.     Payroll Taxes and Processing Fees**

20. As required by law, the Debtors regularly deduct amounts from the Employees' paychecks for local, state and federal taxes, employee benefits, and employee programs that the Debtors had historically sponsored. Prior to closing all of their stores and terminating the majority of their employees, the Debtors' payroll tax obligations each pay period were typically $55,000. As of the Petition Date, the Debtors did not withhold any payroll deductions. Additionally, the Debtors use ADP, LLC ("ADP") to process their payroll. ADP issues invoices to the Debtors for its services with each payroll it processes. Typically, ADP's fees total approximately $13,000 per month, which the Debtors pay to ADP in connection with the payroll funding. As of the Petition Date, the Debtors owe ADP approximately $10,500 (the "Prepetition ADP Claims").

21. By this Motion, the Debtors seek entry of an order authorizing the Debtors, in their sole discretion, to (i) forward all such amounts to the respective taxing authority or plan administrator, or make payments on account of such employee benefits and (ii) pay the Prepetition ADP Claims in the ordinary course for any unpaid prepetition services.

## V. Employee Severance and Bonus Programs

22. <u>Severance</u>. Prior to the Petition Date, the Debtors maintained a severance program for certain eligible employees. Eligible salaried employees under the severance program (not including top-level management) were eligible for severance equal to 5 days' salary for the first year employed, and 2.5 additional days for each additional year employed with the Debtors. Eligible managers under the severance program were eligible for severance payments equal to 2 weeks' salary. Eligible part-time employees under the severance program who were in good-standing and employed with the Debtors for more than 6 months were eligible to receive the equivalent of 1 weeks' worth of pay, calculating based off the average hours worked over the prior 6 months.[2] Accrued severance obligations under the Debtors' severance program as of the Petition Date total approximately $1,800,000 (the "<u>Severance Obligations</u>").[3]

23. The Debtors intend to continue their prepetition severance program for Current Employees during the chapter 11 cases. The Debtors believe that continuing the prepetition severance program (including, honoring the prepetition Severance Obligations) will help alleviate some of the negative stigma associated with the Debtors' bankruptcy filing and preserve the value of the Debtors' businesses. Specifically, payment of the Severance Obligations will help maintain employee morale with respect to those employees who are being asked to continue their employment with the Debtors during these chapter 11 cases and provide some financial comfort to employees who were relieved of their employment with the Debtors.

24. The Debtors believe the prepetition severance policy is reasonable, appropriately tailored, and in the best interests of the Debtors' estates. Accordingly, by this Motion, the

---

[2] Prior to the Petition Date, HGI Funding, LLC ("<u>HGI Funding</u>"), an affiliate of HGI Global Holdings, LLC, the largest holder of the Debtors' equity interests, guaranteed the severance obligations of two Employees.

[3] Of the $1,800,000 outstanding in severance obligations, approximately $1,214,000 is owed to a certain former executive employee and $218,000 is owed to a certain former artistic director.

Debtors seek entry of an order authorizing the Debtors, in their sole discretion, to (i) continue the severance program during the post-petition period and (ii) pay the Severance Obligations, subject to an aggregate cap of $12,475 per Employee for all of such Employee's prepetition Employee Obligations.[4]

25. Bonus Programs. The Debtors do not maintain an active bonus program for most of their Employees. The Debtors' CEO and COO, however, have contractual first year and incentive bonuses (the "Senior Management Bonuses"). As of the Petition Date, there are no outstanding obligations under the Senior Management Bonuses.[5] Prior to the Petition Date, HGI Funding entered into guaranty agreements with each of the CEO and COO, whereby HGI Funding agreed to provide these individuals with certain payments in the event such payments are not made by the Debtors.

**Employee Benefit Programs**

26. The Debtors provide Current Employees (and their spouses and children), in the ordinary course of business, with a number of employee benefits, including, but not limited to, (i) medical insurance, (ii) dental insurance, (iii) vision insurance, (iv) life insurance, (v) retirement plans, (vi) long-term disability insurance, and (vii) worker's compensation, as described in greater detail below.

    i. Medical Plan: The Debtors offer preferred provider organization (PPO) plans through CIGNA, as well as health maintenance organization (HMO) plans through CIGNA and Kaiser Permanente. The Kaiser Permanente HMO plan is only offered to Current Employees residing in California. As of the Petition Date, the Debtors provide insurance coverage to 131 employees, contribute roughly 70% to the cost of the plan they choose, and deduct employee contributions for

---

[4] The Debtors are not seeking authority to pay to any "insider" (as such term is defined in section 101(31) of the Bankruptcy Code) severance amounts for the prepetition or postpetition period; provided, however, that the Debtors expressly reserve their rights to seek such relief in the future.

