## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------  x
                                                              :
In re:                                                        :       Chapter 11
                                                              :
FREDERICK'S OF HOLLYWOOD, INC., et al.,¹                      :       Case No. 15-_____ (__)
                                                              :
                                                              :
                                  Debtors.                    :       (Joint Administration Requested)
------------------------------------------------------------  x
```

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING POSTPETITION SECURED FINANCING PURSUANT
TO SECTIONS 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e),
AND 503(b) OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE
DEBTORS TO USE CASH COLLATERAL PURSUANT TO SECTION 363
OF THE BANKRUPTCY CODE, (III) PROVIDING ADEQUATE
PROTECTION TO THE PREPETITION LENDERS PURSUANT TO
SECTIONS 361, 362, AND 363 OF THE BANKRUPTCY CODE,
(IV) MODIFYING THE AUTOMATIC STAY PURSUANT TO SECTION
362(d) OF THE BANKRUPTCY CODE, (V) SCHEDULING A FINAL
HEARING, AND (VI) PROVIDING RELATED RELIEF**

Frederick's of Hollywood, Inc. and its affiliated debtors and debtors in possession

(each, a "Debtor" and, collectively, the "Debtors") hereby file this motion (the "Motion")

pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code, 11

U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), rules 2002, 4001, and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1 and 4001-2

of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court

for the District of Delaware (the "Local Rules") seeking entry of: (i) an interim order (the

"Interim Order"), substantially in the form attached hereto as **Exhibit A**, (a) authorizing the

---

[1]     The debtors in these chapter 11 cases and the last four digits of each debtor's taxpayer identification number are
as follows:  (i) FOHG Holdings, LLC (7902); (ii) Frederick's of Hollywood Group Inc. (3042); (iii) FOH
Holdings, Inc. (5442); (iv) Frederick's of Hollywood, Inc. (6265); (v) Frederick's of Hollywood Stores, Inc.
(8882); and (vi) Hollywood Mail Order, LLC (5205).  The debtors' principal offices are located at 6464 W.
Sunset Blvd., Suite 1150, Los Angeles, CA 90028.

Borrowers (as defined below), on an interim basis, to (1) obtain postpetition financing pursuant to a debtor-in-possession financing facility on the terms described herein, and (2) use Cash Collateral (as defined below), including, without limitation, to make payments on the Prepetition Obligations (as defined herein) as set forth in the DIP Budget (as defined herein), (b) granting priming liens and superpriority administrative claims, (d) providing Adequate Protection (as defined below) to the Prepetition Secured Parties (as defined below) for the priming of their existing liens and the Borrowers' use of Cash Collateral, (e) modifying the automatic stay pursuant to section 362 of the Bankruptcy Code (as defined below), (f) scheduling a final hearing on the Motion (the "<u>Final Hearing</u>"), and (g) granting related relief; and (ii) a final order (the "<u>Final Order</u>" and, together with the Interim Order, the "<u>DIP Orders</u>") authorizing the relief granted in the Interim Order on a permanent basis, as described in this Motion.

In support of this Motion, the Debtors rely upon and incorporate by reference the Declaration of William Soncini in Support of Chapter 11 Petitions and First Day Pleadings of Frederick's of Hollywood, Inc. and its Affiliated Debtors and Debtors in Possession (the "<u>First Day Declaration</u>") and the declaration of Michael A. O'Hara, the Chief Executive Officer and Managing Member of Consensus Advisory Services LLC and its affiliated entities ("<u>Consensus</u>"), the Debtors' investment banker  (the "<u>O'Hara Declaration</u>"), with respect to the Debtors' proposed DIP financing, each filed contemporaneously herewith.  In further support of the Motion, the Debtors respectfully state as follows:

<u>**Jurisdiction**</u>

1.      This court (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

3.      The Debtors seek entry of the Interim Order, substantially in the form attached hereto as **Exhibit A**,  and the Final Order, substantially in the form that shall be filed with the Court:

(i)      authorizing FOHG Holdings, LLC, Frederick's of Hollywood Group Inc., FOH Holdings, Inc., Frederick's of Hollywood, Inc., Frederick's of Hollywood Stores, Inc., and Hollywood Mail Order, LLC (collectively, the "<u>Borrowers</u>") to obtain a senior secured superpriority debtor in possession revolving credit facility in the maximum committed amount of $11 million (the "<u>DIP Facility</u>"), $5.2 million of which will be available on an interim basis, and to enter into a senior secured, superpriority debtor-in-possession credit and security agreement (together with all schedules and exhibits thereto, the "<u>DIP Credit Agreement</u>," and together with all security, pledge, guaranty, and other lien and loan documents entered into in connection therewith and as further amended, restated, supplemented, or otherwise modified from time to time, the "<u>DIP Documents</u>"),[2] by and among the Borrowers, Salus CLO 2012-1, Ltd ("<u>Salus CLO</u>" or the "<u>DIP Lender</u>"), and Salus Capital Partners, LLC ("<u>SCP</u>"), as administrative agent and collateral agent (in such capacity, the "<u>DIP Agent</u>"), all in respect of the obligations set forth in the DIP Documents and herein (the "<u>DIP Obligations</u>");

(ii)     authorizing the Borrowers to use "cash collateral" (as such term is defined in section 363 of the Bankruptcy Code) (the "<u>Cash Collateral</u>"), including, without limitation, to make payments on the Prepetition Obligations as set forth in the DIP Budget;

(iii)    granting to the DIP Agent, on behalf of the DIP Lender, senior, priming liens on the Prepetition Collateral securing the DIP Facility, and superpriority claims in respect of the DIP Obligations;

(iv)     granting Adequate Protection to the Prepetition Secured Parties in the form of Adequate Protection Liens, 507(b) Claims, and Adequate Protection Payments (all as defined below);

(v)      modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Agreement;

(vi)     scheduling the Final Hearing; and

---

[2]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the DIP Documents or DIP Orders, as applicable.

