IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
---------------------------------------------------------- x
                                                           :
In re:                                                     :     Chapter 11
                                                           :
FREDERICK'S OF HOLLYWOOD, INC., et al.,¹                    :     Case No. 15-_____ (__)
                                                           :
                                                           :
                              Debtors.                     :     (Joint Administration Requested)
---------------------------------------------------------- x
```

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I)(A) APPROVING PROCEDURES IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL OF CERTAIN DEBTORS' ASSETS, (B) APPROVING STALKING HORSE PROTECTIONS, (C) SCHEDULING RELATED AUCTION AND HEARING TO CONSIDER APPROVAL OF SALE, (D) APPROVING PROCEDURES RELATED TO ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (E) APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (II)(A) AUTHORIZING SALE OF SUBSTANTIALLY ALL OF CERTAIN DEBTORS' ASSETS PURSUANT TO SUCCESSFUL BIDDER'S ASSET PURCHASE AGREEMENT, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO**

Frederick's of Hollywood, Inc. and its affiliated debtors and debtors in possession (each,

a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>") hereby file this motion (the "<u>Motion</u>") seeking entry

of an order, pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11

U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), rules 2002, 6004, 6005, 6006, 9007, and 9014 of

the Federal Rules of Bankruptcy Procedure (as amended, the "<u>Bankruptcy Rules</u>"), and rules

2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

---

¹ The debtors in these chapter 11 cases and the last four digits of each debtor's taxpayer identification number are as follows:  (i) FOHG Holdings, LLC (7902); (ii) Frederick's of Hollywood Group Inc. (3042); (iii) FOH Holdings, Inc. (5442); (iv) Frederick's of Hollywood, Inc. (6265); (v) Frederick's of Hollywood Stores, Inc. (8882); and (vi) Hollywood Mail Order, LLC (5205).  The debtors' principal offices are located at 6464 W. Sunset Blvd., Suite 1150, Los Angeles, CA 90028.

Bankruptcy Court for the District of Delaware (the "Local Rules"), (i)(a) approving procedures in connection with the sale of substantially all of certain of the Debtors' assets, (b) approving the Stalking Horse Protections (as defined below), (c) scheduling the related auction and hearing to consider approval of the sale, (d) approving procedures related to the assumption of certain of the Debtors' executory contracts and unexpired leases, (e) approving the form and manner of notice thereof, and (f) granting related relief, and (ii)(a) authorizing the sale of such assets free and clear of liens, claims, encumbrances, and other interests, except as provided in the applicable asset purchase agreement, (b) approving the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases related thereto, and (c) granting related relief.

In support of this Motion, the Debtors submit the Declaration of William Soncini in Support of Chapter 11 Petitions and First Day Pleadings of Frederick's of Hollywood, Inc. and its Affiliated Debtors and Debtors in Possession (the "First Day Declaration") and the declaration of Michael A. O'Hara, the Chief Executive Officer and Managing Member of Consensus Advisory Services LLC and its affiliated entities, the Debtors' investment banker (the "O'Hara Declaration"), with respect to the proposed sale of the Debtors' assets.   In further support of the Motion the Debtors respectfully state as follows:

## Jurisdiction and Venue

1.      This Court (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background**

3.      On April 19, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner and no committee has been appointed or designated in these chapter 11 cases.  The Debtors' request for joint administration of these chapter 11 cases for procedural purposes only is currently pending.

4.      Tracing their origins to 1946, the Debtors sell high quality women's apparel and related products under their proprietary Frederick's of Hollywood® brand.  Since their inception, the Debtors have remained a market leader and innovator in the female fashion and lingerie industry.  The Debtors' major merchandise categories are foundations (including various types of undergarments), lingerie (including daywear and sleepwear), ready-to-wear (dresses and sportswear, including denim), and fragrance and accessories (including shoes, handbags, jewelry, personal care products, and novelties).  At their height, the Debtors operated over 200 retail stores across the United States, as well as maintained a robust mail catalog and an e-commerce business through their website at www.fredericks.com.

5.      The Debtors were compelled to commence these chapter 11 cases amidst a sustained decline in operating revenue attributable to increased competition from other apparel retailers and brands, decreased foot traffic in shopping malls, and weak discretionary spending by target consumers due to the recent economic downturn.  This confluence of factors, together with the rising cost of wholesale inventory and onerous real property lease terms, ultimately resulted in the cessation of the Debtors' retail store operations prior to the Petition Date.

6.      Through these chapter 11 cases, the Debtors seek to effectuate a sale of their e-commerce business – including their intellectual property and remaining inventory – pursuant to

a competitive bidding process that will maximize value for their stakeholders and inure to the benefit of all parties in interest.

7.      Additional information regarding the Debtors' businesses, assets, capital structure, and the circumstances leading to the filing of these chapter 11 cases is set forth in the First Day Declaration, which is being filed contemporaneously herewith and is incorporated by reference herein.

**Preliminary Statement**

8.      As set forth in the O'Hara Declaration, after an extensive review of strategic alternatives for their businesses, the Debtors, in consultation with their advisors, have determined that maximizing the value of their estates is best accomplished through an orderly sale, free and clear of liabilities, of certain tangible and intangible assets, comprised mainly of the Debtors' e-commerce business and inventory (as described more fully herein, the "Assets") of certain of the Debtors (collectively, the "Sellers").

9.      The Sellers have agreed to the terms of an asset purchase agreement between the Sellers and Authentic Brands Group, LLC (the "Stalking Horse Purchaser"), pursuant to which the Stalking Horse Purchaser will acquire the Assets, subject to higher or better offers, on the terms and conditions specified therein (collectively with the schedules and related documents thereto, the "Stalking Horse Agreement"), a copy of which is attached as **Exhibit 2** to the Bid Procedures Order (defined below).[2]  The sale transaction contemplated pursuant to the Stalking

---

[2]     Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Stalking Horse Agreement or in the Interim Order (I) Authorizing Post-Petition Secured Financing Pursuant to Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 503(b) of the Bankruptcy Code; (II) Authorizing the Debtors to Use Cash Collateral Pursuant to Section 363 of the Bankruptcy Code; (III) Providing Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, and 363 of the Bankruptcy Code; (IV) Modifying the Automatic Stay Pursuant to Section 362(d) of the Bankruptcy Code; (V) Scheduling a Final Hearing; and (VI) Providing Related Relief.

Horse Agreement is subject to competitive bidding as set forth herein, although in light of extensive marketing efforts that have been conducted to date, the bidding timeline is appropriately tailored.

10.    Pursuant to the terms of the Stalking Horse Agreement, the Stalking Horse Purchaser has agreed to purchase the Assets for (a) $22,500,000 (subject to certain purchase price reductions) *plus* (b) amounts to be paid to the Sellers pursuant to the terms of a Revenue Sharing Agreement annexed to the Stalking Horse Agreement (the "Stalking Horse Purchase Price"). The Stalking Horse Agreement provides the Stalking Horse Purchaser with certain bid protections, including reimbursement of its reasonable expenses not to exceed $300,000, and a termination fee of $850,000 (each as described more fully below, together, the "Stalking Horse Protections"). The Debtors, in the exercise of their business judgment, believe that the Stalking Horse Protections are a necessary and reasonable inducement for the Stalking Horse Purchaser to submit its stalking horse bid and, thus, establish a "floor" for the sale of the Debtors' Assets and encourage competitive bidding and realization of the highest possible value for the benefit of all stakeholders.

11.    The Debtors believe the sale of their Assets pursuant to the procedures and on the timeline proposed herein presents the best opportunity to maximize the value for all interested parties.

