IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x
                                                              :
In re:                                                        :    Chapter 11
                                                              :
FREDERICK'S OF HOLLYWOOD, INC., *et al.*,[1]                  :    Case No. 15-_____ (__)
                                                              :
                                                              :
                      Debtors.                                :    (Joint Administration Requested)
------------------------------------------------------------- x

**DECLARATION OF MICHAEL A. O'HARA IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I)(A) APPROVING PROCEDURES IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL OF CERTAIN DEBTORS' ASSETS, (B) APPROVING STALKING HORSE PROTECTIONS, (C) SCHEDULING RELATED AUCTION AND HEARING TO CONSIDER APPROVAL OF SALE, (D) APPROVING PROCEDURES RELATED TO ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (E) APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (II)(A) AUTHORIZING SALE OF SUBSTANTIALLY ALL OF CERTAIN DEBTORS' ASSETS PURSUANT TO SUCCESSFUL BIDDER'S ASSET PURCHASE AGREEMENT, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO**

I, Michael A. O'Hara, declare as follows:

1.    I am the Chief Executive Officer and Managing Member of Consensus Advisory Services LLC and its affiliated entities ("Consensus"), an investment banking firm that is providing investment banking and related services to the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2.    I submit this declaration in support of the Debtors' Motion For Entry of an Order (I)(A) Approving Procedures in Connection With Sale of Substantially all of Certain Debtors'

---

[1] The debtors in these chapter 11 cases and the last four digits of each debtor's taxpayer identification number are as follows: (i) FOHG Holdings, LLC (7902); (ii) Frederick's of Hollywood Group Inc. (3042); (iii) FOH Holdings, Inc. (5442); (iv) Frederick's of Hollywood, Inc. (6265); (v) Frederick's of Hollywood Stores, Inc. (8882); and (vi) Hollywood Mail Order, LLC (5205). The debtors' principal offices are located at 6464 W. Sunset Blvd., Suite 1150, Los Angeles, CA 90028.

Assets, (B) Approving Stalking Horse Protections, (C) Scheduling Related Auction and Hearing to Consider Approval of Sale, (D) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (E) Approving Form and Manner of Notice Thereof, and (II)(A) Authorizing Sale of Substantially All of Certain Debtors' Assets Pursuant to Successful Bidder's Asset Purchase Agreement, Free and Clear of Liens, Claims, Encumbrances, and Other Interests, and (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto (the "Motion").[2]

3. Except as otherwise indicated, all facts set forth in this declaration are based on my personal knowledge, my review of relevant documents, my opinion, my experience as an investment banker, or my conversations with the Debtors' employees. If called on to testify, I could and would testify to the facts set forth herein. I am authorized to submit this declaration on behalf of the Debtors. I am not being compensated specifically for this testimony other than payments received by Consensus as a professional to be retained in these chapter 11 cases.

## Qualifications

4. I am the Chief Executive Officer and managing member of Consensus. Consensus is a boutique investment banking and financial advisory firm focused exclusively on the retail and consumer product markets and is based in Boston, Massachusetts, with offices in New York and London. Consensus provides a host of advisory services to clients generally, including consulting, valuation, and due diligence services to healthy and distressed businesses, their investors, and lenders. Consensus also provides investment banking services to retailers and consumer products companies, and its principals have been involved in billions of dollars of retailer and consumer products mergers and acquisitions transactions in the aggregate over the past ten years.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings set forth in the Motion.

5.      Consensus raises capital for retail and consumer companies through Consensus Securities LLC, which is a FINRA (formerly the NASD) registered broker-dealer.  Consensus has substantial experience as an investment banker, financial advisor, and/or management consultant in multiple retail and consumer products chapter 11 and chapter 7 cases including the following:  In re Karmaloop, Inc., No. 15-10635 (MFW) (Bankr. D. Del. Mar. 22, 2015); In re Cache, Inc., No. 15-10172 (MFW) (Bankr. D. Del. Feb. 4, 2015); In re Love Culture Inc., No. 14-24508 (NLW) (Bankr. D.N.J. Sept. 4, 2014); In re Connaught Group, Ltd., No. 12-10512 (SMB) (Bankr. S.D.N.Y. March 2012); In re: RoomStore, Inc., No. 11-37790 (DOT) (Bankr. E.D. Va. December 2011); In re The Rugged Bear Company, No. 11-10577 (HJB) (Bankr. D. Mass. January 2011); In re Ultra Stores, Inc., No. 09-11854 (BRL) (Bankr. S.D.N.Y. April 2009); In re Lexington Jewelers Exchange, Inc., d/b/a Alpha Omega Jewelers, No. 08-10042 (WCH) (Bankr. D. Mass. January 2008); In re L.I.D., Ltd, No. 07-10725 (JMP) (Bankr. S.D.N.Y. March 2007); In re Tyringham Holdings, No. 06-32385 (DOT) (Bankr. E.D. Va. September 2006); In re M. Fabrikant & Sons, No. 06-12737 (SMB) (Bankr. S.D.N.Y. November 2006); among others.