[5] The Debtors are not seeking authority to honor or pay the Senior Management Bonuses at this time; provided, however, that the Debtors expressly reserve their rights to seek such relief in the future.

insurance each payroll cycle. Historically, this coverage cost the Debtors approximately $103,000 per month in premiums.

ii. Dental Plan: CIGNA provides PPO and HMO dental insurance coverage to approximately 126 of the Debtors' employees. Historically, this coverage cost the Debtors approximately $6,500 per month in premiums.

iii. Vision: VSP provides vision insurance coverage to approximately 107 of the Debtors' Current Employees. Historically, this coverage cost the Debtors approximately $1,050 per month in premiums.

iv. Life Insurance & AD&D: The Debtors provide basic life and accidental death and dismemberment ("AD&D") insurance coverage to eligible Current Employees through CIGNA, in an amount one times an employee's annual earnings, up to a maximum of $50,000. Employees have the option to purchase additional group term life insurance, at cost, up to a maximum of $500,000. As of the Petition Date, approximately 174 employees receive such coverage, which historically cost the Debtors approximately $1,000 per month.

v. Long-Term Disability: The Debtors offer group long-term disability insurance through CIGNA. The voluntary policy provides a monthly benefit of 60% of an employee's pre-disability monthly earnings (capped at $8,000 per month), when an employee has been injured for more than a 90 day waiting period. The CEO and COO are covered under long-term disability plans paid for by the Debtors. Other employees who choose to participate in the program are responsible for the full premium associated with the voluntary policy.

vi. 401(k) Plan: The Debtors maintain a 401(k) plan for the benefit of their Current Employees, administered by USI Consulting Group. The Debtors do not provide matching contributions to the plan. The Debtors pay approximately $1,250 in monthly expenses associated with administering the 401(k). The Debtors do not offer any other pension plans to their employees.

vii. Worker's Compensation: The Debtors provide worker's compensation insurance to most employees through The Hartford, except in those states which require another provider. The annual premium for such policy is approximately $277,046. In Washington and in Ohio, the state provides worker's compensation through the Department of Labor and the Bureau of Worker's Compensation respectively. Historically, the Debtors contributed approximately $200 per month to these state programs, based on payroll of the employees in these states.

27. In addition to the employee benefits identified above, the Debtors offer their employees a number of voluntary benefits, including, but not limited to, supplemental life and AD&D insurance coverage for employees and family members, legal services through

LegalShield, and parking for the Debtors' corporate headquarters (these voluntary benefits, together with benefits (i)-(vii) listed above, the "Employee Benefit Programs"). The Debtors administer the premiums associated with the voluntary programs identified above. The Debtors contribute to parking costs, but do not pay for the other voluntary benefits.

28. In connection with the Employee Benefit Programs, the Debtors may incur incidental costs, including, administrative expenses. The Debtors estimate that the approximate aggregate monthly expense for such incidental costs is $1,000.

29. By this Motion, the Debtors seek entry of an order authorizing the Debtors, in their sole discretion, to continue to provide the Employee Benefit Programs to Current Employees in the ordinary course of business.

**Relief Requested**

30. The Debtors seek entry of interim and final orders, pursuant to sections 105, 363, and 507 of title 11 of the Bankruptcy Code, rules 6003 and 6004 of the Bankruptcy Rules, and rule 2015-2 of the Local Rules, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, (i) authorizing the Debtors, in their sole discretion, to pay (a) amounts relating to the prepetition Employee Obligations and (b) continue existing Employee Benefit Programs, (ii) authorizing banks and other financial institutions to receive, process, honor, and pay all checks and electronic payment requests relating to the foregoing, (iii) scheduling a final hearing on this Motion, and (iv) granting certain related relief.

31. The Debtors represent that they will not pay any amounts over $12,475 to any individual Employee on account of such Employee's prepetition Employee Obligations, and that they will not pay any amounts over a total aggregate amount of $1,058,000 on account of prepetition Employee Obligations.

**Basis for Relief**

I. **Ample Cause and Authority Exists for the Debtors to Pay Employee Obligations and Honor Employee Benefit Programs in the Debtors' Discretion**

32. In order to maintain their remaining workforce throughout these chapter 11 cases, the Debtors believe it is imperative that they continue to pay, in their sole discretion, the outstanding prepetition Employee Obligations, subject to an aggregate cap of $12,475 per Employee for all of such Employee's prepetition Employee Obligations, and to continue, in their sole discretion, the Employee Benefit Programs. Doing so will ensure that those employees that remain with the Debtors will have assurance that their wages, salaries, and benefits will continue uninterrupted and thus stabilize the Debtors' remaining workforce. Any delay in such payment may cause disruption to employee morale and the management of the Debtors' business operations.