(vii)    granting related relief.

## Concise Summary

4.    The following chart contains a summary of the essential terms of the DIP Facility, together with references to the applicable sections of the relevant source documents, in accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Local Rule 4001-2:[3]

| | |
|---|---|
| *Borrowers*<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | FOHG Holdings, LLC, Frederick's of Hollywood Group Inc., FOH Holdings, Inc., Frederick's of Hollywood, Inc., Frederick's of Hollywood Stores, Inc., and Hollywood Mail Order, LLC |
| *Lenders*<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Salus CLO 2012-1, Ltd.<br><br>Pursuant to that certain Participation Agreement (the "<u>Participation Agreement</u>") by and among (i) Salus CLO, as selling lender and as DIP Lender, (ii) Front Street Re (Cayman) Ltd. ("<u>Front Street</u>"), as participant, and (iii) SCP, in its capacities as the DIP Agent and Prepetition Agent (as defined below), Front Street shall purchase from Salus CLO a last-out participation interest in the FILO Advance (as defined below) in an amount at any time equal to the Incremental DIP Exposure.    "<u>Incremental DIP Exposure</u>" means, as of any date, an amount equal to (i) the then outstanding principal balance of the DIP loans made by the DIP Lender under the DIP Credit Agreement (in an amount not to exceed 110% of all disbursement amounts contained in the Approved Budget), minus (ii) the aggregate amount received by the Prepetition Agent from and after the Petition Date from "Total Operating Receipts" as reflected in the Budget and applied to the permanent repayment of the outstanding principal balance of the Prepetition Obligations in accordance with the terms of the DIP Credit Agreement, the Interim Order, or the Final Order, as applicable).[4] |
| *Commitment*<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)*<br>*Local Rule 4001-2(a)(ii)* | $11 million, of which $5.2 million shall be available on an interim basis.<br><br>(DIP Credit Agreement § 1) (Interim Order ¶ 3) |
| *Interest Rates*<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)*<br>*Local Rule 4001-2(a)(ii)* | <u>Non-Default Interest Rate</u>: LIBOR Rate plus 15.5%.<br><br>(DIP Credit Agreement § 2.4(a)) |

---

[3]    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the documents shall control.  Capitalized terms used but not otherwise defined in this Motion shall have the meaning ascribed to them in the form of debtor-in-possession credit and security agreement attached hereto as **Exhibit B** (the "DIP Credit Agreement").

[4]    This structure effectively increases Front Street's investment in the Debtors' prepetition capital structure commensurate with the Debtors' borrowing needs during the chapter 11 cases.  The Participation Agreement is attached hereto as **Exhibit C**.

| | |
|---|---|
| | *Default Interest Rate*:  2.0% above the contractual rate.<br><br>(DIP Credit Agreement § 2.4(b)) |
| ***Term/Maturity***<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)*<br>*Bankruptcy Rule*<br>*4001(b)(1)(B)(iii)*<br>*Local Rule 4001-2(a)(ii)* | The DIP Facility will mature on six (6) months from the execution of the DIP Credit Agreement.<br><br>(DIP Credit Agreement § 1) |
| ***Events of Default***<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)*<br>*Local Rule 4001-2(a)(ii)* | The DIP Credit Agreement contains usual and customary events of default. In addition, an Event of Default shall occur if the Participation Agreement is not in full force and effect or Front Street has defaulted on its obligations thereunder.<br><br>(DIP Credit Agreement § 8) (Interim Order ¶ 28) |
| ***Use of DIP Loan***<br>*Bankruptcy Rule*<br>*4001(b)(1)(B), (c)(1)(B)*<br>*Local Rule 4001-2(a)(ii)* | The proceeds of the DIP Facility may be used solely for the purposes permitted by the DIP Orders (as applicable) and the DIP Budget, including to (i) pay fees, costs and expenses in connection with the DIP Credit Agreement, (ii) pay postpetition operating expenses of the Borrowers incurred in the ordinary course of business, (iii) pay costs and expenses of administration of the chapter 11 cases, including payment of Allowed Professional Fees, and (iv) pay other amounts as specified in the DIP Budget and/or operative documentation and allowed by the Court.<br><br>(DIP Credit Agreement p. 1-2) |
| ***Borrowing Limits***<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The DIP Credit Agreement contains negative covenants, including restrictions on incurrence of certain Indebtedness, the incurrence of Liens, and the making of certain Investments.<br><br>(DIP Credit Agreement § 7) |
| ***Borrowing Conditions***<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)*<br>*Local Bankruptcy Rule*<br>*4001-2(a)(ii)* | The DIP Credit Agreement contains usual and customary conditions precedent to extensions of credit.  In addition, the DIP Lender's obligation to make any loan under the DIP Credit Agreement is subject to the Participation Agreement being in full force and effect and Front Street not having defaulted on its obligations thereunder or terminated its obligations to fund under Section 5 of the Participation Agreement.<br><br>(DIP Credit Agreement § 4) |
| ***Fees***<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | *Unused Fee*:  The Borrowers will pay to the DIP Agent, for the account of the DIP Lender, an unused line of credit fee in the amount and at the time agreed in a Fee Letter.<br><br>*Collateral Monitoring Fee*:  The Borrowers will pay to the DIP Agent, for its own account, collateral monitoring fees in the amount and at the time agreed in a Fee Letter. |

| **Agreed Budget** *Bankruptcy Rule 4001(c)(1)(B)* | So long as the DIP Obligations and any commitments under the DIP Facility remain outstanding, the Debtors must operate within a budget (the "DIP Budget"),[5] subject to the permitted variance.<br><br>(DIP Credit Agreement § 6.10)<br><br>***The Debtors have reason to believe that the DIP Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the financing or the DIP Budget.*** |