### Relief Requested[3]

12.    Pursuant to this Motion, the Debtors request relief in two steps. *First*, the Debtors request entry of an order, in the form attached hereto as **Exhibit B** (the "Bid Procedures Order"):

---

[3]    In compliance with Local Rule 6004-1 and for the convenience of the reader, the salient terms of the transaction as currently set forth in the Stalking Horse Agreement have been summarized and are attached hereto as **Exhibit A**.

(A) approving procedures (the "<u>Bid Procedures</u>," the form of which is attached thereto as **Exhibit 1**) for (i) submitting bids for any or all of the Assets of certain of the Debtors and (ii) conducting an auction (the "<u>Auction</u>") with respect to the Assets in the event the Debtors receive at least one additional bid; (B) approving the Stalking Horse Protections; (C) scheduling the Auction for May 28, 2015 at 10:00 a.m. (prevailing Eastern Time) at Milbank, Tweed, Hadley and M$^c$Cloy LLP, One Chase Manhattan Plaza, New York, NY 10005 or at such other time, place, and date as may be designated by the Debtors; (D) scheduling a hearing on or before June 2, 2015 (the "<u>Sale Hearing</u>") to consider approval of the sale of the Assets with respect to any bid(s) accepted by the Debtors; (E) approving the Cure Procedures (as defined below) for the assumption and assignment of certain executory contracts and unexpired leases (the "<u>Contracts</u>") of the Debtors to any purchaser(s) of the Assets, and to resolve any objections thereto; and (F) approving (i) the form of notice of the Auction and Sale (the "<u>Procedures Notice</u>"), attached to the Bid Procedures Order as **Exhibit 3**, to be served on the Procedures Notice Parties (as defined below) and (ii) the form of notice to parties holding Contracts that may be assumed and assigned in connection with the sale of the Assets, in the form attached to the Bid Procedures Order as **Exhibit 4**.

13.    *Second*, the Debtors request entry of an order, pursuant to sections 105, 363, and 365 of the Bankruptcy Code in the form attached hereto as **Exhibit C** (the "<u>Sale Order</u>"), (i) approving the sale of the Assets to the purchaser, free and clear of all liens, claims, encumbrances, and liabilities, except as provided in the applicable asset purchase agreement, and (ii) authorizing the Debtors to consummate the Sale (as defined below) and all documents, agreements, and contracts executed in conjunction therewith.

## PROPOSED BID AND SALE PROCEDURES

### Assets to be Sold

14.     As noted above, the Debtors seek to complete a sale (the "Sale") of their Assets, which primarily comprise their e-commerce business and inventory, including, among other things:

    (a)    the Inventory;

    (b)    the Assumed Contracts;

    (c)    all interests of Sellers in and to all Intellectual Property that relates in any way to the Business (and, to the extent permitted under the Bankruptcy Code and authorized by the Bankruptcy Court, all Avoidance Actions related thereto);

    (d)    all books and records, files, data, reports, computer codes and sourcing data, advertiser and supplier lists, cost and pricing information, business plans, and manuals, blueprints, research, and development files, and other records of any Seller that relate in any way to the Business;

    (e)    all marketing, advertising, and promotional materials and product samples; and

    (f)    all goodwill associated with the Business and/or the Assets.

15.     The Assets shall not include the assets forth in section 2.2 of the Stalking Horse Agreement (the "Excluded Assets"), including, without limitation:

    (a)    any Contracts that are not otherwise Assets as described in section 2.1 of the Stalking Horse Agreement;

    (b)    cash and cash equivalents of the Sellers;

    (c)    the Stalking Horse Purchase Price;

    (d)    all fixtures, furniture, display sets, mannequins, and other "hard assets" located at the Retail Stores (but excluding Inventory);

    (e)    all accounts receivable and other receivables of Sellers, including, without limitation, all accounts receivable in respect of goods shipped or products sold or services rendered to customers by Sellers on or prior to the Closing Date;

(f)     all Avoidance Actions that are not otherwise Assets as described in section 2.1 of the Stalking Horse Agreement;

(g)     all rights, claims, and causes of action of Sellers that do not relate to the Stalking Horse Agreement;

(h)     all books and records of Sellers unless specifically provided for in section 2.1(e) of the Stalking Horse Agreement, including but not limited to corporate minute books, stock transfer books, the corporate seal of Sellers, tax records, employment records and other corporate books and records relating to Sellers' organization, existence, and operations, and associated Avoidance Actions; and

(i)     any shares of stock or other equity interests in any Subsidiary of Parent.

16.     The Debtors will not entertain bids for all or substantially all of the Assets that do not, individually or collectively, exceed the sum of the Stalking Horse Purchase Price, Termination Fee, and the Expense Reimbursement, plus $250,000, in the aggregate.

17.     Except as otherwise provided in the applicable asset purchase agreement, all of the Debtors' rights, title, and interest in all of the Assets shall be sold free and clear of any liens, security interests, claims, charges, or encumbrances pursuant to section 363 of the Bankruptcy Code.    The Debtors propose that any such liens, security interests, claims, charges, or encumbrances shall attach to the amounts payable to the Debtors' estates resulting from the Sale, net of any transaction fees (the "Sale Proceeds"), in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto, subject to any further order of the Court.

**Summary of Proposed Bid Procedures**

18.     In order to ensure that the Debtors receive the maximum value for their Assets, the Stalking Horse Agreement is subject to higher or otherwise better offers, and, as such, the Stalking Horse Agreement will serve as the "stalking-horse" bid for the Assets.

## I.        Documentation Necessary for Qualification as a Potential Bidder

19.        In order to be qualified to receive any confidential information from the Debtors, to submit an Initial Overbid (as defined below), and to participate in the Auction with respect to the Assets, a potential bidder (each, an "Interested Party") must submit each of the following to the Notice Parties (as defined below) on a timely basis:

(a)        An executed confidentiality agreement which shall inure to the benefit of the Debtors and may be assigned to the Successful Bidder (as defined below), in a form and substance satisfactory to the Debtors; and

(b)        A statement demonstrating, to the Debtors' satisfaction, after reasonable consultation with the DIP Agent, the Prepetition Agent,[4] and FSR, that the Interested Party has a bona fide interest in purchasing the Assets;

(c)        Current audited financial statements and latest unaudited financial statements of the Interested Party or, if the Interested Party is an entity formed for the purpose of acquiring the Assets, current audited financial statements and latest unaudited financial statements of the equity holders or sponsors of the Interested Party who will guarantee the obligations of the Interested Party, or such other form of financial disclosure and/or credit-quality support or enhancement, if any, that, as determined by the Debtors in their reasonable discretion after reasonable consultation with the DIP Agent, the Prepetition Agent, and FSR, demonstrates that the Interested Party has the financial wherewithal and other capabilities necessary to consummate the Sale.

20.        An Interested Party that delivers the documents and information described above and that the Debtors determine in their reasonable business judgment, after consultation with their advisors and reasonable consultation with the DIP Agent, the Prepetition Agent, and FSR, is likely (based on availability of financing, experience, and other factors considered by the

---

[4]    The term "DIP Agent" shall refer to Salus Capital Partners, LLC, as administrative and collateral agent pursuant to that certain Senior Secured, Super-Priority Debtor-In-Possession Credit and Security Agreement, dated as of April 19, 2015, entered into by and among the Debtors, the DIP Agent and Salus CLO 2012-1, LTD., as lender. The term "Prepetition Agent" shall refer to Salus Capital Partners, LLC, as administrative and collateral agent pursuant to that certain Credit and Security Agreement, dated as of May 31, 2012, entered into by and among the Debtors, the Prepetition Agent and the lenders from time to time party thereto, as amended or modified through the Petition Date.