6.      Since forming Consensus in February 2006, I have advised a wide range of companies ranging from early stage consumer products companies, to publicly traded retailers, to leading multi-national commercial lenders.  In the past year, I have played a leading role in Consensus's engagements on behalf of Aerosoles, Inc., Spence Diamonds, Ltd., XCEL Brands, Conway Department Stores, Love Culture, Karmaloop, Inc., Danier Leather, Sequential Brands, Diamlink, Inc., and several others.  I have also in the past served as the Chief Restructuring Officer of Lexington Jewelers Exchange, Inc. d/b/a Alpha Omega Jewelers and The Rugged Bear and as the post-effective trustee to the Crescent Jewelers Unsecured Creditors Trust and

advised ten official committees of unsecured creditors in bankruptcy cases and several ad hoc committees outside of court. I regularly advise lenders and investors in complex transactions, almost entirely in the retail and consumer products markets.

7. Prior to forming Consensus, I served as a Managing Director of Financo, Inc., where I provided services to such clients as Gadzooks, Inc., The Container Store, Whitehall Jewelers, Lifetime Brands, and Wilsons The Leather Experts. In May 2002, I was appointed the Chairman, CEO, and President of the bankruptcy estates of Casual Male Corp. and its 16 direct and indirect subsidiaries, effectively serving as their chief restructuring officer.

8. I am a graduate of Duke University School of Law and Boston College. I am a member of the Finance Commission for the Town of Westwood, Massachusetts and a member of the Board of Directors of Arena Brands, Inc. I am FINRA Series 7, 24, 63, and 79 certified and a member of the Bar of the Commonwealth of Massachusetts.

### The Marketing of the Assets

9. In December 2014, the Debtors engaged Consensus to conduct a review of the Debtors' strategic alternatives, including an exploration of multiple restructuring, sale, or other alternatives. The Debtors directed Consensus to develop, with the Debtors, informational materials about the Debtors and reach out to parties who were likely to find the Debtors' brand name and other intellectual property valuable to their core businesses and who could add strategic or operational value (in addition to capital) to the business going forward.

10. Consensus's efforts in this endeavor were substantial, and included tasks such as (i) developing a contact list of over 70 potentially interested parties meeting this criteria, (ii) developing with management an 18-page marketing document describing the Debtors' history, brand attributes, and strategic opportunities, (iii) contacting nearly all of the potentially

interested parties set forth on the contact list (plus others who later emerged), (iv) negotiating to completion 24 confidentiality agreements, (v) compiling, managing, and revising an online data room where interested parties who signed confidentiality agreements could review financial information, contracts, leases, intellectual property, and other data pertaining to the Debtors, and (vi) holding multiple conversations with potentially interested parties and negotiating terms with those interested in transacting.

11. In mid-February 2015, Consensus, on behalf of the Debtors, invited 21 parties who had signed confidentiality agreements to submit strategic proposals to the Debtors. The Debtors received five written and one verbal strategic proposal submissions on or around March 2, 2015. With the exception of one proposal, which merely offered strategic operating assistance, all proposals received contemplated acquiring all or a portion of the Debtors' assets. None of the proposals contemplated a viable refinancing or recapitalization of the Debtors' capital structure. Following receipt of these proposals, the Debtors and Consensus participated in multiple meetings and calls with the various parties, and explored a multitude of factors related to each potential transaction, including certainty of closing, financial wherewithal, speed of the transaction, closing conditions, as well as purchase price and other considerations.

12. After extensive analysis of the benefits and risks of each proposed transaction, the Debtors ultimately determined that the offer presented by Authentic Brands Group, LLC (the "Stalking Horse Purchaser") was the best available alternative to maximize value for the Debtors' stakeholders under the circumstances. Therefore, following substantial, arm's-length, and good-faith negotiations, the Debtors and the Stalking Horse Purchaser agreed to the terms of the Stalking Horse Agreement and the Revenue Sharing Agreement on April 13, 2015. The Stalking Horse Agreement prohibited the Debtors from selling any further inventory at their

retail stores as of the Petition Date.  As a result, and in light of the continuing and substantial losses associated with the operation of such stores, the Debtors, in their business judgment, closed their retail stores as of the Petition Date in order to maximize value for their stakeholders.