33. The relief requested in this Motion may be authorized pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and the "doctrine of necessity." Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Courts, in turn, frequently apply section 105(a) to authorize relief in chapter 11 cases, similar to that sought herein, where the debtor has a workforce that is important to the preservation of its business. See, e.g., In re Chateaugay Corp., 80 B.R. 279, 287 (S.D.N.Y. 1987) (denying leave to appeal a bankruptcy court order authorizing the Debtor to pay pre-bankruptcy wages, salaries, employee benefits, reimbursements, and workers' compensation claims and premiums); In re Ionosphere Clubs, Inc., 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989) (same); In re Gulf Air, Inc., 112 B.R. 152, 154 (Bankr. W.D. La. 1989) (authorizing the debtor to pay current employees' pre-bankruptcy wages, salaries, medical benefits, and business expense claims).

34. In so holding, courts typically rely on the "necessity of payment" doctrine, first enunciated by the United States Supreme Court in <u>Miltenberger v. Logansport Ry. Co.</u>, 106 U.S. 286 (1882), by which courts may authorize a debtor to make postpetition payments with respect to prepetition claims where such payments are necessary for the preservation of the estate. <u>See also</u> <u>In re Lehigh & New England Ry. Co.</u>, 657 F.2d 570, 581 (3d Cir. 1981) (declining to apply the necessity of payment doctrine in the context of a railway no longer in operation, but noting that, under the necessity of payment doctrine, "if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized even if it is made out of corpus [of the estate]"); <u>In re Meridian Auto Sys.-Composite Operations, Inc.</u>, 372 B.R. 710, 714 (Bankr. D. Del. 2007) (granting the debtor authority to pay prepetition obligations owed to certain critical vendors); <u>In re Just for Feet, Inc.</u>, 242 B.R. 821, 824-26 (D. Del. 1999) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business).

35. Here, payment of the prepetition Employee Obligations and continuation of Employee Benefit Programs is warranted pursuant to section 105(a) and the "doctrine of necessity." In the absence of such payments, the Debtors believe that the Current Employees may seek alternative employment opportunities. Indeed, it is difficult to envision an employee who would continue to work for an employer who has filed, or announced its intention to file, a petition for bankruptcy, particularly an employer that is in the midst of selling its assets, absent any assurances by the employer that the employee will be paid in full on a timely basis. Consequently, the Debtors' inability to pay Employee Obligations and to continue to honor Employee Benefit Programs would almost certainly impair their ability to operate their businesses as they sell their assets. Preservation of the estate is often most critical and extremely

difficult early in chapter 11 cases. For that reason, where failure to make payments of certain essential prepetition claims threatens to disrupt a debtor's efforts to avail itself of the chapter 11 process, bankruptcy courts routinely invoke their equitable powers to authorize a debtor to pay such claims under the doctrine of necessity. See In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (authorizing payment of prepetition claims as "necessary to avert a serious threat to the [c]hapter 11 process").

36.     The Court may also authorize the Debtors to pay the Employee Obligations and continue the Employee Benefit Programs arising or relating to the period after the Petition Date pursuant to section 363(b) of the Bankruptcy Code, which provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). To approve the use of a debtor's assets outside the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code, the Court must find that a "good business reason" exists for the use of such assets. See, e.g., Official Comm. of Unsecured Creditors v. Enron Corp. (In re Enron Corp.), 335 B.R. 22, 27-28 (S.D.N.Y. 2005) (quoting In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983)). In this case, the payment of certain prepetition employee wages and benefits, and the continuation of existing benefits, in order to preserve and protect the Debtors' business, retain currently working employees, maintain positive employee morale, and ultimately administer these cases efficiently and effectively as the Debtors market and sell their assets, is a "good business reason" to authorize such prepetition payment. Indeed, the Debtors believe such authorization is necessary to keep their existing workforce intact to maximize the value of the bankruptcy estates for the benefit of all parties in interest in these chapter 11 cases.

37. In particular, the inability to continue the Credit Card Program would create hardship for the Debtors and their Current Employees. Obtaining new credit cards would result in significant costs and delays, and would prevent Current Employees, who use cards on a regular basis, from performing their duties. Further, the Credit Card Program is an important benefit for the Debtors' Current Employees, as these employees may be unable to pay for certain business expenses from their personal funds and await reimbursement from the Debtors. Although the Debtors pay invoices for the American Express corporate cards, the accounts are held in the names of individual employees and, therefore, to the extent the Debtors fail to remit payment to American Express for valid and legitimate charges, the employees may be personally liable for the same.