|---|---|
| ***Entities with Interest in Cash Collateral*** *Bankruptcy Rule 4001(b)(1)(B)(i)* | The Prepetition Agent on behalf of the Prepetition Lenders (each, as defined below). |
| **Use of Cash Collateral** *Bankruptcy Rule 4001(b)(1)(B)(ii) Local Rule 4001-2(a)(ii)* | The Debtors are authorized to use Cash Collateral subject to the terms of the Interim Order, Final Order, DIP Budget, and DIP Documents.<br><br>(Interim Order ¶ 2) |
| ***Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral*** *Bankruptcy Rule 4001(b)(1)(B)(iv)* | The Interim Order provides as "Adequate Protection" for the Prepetition Secured Parties as follows:<br><br>(i) "Adequate Protection Liens":  The Prepetition Agent shall be granted (for the ratable benefit of the respective Prepetition Lenders and subject to the same priority as between such Prepetition Lenders) valid, binding, perfected and enforceable security interests and replacement liens upon all property of the Debtors, including Avoidance Actions and proceeds thereof, whether arising prepetition or postpetition of any nature whatsoever.  The Adequate Protection Liens are subject and subordinate to (1) the Carve-Out, (2) the DIP Liens (as defined below), and (3) the Prior Permitted Senior Liens (as defined below).<br><br>(ii) "507(b) Claims":  The Prepetition Secured Parties are each granted an administrative expense claim pursuant to section 507(b) of the Bankruptcy Code with priority over all other administrative expenses, but in all cases subject and subordinate to the Carve-Out and the DIP Superiority Claims.<br><br>(iii) "Adequate Protection Payments":  The Debtors shall, in accordance with the DIP Budget, (a) pay all reasonable fees and expenses under the Prepetition Credit Documents (as defined below) incurred by the Prepetition Agent and Prepetition Lenders, whether incurred prior to or following the Petition Date, and (b) pay all interest on the Line of Credit (as defined in the Prepetition Credit Agreement) at the Default Rate (as defined in the Prepetition Credit Agreement), other than any portion of the Line of Credit which has been participated to the Term Lender (as defined in the Prepetition Credit Agreement).<br><br>(Interim Order ¶ 18) |

---

[5]    A copy of the DIP Budget is annexed hereto as **Exhibit D**.

| | |
|---|---|
| ***Other Covenants*** | The DIP Credit Agreement contains usual and customary affirmative and negative covenants.<br><br>(DIP Credit Agreement §§ 6-7) |
| ***Liens and Priorities***<br>*Bankruptcy Rule 4001(c)(1)(B)(i), (xi), Local Rules 4001-2(a)(i)(A), D), (G),and 4001-2(a)(ii)* | *DIP Liens*:  Subject to the Carve-Out, the DIP Obligations shall be secured by the following liens (the "DIP Liens"):<br><br>• *First Priority Liens*.  A first priority security interest and lien pursuant to section 364(c)(2) of the Bankruptcy Code on all unencumbered property of the Debtors and their estates (including, upon entry of the Final Order, Avoidance Action Proceeds).<br><br>• *Junior Priority Liens*.  A junior security interest and lien pursuant to section 364(c)(3) of the Bankruptcy Code on all property of the Debtors and their estates that is subject and subordinate to a Prior Permitted Senior Lien.<br><br>• *Priming Liens*.  A first priority, priming security interest in and lien pursuant to section 364(d)(1) of the Bankruptcy Code on all assets of the Debtors and their estates, of any nature whatsoever and wherever located, whether arising prior to or following the Petition Date, securing the obligations of the Debtors under the Prepetition Credit Agreement (as defined below).<br><br>(Interim Order ¶ 9)<br><br>*DIP Superpriority Claims*:  Pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Obligations will be entitled to superpriority administrative expense claim status in the chapter 11 cases (the "DIP Superpriority Claims").<br><br>(Interim Order ¶ 9) |
| ***Milestones***<br>*Bankruptcy Rule 4001(c)(1)(B)(v-vi)*<br>*Local Rule 4001-2(a)(ii)* | The DIP Credit Agreement contains the following milestones:<br><br>• The Debtors fails to file the Sale Motion within two (2) days of  the Petition Date;<br><br>• The Bidding Procedures Order is not entered on or before twenty one (21) days after the Petition Date;<br><br>• An auction is not conducted for the purchase of the assets on or before forty (40) days after the Petition Date;<br><br>• The Sale Order is not entered on or before forty five (45) days after the Petition Date; and<br><br>• The closing of the sale of all or substantially all of the Debtors' assets shall not have occurred on or before the date that is sixty (60) days after the Petition Date. |

| | (DIP Credit Agreement § 8) |
|---|---|
| *Carve Out*<br>*Local Rule 4001-2(a)(ii)* | The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the 507(b) Claims Parties shall each be subject and subordinate to the payment of the following:  (i) the unpaid fees payable to the U.S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of Title 28 of the United States Code, plus (ii) the fee and expense claims of the respective retained professionals of the Debtors and any Committee (collectively, the "<u>Retained Professionals</u>") that have been approved by the Court during the chapter 11 cases which were incurred (a) on and after the Petition Date and prior to the Carve-Out Trigger Date in amounts not in excess of the amounts set forth in the DIP Budget, and (b) on and after the Carve-Out Trigger Date in an aggregate amount not exceeding $100,000 in the aggregate for all Retained Professionals provided that, in each case, such fees and expenses of the Retained Professionals are in accordance with the DIP Budget on a cumulative basis for the applicable period and are ultimately allowed on a final basis by the Court.<br><br>(Interim Order ¶ 11) |