Debtors in their discretion after reasonable consultation with the DIP Agent, the Prepetition Agent, and FSR) (i) to be able to consummate the sale and (ii) is pursuing the transaction in good faith, will be deemed to be a "Potential Bidder."

21.    As promptly as practicable after an Interested Party delivers all of the materials required above, the Debtors will determine, after reasonable consultation with the DIP Agent, the Prepetition Agent, and FSR, whether the Interested Party is deemed to be a Potential Bidder and (a) will notify the Interested Party as to such determination and (b) will notify the Stalking Horse Purchaser if it determines that the Interested Party is a Potential Bidder.

22.    Notwithstanding the foregoing, the DIP Agent and the Prepetition Agent shall not be required to deliver the materials set forth above in order to be a Potential Bidder and shall be deemed a Potential Bidder for all purposes.

**II.    Due Diligence**

23.    The Debtors will afford any Potential Bidder such due diligence access or additional information as the Debtors, in consultation with their advisors, deem appropriate, in their reasonable discretion.  For any Potential Bidder who is a competitor of the Debtors or is affiliated with any competitor of the Debtors, the Debtors reserve the right to withhold any materials or information that the Debtors determine are business-sensitive or otherwise not appropriate for disclosure to such Potential Bidder; provided, that the Debtors shall notify the DIP Agent and the Prepetition Agent of the determination to withhold such information and shall provide reasonable detail as to the information withheld.  The Debtors must promptly advise the Stalking Horse Purchaser in the event any other Potential Bidder receives diligence the Stalking Horse Purchaser has not previously been provided access to and shall promptly be provided with access to such diligence materials.  The due diligence period shall extend through and include the

Bid Deadline (as defined below). Additional due diligence will not be provided after the Bid Deadline.

### III.    Provisions Governing Qualifications of Overbids

24.    A bid submitted will be considered a qualified bid only if the bid is submitted by a Potential Bidder and complies with all of the following (a "<u>Qualified Bid</u>"):

(a)    includes a proposed purchase agreement, including all exhibits and schedules thereto (the "<u>Competing Purchase Agreement</u>"), duly authorized and executed by the Potential Bidder, along with a redlined, marked copy showing all changes between the Competing Purchase Agreement and the Stalking Horse Agreement, that:

(i)    provides for consideration (the "<u>Competing Purchase Price</u>") that, in the Debtors' business judgment, after reasonable consultation with the DIP Agent, the Prepetition Agent, and FSR, individually, or together with one or more other bids that otherwise satisfy the requirements for a Qualified Bid, exceeds the Purchase Price, Termination Fee, and Expense Reimbursement by at least $250,000 (such amount, the "<u>Minimum Overbid</u>");

(ii)    specifically disclaims any right of Potential Bidder to receive a breakup fee or termination fee, and waives any claim to compensation under section 503(b) of the Bankruptcy Code for making a substantial contribution;

(iii)    identifies with particularity which executory contracts and unexpired leases the Potential Bidder wishes to assume;

(iv)    contains a proposed closing date that is not later than June 30, 2015;

(b)    includes a cashier's check made payable to the order of the Debtors equal to (a) 10% of the Competing Purchase Price, if the total consideration is quantifiable or (b) an amount to be determined by the Debtors, if the total consideration is unquantifiable, which will be retained by the Debtors as a refundable deposit for application against the purchase price at the closing of the transaction, or returned to the Potential Bidder as set forth below;

(c)    identifies the full legal name of the Potential Bidder (including any equity holders or other financial backers, if the Potential Bidder is an entity formed for the purpose of consummating the Sale);

(d)    provides that such offer remains open and irrevocable as follows (i) until the closing of the Sale, if it is designated as the Successful Bid, (ii) until

the Back-Up Expiration Date (as defined below) if it is designated as the Back-Up Bid (as defined below), and (iii) in all other cases, until the earlier of (x) entry of the Sale Order and (y) ten days after conclusion of the Auction;

(e)  contains information establishing, based upon the Debtors' business judgment, after reasonable consultation with the DIP Agent, the Prepetition Agent, and FSR, the Potential Bidder's ability to provide adequate assurance of performance with respect to the executory contracts and unexpired leases identified in subparagraph (a)(iii) above;

(f)  is accompanied by evidence establishing, based upon the Debtors' business judgment, after reasonable consultation with the DIP Agent, the Prepetition Agent, and FSR, that the Potential Bidder has the financial ability to pay the Competing Purchase Price;

(g)  contains terms and conditions that, taken as a whole, are higher or otherwise better than the terms and conditions of the Stalking Horse Agreement as determined by the Debtors using their business judgment after reasonable consultation with the DIP Agent, the Prepetition Agent, and FSR;

(h)  is accompanied by evidence establishing, based upon the Debtors' business judgment, after reasonable consultation with the DIP Agent, the Prepetition Agent, and FSR, that (a) the Potential Bidder is capable and qualified, financially, legally, and otherwise, of unconditionally performing all obligations under the Competing Purchase Agreement and (b) all necessary internal, board, and shareholder approvals related to the submission, execution, delivery, and closing of the Competing Purchase Agreement have been obtained;

(i)  is not subject to any due diligence or financing contingencies of any kind, or any contingencies related to any internal or investment committee or similar approvals;

(j)  is accompanied by an affirmative statement that there are no conditions precedent to the Potential Bidder's execution, delivery, and closing of the Competing Purchase Agreement other than those contained in the Competing Purchase Agreement;

(k)  includes an acknowledgement and representation, in form and substance satisfactory to the Debtors, that the Potential Bidder:  (A) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer, (B) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its bid, and (C) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties

whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Competing Purchase Agreement;

(l)    contains such other information reasonably requested by the Debtors or the DIP Agent, the Prepetition Agent, or FSR; and

(m)    is received by each of the Notice Parties prior to the Bid Deadline.

25.    The Stalking Horse Purchaser and any Potential Bidder that timely submits a Qualified Bid (an "Initial Overbid"), as set forth above and as determined by the Debtors in their sole discretion, after reasonable consultation with the DIP Agent, the Prepetition Agent, and FSR, shall each be deemed a "Qualified Overbidder" and may bid for the Assets at the Auction.  Any entity that fails to submit a timely, conforming Initial Overbid, as set forth above, shall be disqualified from bidding for the Assets at the Auction.

26.    Notwithstanding the requirement set forth above, the Debtors, in their discretion, after reasonable consultation with the DIP Agent, the Prepetition Agent, and FSR, may accept, as a single Qualified Bid, multiple bids for the Assets, a portion of the Assets, or some or all of the Assets together with any other assets of the Debtors such that, when taken together in the aggregate, such bids would otherwise meet the standards for a single Qualified Bid.  The Debtors may permit Potential Bidders who submitted such multiple bids by the Bid Deadline but who were not identified as a component of a single Qualified Bid consisting of such multiple bids and which otherwise satisfy the Qualified Bid criteria set forth above to participate in the Auction and to submit at the Auction higher or otherwise better bids that in subsequent rounds of bidding may be considered, together with other bids, as part of such a single Qualifying Bid for overbid purposes.

27.    Notwithstanding the foregoing, the DIP Agent and the Prepetition Agent shall be deemed a Qualified Overbidder for all purposes hereunder.  Any bid submitted by the DIP Agent and/or Prepetition Agent shall be a Qualified Bid.