13.     In my opinion, based upon the sale process conducted by the Debtors prior to the Petition Date, entering into the Stalking Horse Agreement and conducting a subsequent auction presents the best way for the Debtors to maximize value for their stakeholders.  Following the approval of the Bid Procedures, the Debtors, with the aid of Consensus, will continue to market the Assets to a group of potential buyers up until the completion of the Auction by (i) engaging potential buyers and investors that may have an interest in bidding for the Assets, and (ii) providing access to a data room of confidential information on the Assets to all Qualified Bidders.  In this way, the Debtors, with the assistance of Consensus, intend to maximize the number of participants that may ultimately participate as buyers at the Auction and thereby maximize the value to be achieved from the proposed Sale.

**The Reasonableness of the Proposed Termination Fee and Expense Reimbursement**

14.     Based upon my experience, the Termination Fee and Expense Reimbursement are reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Stalking Horse Purchaser.  First, the Termination Fee of $850,000 represents 3.77% of the cash component of the Stalking Horse Purchase Price. Second, both the Termination Fee and Expense Reimbursement were heavily negotiated in good faith, and both were necessary to secure the Stalking Horse Purchaser's commitment under the Stalking Horse Agreement.  Third, the payment of the Termination Fee and Expense Reimbursement will not diminish the Debtors' estates.  The Debtors do not intend to terminate the Stalking Horse Agreement if to do so would incur an obligation to pay the Termination Fee

and Expense Reimbursement, unless to accept an alternative bid, which bid must exceed the consideration offered by the Stalking Horse Purchaser by an amount sufficient to pay the Termination Fee and Expense Reimbursement. In sum, the Debtors' ability to offer the Termination Fee and Expense Reimbursement enables them to ensure the sale of the Assets at a price they believe to be fair while, at the same time, providing them with the potential of even greater benefit to the estates.

15. Based upon my experience, given these circumstances, the Termination Fee and Expense Reimbursement are (i) commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Stalking Horse Purchaser, (ii) reasonable and appropriate in light of the size and nature of the proposed Sale and comparable transactions, the commitments that have been made, the condition of the Assets, and the efforts that have been made and will be expended by the Stalking Horse Purchaser, and (iii) necessary to induce the Stalking Horse Purchaser to pursue the proposed Sale and to continue to be bound by the Stalking Horse Agreement.

### The Reasonableness of the Bid Procedures

16. The proposed Bid Procedures are designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids. The proposed Bid Deadline requires bids for the purchase of the Assets to be delivered no later than May 26, 2015 at 5:00 p.m. (prevailing Eastern Time), which ensures that the proposed Sale is completed in a timely manner. The Bid Deadline provides parties with sufficient time to obtain information and formulate and submit a timely and informed bid to purchase the Assets.

17. As described above, the Debtors' assets have been extensively marketed over the last three-and-a-half months to a broad group of strategic and financial buyers, and substantial

information regarding the Debtors' business has been made available during the process. As such, numerous parties that may have an interest in bidding at the Auction will not be starting from scratch in formulating their bids. Furthermore, potential bidders will have access to updated information prepared by the Debtors' management and a substantial body of information available through an extensive data room, including information gathered specifically based upon the due diligence requests of several potential buyers. Thus, based upon the extensive marketing efforts of the Debtors, with the aid of Consensus, prior to the Petition Date, and the level of preparedness at the outset of the marketing process, the time contained in the Bid Procedures for the Debtors to further market the Assets is reasonable.

18. In my opinion, the proposed Bid Procedures will ensure that the consideration received for the Assets will be fair and reasonable and that the Debtors will have an opportunity to consider all competing offers and to select, in their reasonable business judgment, the highest and best offer for the Assets.

### Arm's-Length Negotiations

19. To my knowledge, the parties have entered into the Stalking Horse Agreement without collusion, in good faith, and from arm's-length bargaining positions. Further, I am not aware of any indication of fraud or collusion between the Stalking Horse Purchaser and other bidders, or any similar conduct that would taint the sale process for the Assets.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 20, 2015

/s/ Michael A. O'Hara
Michael A. O'Hara
Chief Executive Officer &
Managing Member
Consensus Advisory Services LLC