38. Finally, because the prepetition wages and other employee claims for which the Debtors seek authority to satisfy would be entitled to priority treatment under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, and do not exceed the $12,475 cap set forth in section 507(a)(4) per Employee, such claims ultimately would be paid before the claims of general unsecured creditors in any event. The Debtors' general unsecured creditors are therefore not prejudiced by the requested relief. In particular, authorizing the Debtor to pay such priority unsecured claims to the Terminated Employees now avoids potential costs associated with resolving such claims later in these chapter 11 cases.

39. Similar relief has been granted in other cases before this Court. See, e.g., In re RadioShack Corp., No. 15-10197 (BLS) (Bankr. D. Del. Mar. 9, 2015); In re Trump Entertainment Resorts, Inc., No. 14-12103 (KG) (Bankr. D. Del. Sept. 10, 2014); In re Energy Future Holdings Corp., No. 14-10979 (CSS) (Bankr. D. Del. June 4, 2014); In re Quantum Foods, LLC, No. 14-10318 (KJC) (Bankr. D. Del. Feb. 20, 2014); In re Nebraska Book

Company, Inc., No. 11-12005 (PJW) (Bankr. D. Del. June 28, 2011); In re Appleseed's Intermediate Holdings LLC, No. 11-10160 (KG) (Bankr. D. Del. Feb. 18, 2011); In re Constar Int'l Inc., No. 11-10109 (CSS) (Bankr. D. Del. Jan. 13, 2011); In re Local Insight Media Holdings, Inc., No. 10-13677 (KG) (Bankr. D. Del. Dec. 10, 2010); In re U.S. Concrete, Inc., No. 10-11407 (PJW) (Bankr. D. Del. Apr. 30, 2010); In re Stallion Oilfield Servs. Ltd., No. 09-13562 (BLS) (Bankr. D. Del. Nov. 16, 2009).

II. **Court Should Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers Relating to Employee Wages, Reimbursable Expenses, and Employee Benefit Programs**

40. By this Motion, the Debtors request that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors related to the Employee Obligations or Employee Benefit Programs, whether such checks were presented or fund transfer requests were submitted prior to or after the Petition Date.

**Bankruptcy Rule 6003 Is Satisfied**

41. Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one (21) days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. For reasons discussed above, authorizing the Debtors to pay, in their sole discretion, the prepetition employee claims, and granting the other relief requested herein, is integral to the Debtors' ability to transition into these chapter 11 cases. Failure to receive such authorization and other relief during the first twenty-one (21) days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their remaining businesses in the ordinary course and maximize the value of the Debtors' estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have

satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### Reservation of Rights

42. Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' right to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code. The Debtors expressly reserve the right to contest any claim related to the relief sought herein. Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' right to subsequently dispute such claim.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

43. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

44. The Debtors will provide notice of this Motion to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the 30 largest unsecured claims on a consolidated basis; (iii) counsel to Salus Capital Partners, LLC, in its capacity as the administrative and collateral agent under the Debtors' prepetition credit facility and in its capacity as the administrative and collateral agent under the Debtors' proposed debtor-in-possession financing facility; (iv) any banking or financial institution that holds the Debtors' accounts; and (v) all parties entitled to notice pursuant to Local Rule 9013-1(m). As this Motion

is seeking "first day" relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested and the urgency of the circumstances surrounding this Motion, no other or further notice need be given.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, the Debtors respectfully request entry of interim and final orders substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, (i) authorizing the Debtors, in their sole discretion, to (a) pay prepetition Employee Obligations and (b) continue existing Employee Benefit Programs, (ii) authorizing banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing, (iii) scheduling a final hearing, and (iv) granting such further relief as may be appropriate and proper.

Dated: April 20, 2015
Wilmington, Delaware

Respectfully submitted,

**RICHARDS, LAYTON & FINGER, P.A.**

/s/ Russell C. Silberglied
Russell C. Silberglied (No. 3462)
Zachary I. Shapiro (No. 5103)
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone:   (302) 651-7700
Facsimile:    (302) 651-7701
Email:          silberglied@rlf.com
                    shapiro@rlf.com

-and-

**MILBANK, TWEED, HADLEY & McCLOY LLP**
Tyson M. Lomazow (*pro hac vice* admission pending)
Matthew Brod (*pro hac vice* admission pending)
One Chase Manhattan Plaza
New York, NY 10005
Telephone:   (212) 530-5000
Facsimile:    (212) 530-5219
Email:          tlomazow@milbank.com
                    mbrod@milbank.com

*Proposed Counsel to Debtors and Debtors in Possession*