| *Determination Regarding Prepetition Claim*<br>*Bankruptcy Rule 4001(c)(1)(B)(iii)* | The Debtors make certain customary admissions and stipulations with respect to the amount of prepetition indebtedness owing to the Prepetition Lenders and the validity, extent, perfection, priority, and enforceability of the Prepetition Liens.<br><br>(Interim Order ¶ 14) |
| *Waiver or Modification of the Automatic Stay*<br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | Notwithstanding the provisions of section 362 of the Bankruptcy Code, upon the maturity of any of the DIP Loans, the DIP Agent, on behalf of the DIP Lender, shall be entitled to immediate payment of the DIP Obligations and to enforce the remedies provided for under the DIP Credit Agreement or under applicable law, without further application to or order by the Court.<br><br>(DIP Credit Agreement § 5.17) |
| *Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien*<br>*Bankruptcy Rule 4001(c)(1)(B)(vii)* | The DIP Liens and Adequate Protection Liens shall be valid, binding, perfected, and enforceable by operation of law upon entry of the Interim Order without any further action by any party.<br><br>(Interim Order ¶ 13) |
| *Release, Waivers or Limitation on any Claim or Cause of Action*<br>*Bankruptcy Rule 4001(c)(1)(B)(viii)* | Each Borrower acknowledges effective upon entry of the Interim Order, that no Debtor has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Debtors' liability to repay the DIP Agent or DIP Lender as provided in the DIP Credit Agreement or to seek affirmative relief or damages of any kind or nature from the DIP Agent or any DIP Lender.  Each Debtor, on behalf of itself and its bankruptcy estate, |

|  | and on behalf of all its successors, assigns, and Subsidiaries and any Person acting for and on behalf of, or claiming through them (collectively, and in each case in their capacities as such, the "Releasing Parties"), fully, finally and forever releases and discharges the DIP Agent and the DIP Lender and its respective past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, participants, and each Person acting for or on behalf of any of them (collectively, and in each case in their capacities as such, the "Released Parties") of and from any and all actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date of entry of the Interim Order in any way, arising out of, connected with or relating to the DIP Credit Agreement, the Interim Order, any other agreement, document or instrument related to any of the foregoing and the transactions contemplated thereby.<br><br>(DIP Credit Agreement § 2.15) (Interim Order ¶ 14) |
| ---- | ---- |
| *Indemnification*<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(ix)* | The Debtors shall indemnify the DIP Agent and DIP Lender and their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "Indemnified Person") and hold each of them harmless from and against all costs, expenses (including reasonable fees, disbursements and other charges of counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Debtors or any of their affiliates or shareholders) that relates to the DIP Facility or the Interim Order, including the financial accommodations to the Debtors contemplated under the DIP Credit Agreement, the chapter 11 cases, or any transactions in connection therewith, provided that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such Indemnified Person's gross negligence or willful misconduct.<br><br>(DIP Credit Agreement § 9.8) (Interim Order ¶ 19) |
| *Release, Waivers or*<br>*Limitation of Rights*<br>*Bankruptcy Rule* | Subject to entry of the Final Order, the DIP Agent, DIP Lender, and the Prepetition Secured Parties (collectively, the "Secured Parties") shall not be subject to any surcharge under section 506(c) of the Bankruptcy Code. |

| *4001(c)(1)(B)(x)* *Local Rules 4001-* *2(a)(i)(B), (C)* | Subject to entry of the Final Order, the Secured Parties shall not be subject to the "equities of the case" exception under section 552(b) of the Bankruptcy Code. |
|---|---|
| | (Interim Order ¶ 12) |

5.      In accordance with Local Rule 4001-2, the following provisions of the DIP Credit

Agreement are highlighted below:

i.      ***Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate.*** The Prepetition Lien and Claim Matters are binding on the estate and all parties in interest, including any Committee, 60 days from the from the date of the appointment of any Committee or, in the event that no Committee is appointed, upon conclusion of the date that is 75 days from the Petition Date.  (Interim Order ¶ 15)

ii.      ***Provisions that waive rights of the debtor's estate under section 506(c).*** The proposed 506(c) waiver will be effective only after entry of the Final Order. (Interim Order ¶ 12)

iii.      ***Provisions that immediately grant prepetition secured creditors liens on the debtor's claims and causes of action arising under sections 544, 547, 548, and 549 of the Bankruptcy Code.*** Subject to entry of the Final Order, Avoidance Actions and proceeds thereof shall be subject to the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the 507(b) Claims. (DIP Credit Agreement § 1) (Interim Order ¶ 17)

iv.      ***Provisions that deem prepetition secured debt to be postpetition debt or prepetition loans from a prepetition secured lender used to pay part or all of that secured creditor's prepetition debt.*** The Debtors are authorized to use Cash Collateral, subject to and as set forth in the DIP Budget, the Interim Order, and the DIP Documents including, without limitation, to make payments on the Prepetition Obligations as set forth in the DIP Budget. (Interim Order ¶ 2)

v.      ***Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out.*** Subject to the DIP Budget, there is no

disparate treatment between the Debtors' professionals and those of a Committee.  (Interim Order ¶ 11)

vi.    ***Provisions that prime any secured lien absent consent of the affected lienor***. The Prepetition Secured Parties have consented to the priming occasioned by the DIP Liens.