## IV.    Bid Deadline

28.    A Potential Bidder that desires to make an Initial Overbid will deliver written copies of its Qualified Bid to each of the following parties (collectively, the "Notice Parties"): (i) counsel to the Debtors:  Milbank, Tweed, Hadley & M$^c$Cloy LLP, One Chase Manhattan Plaza, New York, NY 10005 (Attn:  Tyson M. Lomazow, Esq., facsimile:  (212) 822-5367, email: tlomazow@milbank.com and Alexander M. Kaye, Esq., facsimile:  (212) 822-5171, email: AKaye@milbank.com), (ii) counsel to the DIP Agent and Prepetition Agent:  Greenberg Traurig, One International Place, 20th Floor, Boston, MA 02110 (Attn:  Jeffrey M. Wolf, Esq., facsimile:   (617) 279-8447, email: wolfje@gtlaw.com) and Greenberg Traurig, 200 Park Avenue, New York, NY 10062 (Attn:  Matthew L. Hinker, Esq., facsimile:  (212) 801-6400, email: hinkerm@gtlaw.com), (iii) counsel to Front Street Re (Cayman) Ltd.:  Drinker Biddle & Reath LLP, 600 Campus Drive,  Florham Park, NJ 07932-1047 (Attn:  Robert K. Malone, Esq., facsimile:   (973) 360-9831, email: robert.malone@dbr.com and Maria A. Dantas, Esq., facsimile:  (973) 360-9831, email: maria.dantas@dbr.com), and (iv) counsel to any official committee formed in these cases, so as to be received by no later than May 26, 2015 at 5:00 p.m. (prevailing Eastern Time) (the "Bid Deadline").  Upon receipt by the Debtors of a bid from a Potential Bidder, the Debtors shall timely, but no later than two business days prior to the Auction, provide a summary of such bids to the Stalking Horse Purchaser and its counsel (with copies to the counsel to the DIP Agent, the Prepetition Agent, and FSR).  The Debtors may extend the Bid Deadline in their sole discretion after reasonable consultation with the DIP Agent, the Prepetition Agent, and FSR.

## V.      Evaluation of Competing Bids

29.     A Qualified Bid will be evaluated by the Debtors based upon several factors including, without limitation, (1) the amount of the Competing Purchase Price, (2) the risks and timing associated with consummating such bid, (3) any proposed revisions to the Stalking Horse Agreement, (4) the ability of the Qualified Overbidder to obtain appropriate regulatory approvals, and (5) any other factors deemed relevant by the Debtors in their business judgment after reasonable consultation with the DIP Agent, the Prepetition Agent, and FSR.

## VI.     No Competing Bid

30.     If no timely, conforming Initial Overbid is received, the Debtors shall not conduct an Auction, and following the Bid Deadline the Stalking Horse Purchaser will be named the Successful Bidder and the Debtors shall request at the Sale Hearing that the Bankruptcy Court approve the Debtors entry into the Stalking Horse Agreement and consummation of the transactions contemplated thereby, and request that the Sale Order be immediately effective upon entry.

## VII.    Auction Procedures

31.     If one or more timely conforming Initial Overbids is received, the Debtors will conduct the Auction on May 28, 2015 at 10:00 a.m. (prevailing Eastern Time) (the "Auction Date"), at the offices of Milbank, Tweed, Hadley & M$^c$Cloy LLP, One Chase Manhattan Plaza, New York, NY 10005, or at such other location as shall be identified in a notice filed with the Bankruptcy Court at least 24 hours before the Auction, in which the Stalking Horse Purchaser and all other Qualified Overbidders may participate.  The Auction shall be governed by the following procedures:

> (a)     the Auction will be conducted openly and the actual identity of each Qualified Overbidder will be disclosed on the record at the Auction;

(b)     only the Debtors, any official committee formed in these cases, the Stalking Horse Purchaser, any Qualified Overbidders, the Prepetition Agent, the DIP Agent, FSR, and their respective counsel and representatives shall be permitted to attend and all Qualified Overbidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Overbidder attending the Auction in person;

(c)     each Qualified Overbidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale, and that its Initial Overbid is a good faith bona fide offer and that it intends to consummate the proposed transaction if selected as the Successful Bidder;

(d)     other than the DIP Agent and/or Prepetition Agent, at least one (1) business day prior to the Auction, each Qualified Overbidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction; provided that in the event a Qualified Overbidder elects not to attend the Auction, such Qualified Overbidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Overbidder and such Qualified Overbidder may still be designated by the Debtors as the Back-Up Bidder.   At least two (2) business days prior to the Auction, the Debtors will provide a summary of the Qualified Bid or combination of Qualified Bids which the Debtors believe, in their reasonable discretion, after reasonable consultation with the DIP Agent, the Prepetition Agent, and FSR, is the highest or otherwise best offer (the "Starting Bid") to the Stalking Horse Purchaser (with copies to the DIP Agent, the Prepetition Agent, and FSR);

(e)     bidding will commence at the Starting Bid;

(f)     each subsequent bid shall be in increments of no less than $100,000 above the immediately preceding bid, and the Debtors will evaluate each such bid in their sole discretion after reasonable consultation with the DIP Agent, the Prepetition Agent, and FSR;

(g)     after the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that they believe to be the highest or otherwise best offer (the "Leading Bid").  A round of bidding will conclude after each participating Qualified Overbidder has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid.  If the Stalking Horse Bidder or a Qualified Overbidder (other than the DIP Agent and/or Prepetition Agent) fails to make a subsequent bid, they will not be permitted to bid in any subsequent rounds of bidding at the Auction;

(h)     for the purpose of evaluating the value of the consideration provided by subsequent bids (including any subsequent bid by the Stalking Horse

Purchaser), the Debtors will give effect to any additional liabilities to be assumed by a Qualified Overbidder or the Stalking Horse Bidder and any additional costs which may be imposed on the Debtors;

(i)    the Stalking Horse Purchaser shall have the right, but not the obligation, in its sole and absolute discretion, to match bids made by any Qualified Overbidder and, in such event, the Stalking Horse Purchaser's matching bid shall be deemed the highest or otherwise best bid for the Assets; provided, however, that the Debtors, in their sole discretion, after consultation with the DIP Agent, the Prepetition Agent, and FSR, shall determine whether any such bid by the Stalking Horse Purchaser is a matching bid;

(j)    the Auction shall be conducted openly and each bidder will be informed of the terms of the previous bid determined by the Debtors in their sole discretion after reasonable consultation with the DIP Agent, the Prepetition Agent, and FSR to have been the highest or otherwise best bid;

(k)    the Auction shall continue until there is only one highest or otherwise best bid in the Debtors' sole discretion after reasonable consultation with the DIP Agent, the Prepetition Agent, and FSR (the "Successful Bid" and the Qualified Overbidder submitting the same, the "Successful Bidder");

(l)    the bidding at the Auction shall be transcribed; and

(m)    the Debtors shall have the right  after reasonable consultation with the DIP Agent, Prepetition Agent, and FSR to modify the procedures for the Auction, and to adjourn the auction one or more times for any reason, in a manner not inconsistent with the procedures set forth in subparagraphs (a) through (l) above.

32.    As used herein, the term "Successful Bidder's Purchase Agreement" shall mean, as applicable, the (i) Competing Purchase Agreement of the Successful Bidder, if the Successful Bidder is any Qualified Overbidder other than the Stalking Horse Purchaser, or (ii) Stalking Horse Agreement, as it may be modified during the Auction pursuant to the procedures set forth in the immediately preceding paragraph, if the Stalking Horse Purchaser is the Successful Bidder, in either case, as approved pursuant to the Sale Order.