vii.    ***Provisions that affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1).***  The Secured Parties are granted an "equities of the case" waiver.  The proposed waiver will be effective only after entry of the Final Order.  (Interim Order ¶ 12)

## Background

6.    On April 19, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner and no committee has been appointed or designated in these chapter 11 cases.  The Debtors' request for joint administration of these chapter 11 cases for procedural purposes only is currently pending.

7.    Tracing their origins to 1946, the Debtors sell high quality women's apparel and related products under their proprietary Frederick's of Hollywood® brand.  Since their inception, the Debtors have remained a market leader and innovator in the female fashion and lingerie industry.  The Debtors' major merchandise categories are foundations (including various types of undergarments), lingerie (including daywear and sleepwear), ready-to-wear (dresses and sportswear, including denim), and fragrance and accessories (including shoes, handbags, jewelry, personal care products, and novelties).  At their height, the Debtors operated over 200 retail stores across the United States, as well as maintained a robust mail catalog and an e-commerce business through their website at www.fredericks.com.

8.    The Debtors were compelled to commence these chapter 11 cases amidst a sustained decline in operating revenue attributable to increased competition from other apparel

retailers and brands, decreased foot traffic in shopping malls, and weak discretionary spending by target consumers due to the recent economic downturn. This confluence of factors, together with the rising cost of wholesale inventory and onerous real property lease terms, ultimately resulted in the cessation of the Debtors' retail store operations prior to the Petition Date.

9.    Through these chapter 11 cases, the Debtors seek to effectuate a sale of their e-commerce business – including their intellectual property and remaining inventory – pursuant to a competitive bidding process that will maximize value for their stakeholders and inure to the benefit of all parties in interest.

10.    Additional information regarding the Debtors' businesses, assets, capital structure, and the circumstances leading to the filing of these chapter 11 cases is set forth in the Declaration of William Soncini in Support of Chapter 11 Petitions and First Day Pleadings of Frederick's of Hollywood, Inc. and its Affiliated Debtors and Debtors in Possession (the "First Day Declaration"), which is being filed contemporaneously herewith and is incorporated by reference herein.

**Prepetition Secured Indebtedness**

11.    Certain of the Debtors are party to that certain Credit and Security Agreement, dated as of May 31, 2012 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement" and, together with all agreements, documents, notes, and instruments in respect thereof, the "Prepetition Credit Documents"), by and among Frederick's of Hollywood Group, Inc. ("Group"), FOH Holdings, Inc. ("Parent"), Frederick's of Hollywood, Inc. ("Frederick's"), Frederick's of Hollywood Stores, Inc. ("Stores"), and Hollywood Mail Order, LLC ("Mail Order" and, collectively with Group, Parent, Frederick's, and Stores, the "Borrowers"), as borrowers, the lenders party thereto (the "Prepetition Lenders"), and SCP, in its capacity as administrative and collateral agent (in such capacities, the

"Prepetition Agent" and, together with the Prepetition Lenders, the "Prepetition Secured Parties").

12.     Under the Prepetition Credit Agreement, the Debtors have outstanding funded debt for borrowed money in the approximate aggregate principal amount of $32,988,000, consisting of (i) approximately $16,465,000 in respect of a Line of Credit, consisting of (x) approximately $2,465,000 of outstanding revolving loans (the "Revolving Loans"), and (y) $14,000,000 in respect of a first-in last-out advance (the "FILO Advance"), and (ii) $16,523,000 outstanding in respect of a term loan (the "Term Loans" and, collectively with the Revolving Loans and the FILO Advance, the "Prepetition Credit Facility").   Borrowings under the Prepetition Credit Facility bear interest at a rate per annum equal to, (i) with respect to the Revolving Loans, the Prime Rate plus 8%, (ii) with respect to the FILO Advance, the LIBOR Rate plus 15.5%, and (iii) with respect to the Term Loans, the LIBOR Rate plus 17.5%.[6] Pursuant to the Prepetition Credit Agreement, following the occurrence of an Event of Default, any amounts received on account of the obligations are required to be, following the payment of fees, indemnities, expenses, and principal and interest on any overadvances, applied in the following order:   first, to payment of interest and fees on the Revolving Loans; second, to payment of interest and fees on the FILO Advance; third, to payment of principal of the Revolving Loans; fourth, to payment of principal of the FILO Advance; and fifth, to payment of interest, fees, and principal of the Term Loans.

13.     Pursuant to (i) the Prepetition Credit Agreement, (ii) that certain Copyright Security Agreement, dated as of May 31, 2012, by and among Frederick's, Mail Order, and SCP, (iii) that certain Trademark Security Agreement, dated as of May 31, 2012, by and among

---

[6]     Each of these interest rates includes 4% of default interest, which, as of the Petition Date, was being assessed under the Prepetition Credit Agreement.

Group, Frederick's, and SCP, and (iv) that certain Pledge Agreement, dated as of May 31, 2012, by and among Group, Parent, Frederick's, and SCP, the Borrowers' obligations under the Prepetition Credit Facility (the "Prepetition Obligations") are secured by first-priority, perfected security interests (the "Prepetition Liens") in substantially all of the Borrowers' assets (including intellectual property such as trademarks and copyrights, as well as shares and membership interests of the Borrowers that are subsidiaries of other Borrowers, and up to 65% of the outstanding capital stock of any of their foreign subsidiaries) (collectively, the "Prepetition Collateral").  The Prepetition Credit Facility matures on May 31, 2015.

## Postpetition Financing

### I.      Efforts to Obtain Postpetition Financing

14.     In December 2014, the Debtors retained Consensus to act as their financial advisor and investment banker to assist the Debtors in connection with a potential restructuring. Following its retention by the Debtors, Consensus supported the Debtors' management team in analyzing the Debtors' cash needs to determine the size of additional liquidity necessary to support the Debtors' operational needs.