**VIII.    Selection of Successful Bidder; As-Is Where-Is**

33.    The determination of the Successful Bid and the Back-Up Bid by the Debtors at the conclusion of the Auction shall be final, subject only to approval by the Bankruptcy Court. Any Sale will be on an "as is, where is" basis and without representations or warranties of any kind by the Debtors, their agents or the Debtors' chapter 11 estates, except and solely to the extent expressly set forth in the Successful Bidder's Purchase Agreement.

34.    Unless otherwise agreed to by the Debtors and the Successful Bidder, within two (2) business days after the conclusion of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments, and other documents evidencing and containing the terms and conditions upon which the Successful Bidder's bid was made.  Within 24 hours after the conclusion of the Auction (if any), the Debtors shall file a notice identifying the Successful Bidder with the Bankruptcy Court and shall serve such notice by fax, email, or overnight mail to all counterparties whose contracts are to be assumed and assigned.

35.    The Debtors and the Successful Bidder will consummate the transactions contemplated by the Successful Bidder's Purchase Agreement, pursuant to the terms and conditions thereof, upon the Bankruptcy Court's approval of the Successful Bidder's Purchase Agreement pursuant to the Sale Order.

**IX.    Return of Deposits**

36.    All deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder (as defined below) no later than five (5) business days following the conclusion of the Auction.  The Successful Bidder's deposit will be credited towards the purchase price at the closing under the Successful Bidder's Purchase Agreement. The Back-Up Bidder's deposit shall be returned to it no later than five (5) business days after the Backup Expiration Date or, if the Backup Bidder is selected as the Backup Bidder and the

Debtors elect to consummate the Sale with the Back-Up Bidder, its deposit will be credited towards the purchase price at the closing under the Back-Up Bid.

## X.      Reservation of Rights

37.      The Debtors reserve the right after reasonable consultation with the DIP Agent, the Prepetition Agent, and FSR to amend these Bid Procedures at any time and from time to time in any manner that they determine in their discretion will promote the goals of the Sale and Auction process, provided, however, that no such modification shall be made that is inconsistent with the Stalking Horse Agreement without the prior consent of the Stalking Horse Purchaser and no modification shall be made to the rights of the DIP Agent, the Prepetition Agent, or FSR hereunder without the reasonable consent of the DIP Agent, the Prepetition Agent, and/or FSR. The Debtors reserve the right to terminate discussions with any or all Potential Bidders at any time and without specifying the reasons therefor.

## XI.     Back-Up Bidder

38.      The Qualified Overbidder (other than the DIP Agent and/or Prepetition Agent unless such party so consents) with the next highest or otherwise best Qualified Bid (the "Back-Up Bid"), as determined by the Debtors in their discretion, whether or not an Auction is conducted, shall be required to serve as a back-up bidder (the "Back-Up Bidder").  If an Auction is conducted, the identity of the Back-Up Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.  If an Auction is not conducted, the Debtors shall file a notice with the Court promptly after the Auction Date identifying the Back-Up Bidder and the amount and material terms of the Backup Bid.  The Backup Bidder shall be required to keep the Back-Up Bid open and irrevocable until the earlier of (i) the closing under the Successful Bidder's Purchase Agreement and (ii) 5:00 p.m.

(prevailing Eastern time) on the earlier of the first business day that is 60 days after the Auction Date (the "Backup Expiration Date"). If the Successful Bidder fails to consummate the approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the Successful Bidder for all purposes under these Bid Procedures (and the Back-Up Bid will be deemed to be the Successful Bidder's Purchase Agreement for all purposes hereunder), and the Debtors will be authorized, but not required, to consummate the Sale with the Back-Up Bidder without further order of the Bankruptcy Court.

## XII.    Credit Bid Right

39.    Subject to the entry of the Final Order and any and all applicable law, pursuant to section 363(k) of the Bankruptcy Code and included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, the DIP Agent shall have the right to use the DIP Obligations, DIP Liens, and DIP Superpriority Claims and the Prepetition Agent shall have the right to use the Prepetition Obligations related to the Line of Credit (other than those participated to the Term Lender), in each case subject to section 363(k) of the Bankruptcy Code, to credit bid with respect to any bulk or piecemeal sale of all or any portion of the DIP Collateral or Prepetition Collateral. Notwithstanding the foregoing, the DIP Agent and Prepetition Agent have agreed not to be the Successful Bidder in respect of any credit bid if the Stalking Horse Purchaser fulfills all of its commitments and obligations under the Stalking Horse Agreement.

## XIII.   Application of Proceeds

40.    Upon the closing of such transaction, all liens securing the DIP Obligations and the Prepetition Obligations related to the Line of Credit (other than those that have been participated) (in their respective priority) shall be transferred to the proceeds of such Sale and

such proceeds shall be applied at the closing of the Sale to permanently and indefeasibly repay the DIP Obligations or such Prepetition Obligations, as applicable, in full, in cash.

## XIV.    Sale Hearing

41.    The Debtors will seek entry of the Sale Order from the Bankruptcy Court, approving and authorizing the Sale to the Successful Bidder in accordance with these Bid Procedures and pursuant to the terms and conditions set forth in the Successful Bidder's Purchase Agreement, at the Sale Hearing to begin on or before June 2, 2015.

### Notice of Sale Hearing

42.    As stated above, the Debtors request that this Court schedule the Sale Hearing for June 2, 2015 (prevailing Eastern Time).  The Debtors propose that any objections to the Sale be filed by May 26, 2015 (prevailing Eastern Time), seven days prior to the Sale Hearing.

43.    The Debtors also request that the Court approve the form of the Procedures Notice, substantially in the form of **Exhibit 3** to the Bid Procedures Order.  The Debtors will serve a copy of the Procedures Notice on the following parties:  (i) the U.S. Trustee; (ii) any parties requesting notices in these cases pursuant to Bankruptcy Rule 2002; and (iii) any entity that has expressed a bona fide interest in acquiring the Assets in the six (6) months preceding the date of this Motion (collectively with the parties specified in this paragraph, the "Procedures Notice Parties").

44.    The Debtors propose to serve the Procedures Notice within two (2) business days following entry of the Bid Procedures Order, by first-class mail, postage prepaid on the Procedures Notice Parties.  The proposed Procedures Notice provides that any party that has not received a copy of the Motion or the Bid Procedures Order that wishes to obtain a copy of this Motion or the Bid Procedures Order, including all exhibits thereto, may contact the Debtors' claims and noticing agent, Kurtzman Carson Consultants LLC, (i) at their website,

(www.kccllc.net/Fredericks), (ii) by phone, at (888) 733-1437, (iii) by email, at FredericksInfo@kccllc.com, or (iv) by written request to Frederick's of Hollywood Claims Processing Center, c/o KCC, 2335 Alaska Ave., El Segundo, CA 90245.

45.     The Debtors submit that the foregoing notices comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bid Procedures, the Auction and Sale, and the Sale Hearing to the Debtors' creditors and other parties in interest, as well as to those who have expressed an interest, or those the Debtors believe are likely to express an interest, in bidding on the Assets.  Based on the foregoing, the Debtors respectfully request that this Court approve these proposed notice procedures.