15.     After careful review, the Debtors, in their business judgment, determined that a chapter 11 process premised on the sale of substantially all of their assets would provide the best means to maximize value to all stakeholders.   In anticipation of the commencement of the chapter 11 cases, the Debtors identified the Prepetition Lenders as the most likely sources of postpetition financing, given their liens on substantially all of the Debtors' assets, involvement over the past several months with the Debtors' restructuring efforts, and support for an expedited chapter 11 sale process.  To that end, in March 2015, the Debtors and Consensus initiated a dialogue with the Prepetition Lenders regarding the possibility of the Prepetition Lenders providing debtor-in-possession financing to the Debtors.   Certain of the Prepetition Lenders

expressed interest in providing the financing and advised Consensus that they would not consent to being primed by a third-party lender.  In the weeks that followed, the Debtors and the Prepetition Lenders negotiated in good faith and at arm's length with respect to the terms and conditions of the financing.  These negotiations ultimately resulted in the DIP Facility for which the Debtors are currently seeking approval.

16.    Before agreeing to the terms of the DIP Facility, prior to the Petition Date, Consensus, on behalf of the Debtors, solicited indications of interest from various third parties for the purpose of testing the market and evaluating various other financing proposals.  The third parties solicited comprised sophisticated financial institutions and other investors active in the debtor-in-possession financing market for retail companies.

17.    Through discussions with the potential third-party lenders, however, it became readily apparent that the Debtors' existing capital structure, including the Debtors' level of secured debt (relative to asset value) and lack of unencumbered assets, foreclosed any opportunities for the Debtors to access unsecured or junior credit.  Further, in the absence of a successful priming fight, any debtor-in-possession loan provided by the parties other than the Prepetition Lenders would have required the consent of the Prepetition Lenders, which they indicated they would not be willing to provide.

18.    As a result of the foregoing, the Debtors concluded that there could be no realistic expectation of a third party lender or lender group providing the requisite financing to the Debtors, secured by liens junior to the prepetition liens or on an unsecured basis.  Accordingly, the Debtors determined that the DIP Facility represented the best financing option available to the Debtors and their businesses because it would allow them to avoid the need to engage in a costly and time-consuming priming fight at the outset of these chapter 11 cases, as well as avoid

the execution risk associated with a transaction with a new lender (including any timing and due diligence constraints).

## II.     Overview of DIP Facility

19.     The DIP Facility consists of an $11 million credit facility in the form of revolving loans.  The DIP Facility will be secured by priming DIP Liens and the DIP Agent, for itself and the benefit of the DIP Lender, will be granted DIP Superpriority Claims.  The Prepetition Secured Parties have consented to both the priming of the Prepetition Liens by the DIP Liens and the granting of the DIP Superpriority Claims.  The DIP Facility also provides for a "creeping roll-up" whereby the Debtors will satisfy their Prepetition Obligations through the proceeds of the Prepetition Collateral.

20.     The DIP Facility contemplates that the Prepetition Secured Parties will receive adequate protection in accordance with sections 361 and 363(e) of the Bankruptcy Code for any postpetition diminution in value of their interests in the Prepetition Collateral.  The Interim Order provides adequate protection to the Prepetition Lenders through Adequate Protection Liens, the granting of 507(b) Claims, and the Adequate Protection Payments.

## Basis for Relief

## I.     Authority to Grant Priming Liens and Superpriority Claims Should Be Granted

21.     The DIP Facility requires the Debtors to provide first-priority priming liens and superpriority claims pursuant to section 364(c) and (d) of the Bankruptcy Code.  Section 364(c) of the Bankruptcy Code provides, among other things, that, if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a

lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).

22.    Section 364(d) of the Bankruptcy Code, in turn, allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, after notice and a hearing, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.  11 U.S.C. § 364(d).

23.    As discussed above, despite the efforts of the Debtors and their advisors, the Debtors have been unable to (i) procure sufficient financing (a) in the form of unsecured credit allowable under section 503(b)(1), (b) as an administrative expense under section 364(a) or (b), (c) in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1), or (d) without granting limited priming liens pursuant to section 364(d), or (ii) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

24.    Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtors commenced arm's-length negotiations with the DIP Lender over the DIP Facility.  Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith.  See, e.g., In re L.A. Dodgers LLC, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be

utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").

25.     Section 364 of the Bankruptcy Code does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien.  Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); L.A. Dodgers, 457 B.R. at 313 (citing Ames Dep't Store, 115 B.R. at 37 (noting the court "may not approve any credit transaction under subsection (c) [of section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under section 364(a) or (b)"); In re 495 Central Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most banks lend money only in return for a senior secured position"); In re Aqua Assocs., 123 B.R. 192, 197 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming loan was necessary if debtor were to obtain funding).

26.     Furthermore, a debtor may borrow money under section 364(d)(4) of the Bankruptcy Code if it meets its burden of establishing that the holder of the lien to be primed is adequately protected.  In re Futures Equity L.L.C., 2001 Bankr. LEXIS 2229 *14 (Bankr. N.D. Tex. April 11, 2001) (Houser, J.).  The transaction "should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing."  Id. at *15 (internal citations omitted).  The debtor also has the burden

of demonstrating that (i) the credit transaction is necessary to preserve the estate and (ii) the terms of the transaction are fair and reasonable given the circumstances.  See id.