**Sale Hearing**

46.     At the Sale Hearing, the Debtors will seek Court approval of the Sale to the Successful Bidder, free and clear of all liens, claims, and encumbrances pursuant to section 363 of the Bankruptcy Code, with all liens, claims, and encumbrances to attach to the Sale Proceeds with the same validity and in the same order of priority as they attached to the Assets prior to the Sale, including the assumption by the Debtors, and assignment to the Successful Bidder, of the Contracts pursuant to section 365 of the Bankruptcy Code.  The Debtors will submit and present additional evidence, as necessary, at the Sale Hearing demonstrating that the Sale is fair, reasonable, and in the best interest of the Debtors' estates and all interested parties.

**Procedures for the Assumption and Assignment of Contracts**

47.     The Debtors request the following procedures (the "Cure Procedures") for notifying counterparties to Contracts of potential Cure Amounts (as defined below) with respect to those Contracts that the Debtors may seek to assume and assign on the Closing Date.

48.     Within three (3) days of the entry of the Bid Procedures Order, the Debtors will file a notice of potential assumption, assignment, and/or transfer of the Contracts listed therein

(the "Designated Executory Contracts"), substantially in the form attached to the Bid Procedures Order as **Exhibit 4** (the "Notice of Assumption and Assignment"), and serve such notice on all non-debtor parties to the Designated Executory Contracts (the "Contract Notice Parties").

49.     The Notice of Assumption and Assignment shall identify the calculation of the cure amounts, if any, that the Debtors believe must be paid to cure all defaults outstanding under each Designated Executory Contract (the "Cure Amounts") as of such date.  The Notice of Assumption and Assignment shall also contain information regarding how a non-debtor party to a Designated Executory Contract may obtain adequate assurance of future performance information from the Stalking Horse Purchaser (the "Stalking Horse Adequate Assurance Information").  The Notice of Assumption and Assignment shall set a deadline by which the non-debtor party to a Designated Executory Contract may file an objection to the Cure Amount, the Stalking Horse Adequate Assurance Information, or the assumption and assignment of such contract or lease.  In addition, if the Debtors identify additional Contracts that might be assumed by the Debtors and assigned that are not set forth in the original Notice of Assumption and Assignment, the Debtors shall promptly send a supplemental notice (a "Supplemental Notice of Assumption and Assignment") to the applicable counterparties to such additional Contracts.

50.     The Debtors request that this Court set the deadline to object to any Cure Amount, the Stalking Horse Adequate Assurance Information, or the assumption and assignment of any Designated Executory Contract as three (3) days prior to the Auction; provided, however, that in the event that the Successful Bidder is not the Stalking Horse Purchaser, the Debtors propose that any objections solely as it relates to whether such bidder can provide adequate assurance of future performance may be raised at the Sale Hearing.  To that end, the Notice of Assumption and Assignment and any Supplemental Notice of Assumption and Assignment shall also provide

that objections to any Cure Amount, the Stalking Horse Adequate Assurance Information, or the assumption and assignment of any Designated Executory Contract will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors subject to the Court's calendar.

51.     The Stalking Horse Agreement also contemplates that the Stalking Horse Purchaser may determine to exclude any Designated Executory Contract from the list of Assets no later than two (2) business days prior to the date of the Sale Hearing and may add any Designated Executory Contract to the list of Assets no less than fifteen (15) business days prior to the Sale Hearing.

52.     At the Sale Hearing, the Debtors and/or the Successful Bidder shall (i) present evidence necessary to demonstrate adequate assurance of future performance by any Successful Bidder and (ii) request entry of an order requesting approval of the assumption and assignment of any or all Contracts to be assumed and assigned on the Closing Date to any Successful Bidder. For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

<b><u>Legal Basis for Relief Requested</u></b>

**I.     The Sale of the Assets is Authorized by Section 363 as a Sound Exercise of the Debtors' Business Judgment**

53.     In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be conducted by private sale or public auction.  As set forth in detail in the First Day Declaration, which is incorporated by reference herein, the Debtors have determined that the Sale of their Assets by public auction will enable them to obtain the highest or otherwise best offer for their Assets (thereby maximizing the value of their estates) and is in the best interests of their stakeholders.   The Stalking Horse Agreement is the result of comprehensive, arm's-length negotiations for the Sale of the Assets, and the Sale pursuant to the

terms of the Stalking Horse Agreement, subject to higher or otherwise better offers at the Auction, will provide a greater recovery for the Debtors' creditors than would be provided by any other existing alternative.

54.    Section 363 of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, a sale of a debtor's assets should be authorized if a sound business purpose exists for doing so.  See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 289, 295 (3d Cir. 1996); In re Abbotts Dairies of Pennsylvania, Inc., 788 P.2d 143 (2d Cir. 1986); In re Titusville Country Club, 128 B.R. 396 (W.D. Pa. 1991); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 D. Del. 1991); see also Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

55.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Resources, 147 B.R. 650, 659 ("It is a well-established principle of bankruptcy law that the . . . [trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).  As long as the sale appears to enhance a

debtor's estate, court approval of a trustee's decision to sell should only be withheld if the trustee's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.  GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd., 331 B.R. 251, 255 (N.D. Tex. 2005); In re Lajijani, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005); In re WPRV-TV, Inc., 143 B.R. 315, 319 (D.P.R. 1991) ("The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property.  Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference.").

56.      Applying section 363, the proposed Sale of the Assets should be approved.  As set forth in the O'Hara Declaration, the Debtors, with the assistance of their advisors, conducted a thorough review of the Debtors' strategic alternatives, including an exploration of possible refinancing, restructuring, or sale options and determined that the proposed Sale of their businesses through a 363 sale process governed by the Bid Procedures will maximize the value of their estates and is in the best interests of their stakeholders.  Thus, the Sale is supported by good business reasons.

57.      Further, the fairness and reasonableness of the consideration to be paid by the ultimate purchaser(s) will be demonstrated by adequate "market exposure" and an open and fair auction process – the best means for establishing whether a fair and reasonable price is being paid.  In order to ensure a fair auction process, following approval of the Bid Procedures Order until completion of the Auction, the Debtors are permitted to initiate contact with, solicit, or encourage submission of any inquiries, proposals, or offers by any Person in connection with any sale or other disposition of the Assets.  Accordingly, the Debtors respectfully request that the Sale of the Assets to the Successful Bidder be approved.

**II.    The Bid Procedures Are Appropriate and Will Maximize the Value Received for the Assets**

58.    As noted above, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  See, e.g., In re Fin'l News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

59.    Procedures to dispose of assets, similar to the proposed Bid Procedures, have been approved by bankruptcy courts in this District.  See, e.g., In re Conex Holdings LLC, Case No. 11-10501 (CSS) (Bankr. D. Del. Sept. 14, 2011) [Docket No. 132]; In re Barnes Bay Development Ltd., Case No. 11-10792 (PJW) (Bankr. D. Del. May 19, 2011) [Docket No. 294]; In re East West Resort Development V, L.P., L.L.L.P., Case No. 10-10452 (BLS) (Bankr. D. Del. March 31, 2010) [Docket No. 230]; In re Dana Corp., Case No. 06-10354 (Bankr. S.D.N.Y. Oct. 19, 2006) [Docket No. 3897]; In re Delphi Corp., Case No. 05-44481 (Bankr. S.D.N.Y. June 22, 2006) [Docket No. 4328]; In re Oxford Automotive, Inc., Case No. 04-74377 (Bankr. E.D. Mich. Jan. 24, 2005) [Docket No. 365]; see also In re Calpine Corp., Case No. 05-60200 (Bankr. S.D.N.Y. Dec. 6, 2006) [Docket No. 3221].