27.     Substantially all of the Debtors' assets are encumbered and, despite the diligent efforts of Debtors and Consensus, working capital for these chapter 11 cases was not available absent the proposed DIP Superpriority Claims and consensual priming liens.  Accordingly, the Debtors believe that they were required to obtain financing under sections 364(c) and (d) of the Bankruptcy Code, and accordingly, the DIP Facility reflects the exercise of the Debtors' sound business judgment.  The DIP Lender was unwilling to extend financing on terms more favorable to the Debtors, and the Debtors were not able to obtain alternative sources of financing.  The Debtors' ability to continue to operate their e-commerce business pending a sale pursuant to section 363 of the Bankruptcy Code and to maximize value to all stakeholders depends upon their ability to obtain the DIP Facility.  Without the proposed financing, the Debtors would not have sufficient funds to operate, jeopardizing the successful sale of substantially all of their assets, thereby diminishing recoveries for their stakeholders.

28.     The DIP Facility, together with use of Cash Collateral, will enable the Debtors to operate their e-commerce business in the ordinary course and sell substantially all of their assets during these chapter 11 cases.  The Debtors believe that this will preserve and enhance the value of their estates for the benefit of all parties in interest.

## II.    Use of Cash Collateral Should Be Approved

29.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  The Debtors require the use of the Cash Collateral to fund their operations in conjunction with the liquidity provided by the DIP Facility.  Absent such relief, the

Debtors' businesses will be brought to an immediate halt, with damaging consequences for their estates and creditors.  The interests of the Prepetition Secured Parties in the Cash Collateral will be protected by the adequate protection detailed above, and they have agreed and consented to the use of Cash Collateral on such basis.  Accordingly, the Debtors request that they be permitted to use the Cash Collateral in the operation of their businesses and administration of these chapter 11 cases.

**III.    DIP Facility's "Creeping Roll-Up" Feature is Appropriate**

30.    By this Motion, the Debtors also seek authority, pursuant to section 363(b) of the Bankruptcy Code, to use proceeds from the Prepetition Collateral to repay the Prepetition Obligations.

31.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property, other than in the ordinary course of business, with court approval.  11 U.S.C. § 363(b).  Section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the use of a debtor's property prior to confirmation of a plan, however, it is well settled that transactions should be approved when they are supported by a sound business purpose.  See, e.g., In re Abbotts Dairies, Inc., 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a court should approve a debtor's use of assets outside the ordinary course of business under section 363(b) if the debtor can demonstrate a sound business justification for the proposed transaction); Computer Sales Int'l Inc. v. Fed. Mogul Global, Inc. (In re Fed. Mogul Global, Inc.), 293 B.R. 124, 126 (D. Del. 2003) (same); In re Champion Enters., Inc., 2010 WL 2723820, at *4 (Bankr. D. Del. 2010) (noting that criteria for approval of a transaction under 363(b) is whether the debtor has demonstrated "good, sufficient and sound business purpose justifications").  Once the debtor articulates sound business reasons, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on

an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.'" <u>In re Integrated Res., Inc.</u>, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985)).

32.    After careful consideration of the terms of the DIP Facility, the Debtors determined that the creeping roll-up was appropriate and necessary under the circumstances. This feature was a critical component of the willingness of the DIP Lender to commit to provide funding under the DIP Facility.  Indeed, the DIP Lender would not have agreed to provide the DIP Facility without a creeping roll-up of the Prepetition Obligations.  Moreover, the financing contemplated under the DIP Credit Agreement will offer the Debtors much-needed funds to continue operating their e-commerce business and effectuate the sale process during these chapter 11 cases.  Therefore, the Debtors believe that the roll-up is a necessary component to the DIP Facility and will ensure the Debtors' access to sufficient liquidity for working capital and general corporate purposes to fund day-to-day operations during these chapter 11 cases.

33.    Repayment of prepetition debt in the form of a "roll-up" is a common feature in debtor-in-possession financing arrangements and courts have approved roll-ups in a variety of cases. <u>See</u>, <u>e.g.</u>, <u>In re Furniture Brands Int'l, Inc., et al.</u>, Case No. 13-12329 (Bankr. D. Del. Oct. 11, 2013) (authorizing up to $140 million in debtor-in-possession financing that included roll-up of approximately $91 million prepetition debt pursuant to interim order);  <u>In re Appleseed's Intermediate Holdings LLC, et al.</u>, Case No. 11-10160 (Bankr. D. Del. Jan. 20, 2011) (authorizing up to $140 million in debtor-in-possession financing that included roll-up of approximately $48 million prepetition debt pursuant to interim order); <u>In re Source Interlink Cos. Inc.</u>, Case No. 09-11424 (Bankr. D. Del. Apr. 29, 2009) (authorizing up to $385 million in debtor-in-possession financing that included roll-up of approximately $149 million prepetition

debt pursuant to interim order); In re Dayton Superior Corp., Case No. 09- 10785 (Bankr. D. Del. Apr. 19, 2009) (authorizing up to $165 million in debtor-in-possession financing that included roll-up of approximately $109.8 million prepetition debt pursuant to interim order); In re Pac. Energy Res., Ltd., Case No. 09-10785 (Bankr. D. Del. Mar. 10, 2009) (authorizing up to $183 million in debtor-in-possession financing that included roll-up of approximately $143 million prepetition debt pursuant to interim order); In re Foamex Int'l Inc., Case No. 09-10560 (Bankr. D. Del. Feb. 20, 2009) (authorizing approximately $95 million in debtor-in-possession financing that included full roll-up of approximately $39 million prepetition debt pursuant to interim order); In re Hilex Poly Co. LLC, Case No. 08-10890 (Bankr. D. Del. May 7, 2008) (authorizing up to $140 million in debtor-in-possession financing that included roll-up of approximately $51 million prepetition debt pursuant to interim order); In re Holley Performance Prods. Inc., Case No. 08-10256 (Bankr. D. Del. Feb. 12, 2008) (authorizing approximately $60 million in debtor-in-possession financing that included roll-up of approximately $40 million prepetition debt pursuant to interim order).