60.    The Debtors believe that the Bid Procedures will establish the parameters under which the value of their Assets may be tested at the Auction and through the ensuing Sale Hearing.  Such procedures will increase the likelihood that the Debtors' creditors will receive the greatest possible consideration for the Assets because they will ensure a competitive and fair bidding process.  They also allow the Debtors to undertake the Auction in as expeditious and

efficient manner as possible, which the Debtors believe is essential to maximizing the value of their estates for their creditors.

61.    The Debtors also believe the proposed Bid Procedures will promote active bidding from seriously interested parties and will dispel any doubt as to the highest or otherwise best offer reasonably available for their Assets.  In particular, the proposed Bid Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.

62.    In sum, the Debtors believe the Bid Procedures will encourage bidding for the Assets and are consistent with the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  Accordingly, the proposed Bid Procedures are reasonable, appropriate, and within the Debtors' sound business judgment.

### III.    The Sale of the Assets Free and Clear of Liens and Other Interests is Authorized by Sections 363(f)

63.    The Debtors further submit that it is appropriate to sell the Assets free and clear of liens pursuant to section 363(f) of the Bankruptcy Code, with any such liens attaching to the Sale Proceeds of the Assets to the extent applicable.[5]   Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, claims, interests, and encumbrances if:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interests;

---

[5]    As reflected in the form of Sale Order attached hereto, upon the closing of the Successful Bidder's Asset Purchase Agreement, all liens securing the DIP Obligations and the Prepetition Obligations related to the Line of Credit (other than those participated to the Term Lender) (in their respective priority) shall be transferred to the net proceeds of such sale and such proceeds shall be remitted directly by the Successful Bidder to the DIP Agent and the Prepetition Agent in the following order:  first, to permanently and indefeasibly repay in full the Obligations related to the Line of Credit (as defined in the Prepetition Credit Agreement) (other than any portion of the Line of Credit which has been participated to the Term Lender (as defined in the Prepetition Credit Agreement)); and second, to permanently and indefeasibly repay in full the DIP Obligations.

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f).

64.     This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

65.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests.  In re Dundee Equity Corp., Case No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

66.     The Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the Sale of the Assets pursuant to the Stalking Horse Agreement.  In particular, the Debtors believe that section 363(f)(2) will be met in connection with the transactions proposed under the Stalking Horse Agreement because each of the parties holding liens on the Assets will consent or, absent any objection to this Motion, will be deemed to have consented to the Sale.  Further, any lienholder also will be adequately protected by having their liens, if any,

in each instance against the Debtors or their estates, attach to the Sale Proceeds ultimately attributable to the Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force, and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  Accordingly, section 363(f) authorizes the transfer and conveyance of the Debtors' assets free and clear of any such claims, interests, liabilities, or liens.

67.     Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code.  Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d Cir. 2000).  In the case of In re Trans World Airlines, Inc., 322 F.3d 283, 288–89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest."  The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'"  Id. at 289 (citing 3 Collier on Bankruptcy 15th Ed. Rev., ¶ 363.06[1] (L. King, 15th rev. ed. 1988)).  As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-82 (4th Cir. 1996), a case cited with approval and extensively by the Third Circuit in Folger, supra, the scope of section 363(f) is not limited to in rem interests.  Thus, the Third Circuit in Folger stated that Leckie held that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute."  Folger, 209 F.3d at 258.

68.     Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes such assets free from successor liability resulting from pre-existing claims.

See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to authorize a sale of assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93–94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); In re Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); American Living Systems v. Bonapfel (In re All Am. Of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); WBO Partnership v. Virginia Dept. of Medical Assistance Servs. (In re WBO Partnership), 189 B.R. 97, 104–05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).  The purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the purchaser arising from the Debtors' pre-sale conduct.  Under section 363(f) of the Bankruptcy Code, the purchaser is entitled to know that the Debtors' assets are not infected with latent claims that will be asserted against the purchaser after the proposed transaction is completed.

## IV.    The Proposed Notice of Bid Procedures and Auction Is Appropriate

69.    The Debtors believe that they will obtain the maximum recovery for their estates if their Assets are sold through a well-advertised sale and auction.  As set forth in the O'Hara Declaration, the Debtors have already taken significant steps to identify potential purchasers.

70.     Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of a proposed sale of their assets, including disclosure of the time and place of an auction, the terms and conditions of the sale, and the deadline for filing any objections thereto. The Debtors submit that the proposed notice procedures herein comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the sale by auction to the Debtors' creditors and other interested parties, as well as to those parties who have expressed an interest, or may express an interest, in bidding on the Assets.  The proposed time frame between the filing of this Motion, the commencement of the bidding process, and the Auction should provide interested purchasers ample time to participate in the Auction.

**V.      The Stalking Horse Protections Are Appropriate Under the Circumstances**

71.     As noted above, the Stalking Horse Purchaser was induced to submit its stalking horse bid in reliance on promises by the Debtors to seek the Stalking Horse Protections and in reasonable expectation that this Court would enter an order providing such relief.  The Debtors submit that the Stalking Horse Protections are a normal, and oftentimes necessary, component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code.   In particular, such protections encourage a potential purchaser to invest the requisite time, money, and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process.  See, e.g., In re Comdisco, Inc., Case No. 01-24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, inter alia, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate, and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement); Integrated Resources, 147 B.R. at 660 (noting that fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs and the risks such bidder faces by

having its offer held open, subject to higher and better offers); <u>In re Hupp Indus.</u>, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence"); <u>In re Marrose Corp.</u>, Case No. 89 B 12171 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. Feb. 15, 1992) (stating that "agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); <u>In re 995 Fifth Ave. Assocs.</u>, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citations omitted).

72.      In this case, the Stalking Horse Protections consist of (i) the Termination Fee, in the amount of $850,000, which represents 3.77% of the cash component of the Stalking Horse Purchase Price and (ii) the Expense Reimbursement of up to $300,000.  Bid protections, similar to the Stalking Horse Protections sought to be approved by this Motion, have been approved in other chapter 11 cases in this Court.  <u>See</u>, <u>e.g.</u>, <u>In re Orchard Supply Hardware Stores Corp.</u>, Case No. 13-11565 (CSS) (Bankr. D. Del. July 8, 2013) [Docket No. 155] (approving as administrative expenses a break-up fee of 3% of stalking horse purchase price and expense reimbursement of up to $850,000 in connection with sale of $205 million of sale assets); <u>In re Vertis Holdings, Inc.</u>, Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012) [Docket No. 206] (approving as administrative expenses a break-up fee of 3% of purchase price and expense reimbursement of up to $2,500,000 in connection with sale of $258 million of sale assets); <u>In re Solyndra LLC</u>, Case No. 11-12799 (MFW) (Bankr. D. Del. Sept. 28, 2012) [Docket No. 1113]

(approving as administrative expenses a break-up fee of 2.6% of purchase price and expense reimbursement of up to $500,000 in connection with $90 million sale of assets); In re Chef Solutions Holdings, LLC, Case No. 11-13139 (KG) (Bankr. D. Del. Oct. 19, 2011) [Docket No. 129] (approving as administrative expenses a break-up fee of 3.4% of $36.4 million cash portion of purchase price and expense reimbursement of up to $500,000); In re Nortel Networks Inc., Case No. 09-10138 (KG) (Bankr. D. Del. Feb. 27, 2009) [Docket No. 386] (approving $650,000 break-up fee in connection with $17.65 million sale, or 3.7%, in addition to up to $400,000 in expense reimbursements in connection with $17.65 million sale or 2.3%); In re Tallygenicom, L.P., Case No. 09-10266 (CSS) (Bankr. D. Del. Feb. 19, 2009) [Docket No. 130] (approving $750,000 break-up fee in connection with $36.6 million sale, or 2.0%, and approving a separate $750,000 expense reimbursement in connection with $36.6 million sale, or 2.0%).