## IV.    The Authorization to Pay the Fees Required by the DIP Lender

34.    As described above, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent and DIP Lender in exchange for their providing the DIP Facility. Specifically, the Debtors will pay to the DIP Agent (i) for the benefit of the DIP Lender, the Unused Fee, and (ii) for the account of the DIP Agent, the Collateral Monitoring Fee.[7] The fees the Debtors have agreed to pay to the DIP Lender and other obligations under the DIP Documents represent the most favorable terms to the Debtors on which the DIP Lender would

---

[7]    Pursuant to the terms of the Fee Letter among the DIP Agent and the Borrowers, any amounts paid as part of the Adequate Protection Payments to the Prepetition Agent on account of collateral monitoring fees payable under the Prepetition Credit Agreement are credited against Collateral Monitoring Fees payable with respect to the DIP Facility.

agree to make the DIP Facility available.  The Debtors considered the fees described above when determining in their sound business judgment that the DIP Documents constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and prosecute the chapter 11 cases, and paying these fees in order to obtain the DIP Facility is in the best interests of the Debtors' estates, creditors, and other parties in interest.

## V.    The Scope of the Carve-Out is Appropriate

35.    The proposed DIP Facility subjects the security interests and administrative expense claims of the DIP Lender to the Carve-Out.  Such carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  See Ames Dep't Stores, 115 B.R. at 40.  The DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  Id. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  In addition, the Carve-Out ensures that proceeds of the DIP Facility may be used for the payment of U.S. Trustee fees and professional fees of the Debtors and any future Committee notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

## VI.    The DIP Lender Is a Good Faith Lender under Section 364(e)

36.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

37.     As explained in detail herein and in the O'Hara Declaration, the DIP Documents are the result of (i) the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms available on which to obtain needed postpetition financing, and (ii) are the product of extended arm's-length, good faith negotiations between the Debtors and the DIP Lender.  The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds under the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Debtors request that the Court find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and is entitled to all of the protections afforded by that section.

## VII.    Proposed Adequate Protection Should Be Authorized

38.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by a debtor in possession, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief.  11 U.S.C. § 361.  What constitutes adequate protection must be decided on a case-by-case basis.  See MNBank Dallas, N.A. v. O'Connor (In re O'Connor), 808

F.2d 1393, 1396–97 (10th Cir. 1987); Martin v. U.S. (In re Martin), 761 F.2d 472, 474 (8th Cir. 1985); In re Shaw Indus., Inc., 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003).  The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.  See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (citations omitted).

39.     As noted above, as adequate protection for the interests of the Prepetition Secured Parties in connection with the Prepetition Liens, the Debtors will provide the Prepetition Secured Parties with Adequate Protection Liens, 507(b) Claims, and Adequate Protection Payments.  All of the Prepetition Secured Parties have consented to the use of Cash Collateral and the priming occasioned by the DIP Liens.  Without access to the proposed DIP Facility and use of Cash Collateral, the Debtors will be forced to cease operations and will not be able to consummate a timely and orderly sale pursuant to section 363 of the Bankruptcy Code.  In contrast, the value of the Prepetition Collateral will be preserved, if not increased, by the DIP Facility and use of Cash Collateral because it ensures the uninterrupted continuation of the Debtors' operations and a timely and orderly sale of substantially all of the Debtors' assets that will maximize value to all stakeholders.  Accordingly, the proposed adequate protection is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

## VIII.    Automatic Stay Should Be Modified on Limited Basis

40.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens.

41.    Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

## IX.    Interim Approval Should Be Granted

42.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

43.    Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this motion and (i) authorize the Debtors to use Cash Collateral and borrow up to $5.2 million under the DIP Facility in order to (a) maintain and finance the ongoing operations of the Debtors and (b) avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, and (ii) schedule the Final Hearing.

44.    Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtors will be immediately and irreparably harmed.  Accordingly, the interim relief requested is critical to preserving and maintaining the value of the Debtors' estates and facilitating their sale efforts.

### Waiver of Bankruptcy Rules 6004(a) and (h)

45.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h) and any other applicable Bankruptcy Rule.

## **Notice**

46.     The Debtors will provide notice of this Motion to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the 30 largest unsecured claims on a consolidated basis; (iii) counsel to Salus Capital Partners, LLC, in its capacity as the administrative and collateral agent under the Debtors' prepetition credit facility and in its capacity as the administrative and collateral agent under the Debtors' proposed debtor-in-possession financing facility; (iv) any banking or financial institution that holds the Debtors' accounts; and (v) all parties entitled to notice pursuant to Local Rule 9013-1(m).  As this Motion is seeking "first day" relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested and the urgency of the circumstances surrounding this Motion, no other or further notice need be given.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, the Debtors respectfully request that the Court (a) enter the Interim Order and, after the Final Hearing, the Final Order, substantially in the form that shall be filed with the Court, and (b) grant such other or further relief as is just.

Wilmington, Delaware
Dated:  April 20, 2015

Respectfully submitted,

**RICHARDS, LAYTON & FINGER, P.A.**

/s/ Russell C. Silberglied
Russell C. Silberglied (No. 3462)
Zachary I. Shapiro (No. 5103)
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: silberglied@rlf.com
          shapiro@rlf.com

- and -

**MILBANK, TWEED, HADLEY & M^cCLOY LLP**
Tyson M. Lomazow (*pro hac vice* admission pending)
Matthew Brod (*pro hac vice* admission pending)
One Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000
Facsimile: (212) 830-5000
Email: tlomazow@milbank.com
          mbrod@milbank.com

*Proposed Counsel to Debtors and Debtors in Possession*