73.    A proposed bidding incentive, such as the Termination Fee and Expense Reimbursement, should be approved when it is in the best interests of the estate.  In re S.N.A. Nut Co., 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); see also In re America West Airlines, Inc., 166 B.R. 908 (Bankr. D. Ariz. 1994); In re Hupp Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992).  Typically, this requires that the bidding incentive provide some benefit to the debtor's estate.  Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

74.    In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy), the Third Circuit found that whether break-up fees and expenses could be paid to Calpine Corp. ("Calpine") as a "stalking horse" depended on whether such fees were necessary to preserve the

value of the estate.  O'Brien Envtl. Energy, 181 F.3d at 536.  The court determined that Calpine's right to break-up fees and expenses depended on whether it provided a benefit to the debtor's estate by promoting competitive bidding or researching the value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company.  Id. at 537. The Debtors believe that approval of the Stalking Horse Protections will create such a competitive bidding process.

75.    First, the Termination Fee induced the Stalking Horse Purchaser to submit a bid that will serve as a minimum floor bid upon which other bidders may rely.  Therefore, the Stalking Horse Purchaser has provided a material benefit to the Debtors, their estates, and their respective creditors by encouraging bidding and increasing the likelihood that the best possible price for the Assets will be received.  See, e.g., In re Comdisco, Inc., Case No. 01-24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) [Docket No. 289] (finding proposed termination fee to be of substantial benefit to the debtor's estate); In re Kmart Corp., Case No. 02-02474 (SPS) (Bankr. N.D. Ill. May 10, 2002) [Docket No. 3003]; Integrated Resources, 147 B.R. at 659 (noting that termination payment is an "important tool to encourage bidding and to maximize the value of the debtor's assets").

76.    Second, the Debtors believe that the proposed Expense Reimbursement is fair and reasonably compensates the Stalking Horse Purchaser for taking actions that will benefit the Debtors' estates.  The Expense Reimbursement compensates the Stalking Horse Purchaser for diligence and professional fees incurred in negotiating the terms of the Stalking Horse Agreement on an expedited timeline.

77.    Third, the proposed Stalking Horse Protections are the result of an arm's-length negotiated agreement between the Debtors and the Stalking Horse Purchaser – a true third party

purchaser.  There is no evidence or reason to believe that the relationship between the Debtors and the Stalking Horse Purchaser has been tainted by self-dealing or manipulation.

78.    Finally, the Debtors do not believe the Stalking Horse Protections will have a chilling effect on the sale process.  Rather, the Stalking Horse Purchaser has increased the likelihood that the best possible price for the Assets will be received by permitting other qualified bidders to rely on the diligence performed by the Stalking Horse Purchaser, and moreover, by allowing qualified bidders to utilize the Stalking Horse Agreement as a platform for negotiations and modifications in the context of a competitive bidding process.

79.    In sum, the Stalking Horse Protections are reasonable under the circumstances and will enable the Debtors to maximize the value for their Assets while limiting any chilling effect in the sale process.  The Stalking Horse Protections are not only necessary given the risk the Debtors assume in forgoing a known, willing, and able purchaser for a new potential acquirer, but also ensure that there is an increase in the net proceeds received by their estates, after deducting the Stalking Horse Protections to be paid to the Stalking Horse Purchaser in the event of a prevailing overbid.

**VI.    Assumption and Assignment of Certain Executory Contracts and Unexpired Leases**

80.    Section 365(a) of the Bankruptcy Code provides that, subject to the court's approval, a trustee "may assume or reject any executory contracts or unexpired leases of the debtor."  11 U.S.C. § 365(a).  Upon finding that a trustee has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

81.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an executory contract or unexpired lease of nonresidential real property if:

(a)     the trustee assumes such contract or lease in accordance with the provisions of this section; and

(b)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

82.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

83.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. In re Bygaph, Inc., 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

84.     To the extent necessary, the Debtors and the Successful Bidder will present evidence at the Sale Hearing to prove the financial credibility, willingness, and ability of the Successful Bidder to perform under the Contracts.   The Court and other interested parties

therefore will have the opportunity to evaluate the ability of any Successful Bidder to provide adequate assurance of future performance under the Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code.

85.    In addition, the Cure Procedures are appropriate and consistent with section 365 of the Bankruptcy Code.  To the extent any defaults exist under any Designated Executory Contracts, any such defaults will be cured pursuant to the Successful Bidder's asset purchase agreement.  Any provision in the Designated Executory Contracts that would restrict, condition, or prohibit an assignment of such contracts will be deemed unenforceable pursuant to section 365(f)(1) of the Bankruptcy Code.

86.    Accordingly, the Debtors submit that the Cure Procedures for effectuating the assumption and assignment of the Designated Executory Contracts as set forth herein are appropriate and should be approved.

## VII.    The Successful Bidder Should Be Afforded All Protections Under Section 363(m) as A Good Faith Purchaser

87.    Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor's estate notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  In re Chateaugay Corp., Case No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. May 10, 1993) (quoting In re Abbotts Dairies of Penn., Inc.,

788 F.2d 143, 147 (3d Cir. 1986)); see also Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

88.     The Successful Bidder will either be the Stalking Horse Purchaser, which made an offer after arm's-length, good faith negotiation, or a higher bidder after a competitive purchasing process.  Therefore, the Debtors intend to request at the Sale Hearing a finding that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

## VIII.    Relief from the Fourteen Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

89.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

90.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should

"order otherwise" and eliminate or reduce the fourteen (14) day stay period, <u>Collier</u> suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." <u>Collier on Bankruptcy</u> P 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Furthermore, <u>Collier</u> provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. <u>Id</u>.

91.     In light of the deadlines set forth in the Stalking Horse Agreement, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## **Notice**

92.     The Debtors will provide notice of this Motion to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the 30 largest unsecured claims on a consolidated basis; (iii) counsel to Salus Capital Partners, LLC, in its capacity as the administrative and collateral agent under the Debtors' prepetition credit facility and in its capacity as the administrative and collateral agent under the Debtors' proposed debtor-in-possession financing facility; (iv) any banking or financial institution that holds the Debtors' accounts; and (v) all parties entitled to notice pursuant to Local Rule 9013-1(m).


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, the Debtors respectfully request that the Court enter orders substantially in the form attached hereto as **Exhibit B** and **Exhibit C**:  (a) granting the relief requested herein and (b) granting to the Debtors such other and further relief as the Court may deem proper.

Wilmington, Delaware
Dated: April 20, 2015

Respectfully submitted,

**RICHARDS, LAYTON & FINGER, P.A.**

/s/ Russell C. Silberglied
Russell C. Silberglied (No. 3462)
Zachary I. Shapiro (No. 5103)
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone:       (302) 651-7700
Facsimile:       (302) 651-7701
Email:             silberglied@rlf.com
                        shapiro@rlf.com

-and-

**MILBANK, TWEED, HADLEY & MᶜCLOY LLP**
Tyson M. Lomazow (*pro hac vice* admission pending)
Matthew Brod (*pro hac vice* admission pending)
One Chase Manhattan Plaza
New York, NY 10005
Telephone:       (212) 530-5000
Facsimile:       (212) 530-5219
Email:             tlomazow@milbank.com
                        mbrod@milbank.com

*Proposed Counsel to Debtors and Debtors in Possession*