# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x

In re:

OLD FOH, INC. (f/k/a FREDERICK'S OF
HOLLYWOOD, INC.), *et al.*,[1]

                             Debtors.

---------------------------------------------------------------- x

:    Chapter 11

:    Case No. 15-10836 (KG)

:    (Jointly Administered)

## COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND FRONT STREET RE (CAYMAN) LTD.

**RICHARDS, LAYTON & FINGER, P.A.**
Russell C. Silberglied (No. 3462)
Zachary I. Shapiro (No. 5103)
Joseph C. Barsalona II (No. 6102)
One Rodney Square
920 North King Street
Wilmington, DE 19801

*Co-Counsel to the Debtors and Debtors in Possession*

**DRINKER BIDDLE & REATH LLP**
Robert K. Malone
Howard A. Cohen (No. 4082)
600 Campus Drive
Florham Park, New Jersey 07932-1047

*Counsel to Front Street Re (Cayman) Ltd.*

**MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP**
Tyson M. Lomazow
Matthew Brod
28 Liberty Street
New York, NY 10005-1413

*Co-Counsel to the Debtors and Debtors in Possession*

**COOLEY LLP**
Cathy R. Hershcopf
Seth Van Aalten
Robert Winning
1114 Avenue of the Americas
New York, New York 10036

*Counsel to the Official Committee of Unsecured Creditors*

Dated: October 30, 2015

---

[1] The debtors in these chapter 11 cases and the last four digits of each debtor's taxpayer identification number are as follows: (i) FOHG Holdings, LLC (7902); (ii) FOH Group Inc. (f/k/a Frederick's of Hollywood Group Inc.) (3042); (iii) FOH Holdings, Inc. (5442); (iv) Old FOH, Inc. (f/k/a Frederick's of Hollywood, Inc.) (6265); (v) FOH Stores, Inc. (f/k/a Frederick's of Hollywood Stores, Inc.) (8882); and (vi) Hollywood Mail Order, LLC (5205). The debtors' principal offices are located at 6464 W. Sunset Blvd., Suite 1150, Los Angeles, CA 90028.

I. INTRODUCTION ...........................................................................................................1

II. DEFINITIONS AND CONSTRUCTION OF TERMS ................................................1

    A.      Definitions..............................................................................................1

          1.    "2 Million Cap".......................................................................1

          2.    "503(b)(9) Claim"...................................................................2

          3.    "ABG".....................................................................................2

          4.    "Additional Estate Cash" .......................................................2

          5.    "Administrative Expense Bar Date" ......................................2

          6.    "Administrative Expense Claim"............................................2

          7.    "Administrative Expense Request".........................................2

          8.    "Allowed" ...............................................................................3

          9.    "Allowed Gift Card Claim" ...................................................3

          10.    "Asset Purchase Agreement" or "Stalking Horse Agreement" ...................3

          11.    "Assets"...................................................................................3

          12.    "Avoidance Actions" ..............................................................3

          13.    "Bankruptcy Code"................................................................4

          14.    "Bankruptcy Court" or "Court" ...........................................4

          15.    "Bankruptcy Rules" ...............................................................4

          16.    "Bar Date" or "Bar Dates".....................................................4

          17.    "Bar Date Order" ...................................................................4

          18.    "BDO".....................................................................................4

          19.    "Borrower" or "Borrowers"....................................................4

          20.    "Business Day".......................................................................4

          21.    "Cash"....................................................................................4

          22.    "Causes of Action" ................................................................5

RLF1 13190551v.1

23.     "CBIZ" .................................................................................................5

24.     "Challenge" or "Challenges" ..............................................................5

25.     "Challenge Deadline" ..........................................................................5

26.     "Chapter 11 Cases" .............................................................................5

27.     "Claim" .................................................................................................6

28.     "Claims and Balloting Agent" .............................................................6

29.     "Claims Objection Deadline" ..............................................................6

30.     "Class" .................................................................................................6

31.     "Clerk" .................................................................................................6

32.     "Closing Date" .....................................................................................6

33.     "Combined Disclosure Statement and Plan" ......................................6

34.     "Committee" ........................................................................................6

35.     "Committee Support Letter" ...............................................................6

36.     "Confirmation Date" ............................................................................7

37.     "Confirmation Hearing" .......................................................................7

38.     "Confirmation Order" ..........................................................................7

39.     "Consortium" .......................................................................................7

40.     "Consumer Bar Date" ..........................................................................7

41.     "Creditor" .............................................................................................7

42.     "Debtors" ..............................................................................................7

43.     "DIP Agent" .........................................................................................7

44.     "DIP Credit Agreement" ......................................................................7

45.     "DIP Credit Agreement Claim" ...........................................................8

46.     "DIP Facility" .......................................................................................8

47.     "DIP Financing Order" ........................................................................8

RLF1 13190551v.1

48.    "DIP Lender" ...........................................................................................8

49.    "DIP Motion" ..........................................................................................8

50.    "Disallowed" ..........................................................................................8

51.    "Disputed" ..............................................................................................9

52.    "Distribution" .........................................................................................9

53.    "Docket" .................................................................................................9

54.    "Effective Date" .....................................................................................9

55.    "Entity" ...................................................................................................9

56.    "Equity Interests" .................................................................................10

57.    "Estates" ...............................................................................................10

58.    "Executory Contract" ...........................................................................10

59.    "File", "Filed", or "Filing" ..................................................................10

60.    "Filing Date" .........................................................................................10

61.    "Final DIP Hearing" .............................................................................10

62.    "Final Order" ........................................................................................10

63.    "First Day Declaration" ........................................................................10

64.    "First Rejection Motion" .......................................................................10

65.    "FOHG" .................................................................................................11

66.    "Frederick's" .........................................................................................11

67.    "FSR" ....................................................................................................11

68.    "General Bar Date" ...............................................................................11

69.    "General Unsecured Claim" ..................................................................11

70.    "General Unsecured Creditor Cash Distribution" ................................11

71.    "Gift Card / Merchandise Credit Claim" ..............................................12

72.    "Global Settlement" ..............................................................................12

73. "Governmental Unit" ...........................................................................12

74. "Governmental Unit Bar Date" .............................................................12

75. "Group" ................................................................................................12

76. "HGI Entities" ......................................................................................12

77. "HGI Funding" .....................................................................................12

78. "HGI Global" ........................................................................................12

79. "Holder" ...............................................................................................12

80. "Intercompany Claim" .........................................................................12

81. "Interim Compensation Order" ............................................................12

82. "IRS" ....................................................................................................12

83. "KCC" ..................................................................................................12

84. "Mail Order" ........................................................................................12

85. "Order" .................................................................................................13

86. "Other Secured Claims" .......................................................................13

87. "Parent" ................................................................................................13

88. "Person" ...............................................................................................13

89. "Plan Administrator" ...........................................................................13

90. "Plan Proponents" ...............................................................................13

91. "Priority Non-Tax Claim" ....................................................................13

92. "Priority Tax Claim" ............................................................................13

93. "Prepetition Credit Agreement" ..........................................................13

94. "Prepetition Credit Facility" ...............................................................14

95. "Prepetition Lenders" ..........................................................................14

96. "Prepetition Lenders Secured Claim" ..................................................14

97. "Professional" ......................................................................................14

RLF1 13190551v.1

98.     "Professional Claims" ...................................................................... 14

99.     "Pro Rata" ........................................................................................ 14

100.    "Rejection Bar Date" ....................................................................... 14

101.    "Related Parties" ............................................................................. 15

102.    "Released Parties" ........................................................................... 15

103.    "Releasing Parties" .......................................................................... 15

104.    "Revenue Sharing Agreement" ....................................................... 15

105.    "Sale" ............................................................................................... 15

106.    "Sale Motion" .................................................................................. 15

107.    "Sale Order" ..................................................................................... 16

108.    "Salus CLO" ..................................................................................... 16

109.    "Salus Entities" ................................................................................ 16

110.    "Schedules" ...................................................................................... 16

111.    "SCP" ............................................................................................... 16

112.    "Second Rejection Motion" ............................................................. 16

113.    "Settlement Parties" ......................................................................... 17

114.    "Stores" ............................................................................................ 17

115.    "Supplemental DIP Motion" ............................................................ 17

116.    "Tax Code" ....................................................................................... 17

117.    "Third Rejection Motion" ................................................................ 17

118.    "United States Trustee" .................................................................... 17

119.    "Unsecured Creditor Fund" ............................................................. 17

120.    "Unclaimed Distribution" ................................................................ 17

121.    "Unclaimed Distribution Deadline" ................................................. 17

B.      Interpretation; Application of Definitions and Rules of Construction .................. 17

III. BACKGROUND AND DISCLOSURES ................................................................ 18

    A.     General Background ................................................................................ 18

        1.    The Debtors' Businesses .............................................................. 18

        2.    Previous Chapter 11 Cases ........................................................... 19

        3.    Going-Private Transaction ............................................................ 20

        4.    Organizational Structure .............................................................. 21

    B.     Events Leading to Commencement of the Chapter 11 Cases ................ 21

        1.    Pre-Petition Liquidity and Operational Concerns ........................ 21

        2.    Initial Turnaround Activities ......................................................... 22

        3.    Strategic Review and Sale Process ............................................... 23

    C.     The Chapter 11 Cases ............................................................................ 25

        1.    First Day Motions and Orders (Other than the DIP Motion and DIP Financing Order) ........................................................................... 25

        2.    Post-Petition Financing ................................................................ 28

        3.    Employment and Compensation of Debtors' Professionals and Advisors 29

        4.    Appointment of Committee .......................................................... 30

        5.    Rejection of Executory Contracts and Unexpired Leases ............ 30

        6.    Claims Process and Bar Date ....................................................... 31

            a.    Section 341(a) Meeting of Creditors ................................ 31

            b.    Schedules and Statements ................................................ 31

            c.    Bar Date .......................................................................... 31

        7.    The Sale of Substantially All of the Debtors' Assets ................... 32

            a.    Sale Motion and Bid Procedures ..................................... 32

    D.     Certain Federal Income Tax Consequences .......................................... 33

        1.    Consequences to the Debtors ....................................................... 35

        2.    Consequences to Holders of Allowed General Unsecured Claims ........... 36

RLF1 13190551v.1

|  |  | a. | Gain or Loss ........................................................................... | 36 |

|  |  | b. | Distributions in Satisfaction of Accrued but Unpaid Interest ........ | 37 |

|  |  | c. | Information Reporting and Backup Withholding ......................... | 38 |

|  | E. | Alternative Plan ............................................................................... | 39 |

|  | F. | Global Settlement .............................................................................. | 39 |

|  | G. | Best Interests Test and Liquidation Analysis ..................................... | 40 |

|  | H. | Releases by the Debtors and Third Parties ......................................... | 42 |

|  | I. | Estimated Effective Date and Date of Distributions ............................ | 42 |

IV. SUMMARY OF DEBTORS' ASSETS; SUMMARY OF
OF TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES ...................................... 42

|  | A. | Summary of Assets ............................................................................ | 42 |

|  | B. | Summary of Treatment of Claims and Equity Interests and Estimated Recoveries | 43 |

V. CONFIRMATION AND VOTING PROCEDURES ............................................................ 43

|  | A. | Confirmation Procedure ..................................................................... | 43 |

|  |  | 1. | Confirmation Hearing ............................................................ | 44 |

|  |  | 2. | Procedure for Objections ........................................................ | 44 |

|  |  | 3. | Requirements for Confirmation .............................................. | 45 |

|  |  | 4. | Classification of Claims and Equity Interests ......................... | 45 |

|  |  | 5. | Impaired Claims or Equity Interests ....................................... | 46 |

|  |  | 6. | Feasibility .............................................................................. | 46 |

|  |  | 7. | Eligibility to Vote on the Combined Disclosure Statement and Plan ........ | 47 |

|  |  | 8. | Solicitation Notice ................................................................. | 47 |

|  |  | 9. | Procedure/Voting Deadlines ................................................... | 47 |

|  |  | 10. | Acceptance of the Combined Disclosure Statement and Plan. ................. | 48 |

|  |  | 11. | Elimination of Vacant Classes. .............................................. | 49 |

VI. TREATMENT OF UNCLASSIFIED CLAIMS ................................................................ 49

RLF1 13190551v.1

A.      Administrative Expense Bar Date.................................................................49

B.      Administrative Expense Claims.................................................................50

C.      Priority Tax Claims.................................................................................50

D.      Professional Claims ...............................................................................50

E.      Intercompany Claims .............................................................................51

F.      Payment of Statutory Fees .....................................................................51

VII. CLASSIFICATION OF CLAIMS AND
EQUITY INTERESTS; ESTIMATED RECOVERIES ..............................................52

VIII. TREATMENT OF CLAIMS AND EQUITY INTERESTS...................................52

A.      Treatment of Claims ...............................................................................52

        1.      *CLASS 1 – PREPETITION LENDERS SECURED CLAIMS* ...................52

                a.      Classification.................................................................53

                b.      Impairment and Voting .................................................53

                c.      Treatment .....................................................................53

        2.      *CLASS 2 – OTHER SECURED CLAIMS*....................................53

                a.      Classification.................................................................53

                b.      Impairment and Voting .................................................53

                c.      Treatment .....................................................................53

        3.      *CLASS 3 – PRIORITY NON-TAX CLAIMS* .............................54

                a.      Classification.................................................................54

                b.      Impairment and Voting .................................................54

                c.      Treatment .....................................................................54

        4.      *CLASS 4 – GENERAL UNSECURED CLAIMS* .........................54

                a.      Classification.................................................................54

                b.      Impairment and Voting .................................................54

                c.      Treatment .....................................................................55

RLF1 13190551v.1

5.      *CLASS 5 – EQUITY INTERESTS IN FOHG* ............................................55

        a.      Classification.................................................................55

        b.      Impairment and Voting .................................................55

        c.      Treatment .....................................................................55

6.      *CLASS 6 – EQUITY INTERESTS IN DEBTORS OTHER THAN FOHG* ..56

        a.      Classification.................................................................56

        b.      Impairment and Voting .................................................56

        c.      Treatment .....................................................................56

B.      Modification of Treatment of Claims and Equity Interests ...................56

C.      Cramdown and No Unfair Discrimination..............................................56

IX. PROVISIONS REGARDING THE PLAN ADMINISTRATOR .........................................57

A.      Appointment of the Plan Administrator.................................................57

B.      Rights and Powers of the Plan Administrator........................................58

C.      Post Confirmation Date Expenses of the Plan Administrator................58

X. PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE COMBINED
DISCLOSURE STATEMENT AND PLAN ...................................................................59

A.      Method of Payment................................................................................59

B.      Objections to and Resolution of Claims ................................................59

C.      Claims Objection Deadline ....................................................................59

D.      No Distribution Pending Allowance .......................................................60

E.      Claims Reserve ......................................................................................60

F.      Distribution After Allowance .................................................................60

G.      Delivery of Distributions .......................................................................60

H.      Unclaimed Distributions .......................................................................61

I.      *De Minimis* Distributions .....................................................................62

J.      Setoff.....................................................................................................62

K.      Postpetition Interest .................................................................62

L.      Allocation of Distributions Between Principal and Interest ...................62

XI. IMPLEMENTATION AND EFFECT OF CONFIRMATION OF COMBINED
DISCLOSURE STATEMENT AND PLAN.................................................................63

A.      Means for Implementation of the Combined Disclosure Statement and Plan .......63

    1.      Limited Substantive Consolidation............................................63

    2.      Funding of Liabilities and Distributions....................................64

    3.      Corporate Action; Effectuating Documents; Further Transactions. ..........64

XII. EXCULPATION, RELEASES AND INJUNCTIONS.............................................65

A.      Exculpation .......................................................................65

B.      Releases By the Debtors ...........................................................66

C.      Third Party Releases ..............................................................66

D.      Injunctions Relating to Releases..................................................67

XIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES............................................68

A.      Rejection of Executory Contracts and Unexpired Leases.....................68

B.      Deadline for Filing Proofs of Claim Relating to Executory Contracts and
        Unexpired Leases Rejected Pursuant to the Combined Disclosure Statement and
        Plan ...............................................................................68

XIV. CONDITIONS TO THE EFFECTIVE DATE ....................................................69

A.      Conditions Precedent to the Effective Date..........................................69

B.      Establishing the Effective Date....................................................69

C.      Effect of Failure of Conditions ...................................................70

D.      Waiver of Conditions to Confirmation and Effective Date ...................70

XV. RETENTION OF JURISDICTION .............................................................70

XVI. MISCELLANEOUS PROVISIONS .............................................................73

A.      Avoidance Actions..................................................................73

x

B.    Books and Records ...................................................................................73

C.    Revesting of Debtors' Assets....................................................................73

D.    Termination of Injunctions or Stays ........................................................74

E.    Amendment or Modification of the Combined Disclosure Statement and Plan....74

F.    Severability ...............................................................................................74

G.    Revocation or Withdrawal of the Combined Disclosure Statement and Plan .......75

H.    Binding Effect...........................................................................................75

I.    Notices .......................................................................................................75

J.    Governing Law ..........................................................................................75

K.    Withholding and Reporting Requirements ...............................................77

L.    Headings ....................................................................................................77

M.    Exhibits/Schedules....................................................................................78

N.    Filing of Additional Documents ..............................................................78

O.    No Admissions...........................................................................................78

P.    Successors and Assigns.............................................................................78

Q.    Reservation of Rights................................................................................78

R.    Implementation .........................................................................................79

S.    Inconsistency.............................................................................................79

T.    Dissolution of Debtors ..............................................................................79

U.    Dissolution of the Committee ..................................................................79

V.    Termination of the Plan Administrator .....................................................80

W.    Compromise of Controversies ..................................................................80

X.    Request for Expedited Determination of Taxes........................................81

RLF1 13190551v.1

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF.  NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.  CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED.  THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

**THE COMMITTEE HAS INDEPENDENTLY CONCLUDED THAT THE COMBINED DISCLOSURE STATEMENT AND PLAN IS IN THE BEST INTERESTS OF GENERAL UNSECURED CREDITORS AND URGES SUCH CREDITORS TO VOTE IN FAVOR OF THE COMBINED DISCLOSURE STATEMENT AND PLAN.  A LETTER FROM THE COMMITTEE EXPRESSING ITS SUPPORT FOR THE COMBINED DISCLOSURE STATEMENT AND PLAN IS INCLUDED IN THE SOLICITATION PACKAGE.**

# I. INTRODUCTION

The Debtors,[2] the Committee and FSR hereby propose the Debtors' Combined Disclosure Statement and Plan pursuant to sections 1125 and 1129 of the Bankruptcy Code. The Debtors, the Committee and FSR are the proponents of the Combined Disclosure Statement and Plan within the meaning of section 1129 of the Bankruptcy Code.

The Combined Disclosure Statement and Plan constitutes a liquidating chapter 11 plan for the Debtors. Except as otherwise provided by Order of the Bankruptcy Court, Distributions will occur on the Effective Date or as soon thereafter as is practicable and at various intervals thereafter. The Debtors will be dissolved under applicable law as soon as practicable upon the closing of the Chapter 11 Cases.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XVI of the Combined Disclosure Statement and Plan, the Debtors expressly reserve the right to alter, amend or modify the Combined Disclosure Statement and Plan, one or more times, before its substantial consummation.

## II. DEFINITIONS AND CONSTRUCTION OF TERMS

### A.     Definitions

As used herein, the following terms have the respective meanings specified below, unless the context otherwise requires:

1.     **"2 Million Cap"** means after (a) the Unsecured Creditor Fund is funded in the amount of up to $1.8 million, and (b) FSR receives the first $450,000 of Additional Estate Cash, any Additional Estate Cash shall be split on a 50/50 basis between the Unsecured Creditor Fund

---

[2]     All capitalized terms not defined in this introduction shall have the same meanings set forth in Article I of the Combined Disclosure Statement and Plan.

and FSR until the Unsecured Creditor Fund receives an additional $200,000; provided, however, that once the Prepetition Secured Lenders Claims are paid in full, the Unsecured Creditor Fund shall receive any Additional Estate Cash.

2.     "**503(b)(9) Claim**" means any Claim against any of the Debtors for the value of goods sold to the Debtors in the ordinary course of business and received by the Debtors within twenty (20) days before the Filing Date.

3.     "**ABG**" means Authentic Brands Group, LLC.

4.     "**Additional Estate Cash**" means the Cash that is property of the Estates after consummation of the Sale, including any such property that may be reduced to Cash; provided, however, that Additional Estate Cash shall not include the Debtors' interest in the Revenue Sharing Agreement or any Cash that the Debtors receive on account of such interest.

5.     "**Administrative Expense Bar Date**" means the first Business Day that is thirty (30) calendar days after the Effective Date.

6.     "**Administrative Expense Claim**" means any right to payment constituting actual and necessary costs or expenses of administration of the Chapter 11 Cases under sections 503(b) and 507(a)(2) of the Bankruptcy Code including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estates, (b) 503(b)(9) Claims, (c) all Professional Claims, and (d) any fees or charges assessed against the Estates under section 1930 of chapter 123 of Title 28 of the United States Code.

7.     "**Administrative Expense Request**" means a request for payment of an Administrative Expense Claim that is to be Filed in accordance with Article VII of the Combined Disclosure Statement and Plan.

8.    **"Allowed"** means any Claim that is not a Disputed Claim or a Disallowed Claim; provided, however, that a Disputed Claim shall become an Allowed Claim to the extent (i) no objection to such Claim has been interposed by the Claims Objection Deadline or such other period fixed by the Bankruptcy Court, (ii) an objection to such Claim has been interposed, but withdrawn or overruled by a Final Order and the Debtors have no right to object to such Claim on other grounds, or (iii) the Bankruptcy Court enters a Final Order providing that such Claim is an Allowed Claim.

9.    **"Allowed Gift Card Claim"** means any Claim on account of a gift card purchased prior to the Filing Date as to which a proof of Claim that includes a copy of the gift card showing the gift card number has been timely Filed, regardless of whether such proof of Claim indicates that the Claim is entitled to priority status under the Bankruptcy Code. Allowed Gift Card Claims shall be treated as Allowed Priority Non-Tax Claims under the Combined Disclosure Statement and Plan.

10.    **"Asset Purchase Agreement"** or **"Stalking Horse Agreement"** means that certain asset purchase agreement, dated as of April 13, 2015, made by and among the Debtors and ABG, as amended.

11.    **"Assets"** means all of the Debtors' tangible and intangible assets, comprised mainly of the Debtors' e-commerce business and inventory.

12.    **"Avoidance Actions"** means all avoidance and recovery actions or remedies that may be brought on behalf of the Debtors or their estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 544, 547, 548, 550, 551, 552, or 553 of the Bankruptcy Code.

13.    **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§101-1532, as amended from time to time.

14.    **"Bankruptcy Court" or "Court"** means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases, or if such Court ceases to exercise jurisdiction over the Chapter 11 Cases, such court or adjunct thereof that exercises jurisdiction over the Chapter 11 Case in lieu of the United States Bankruptcy Court for the District of Delaware.

15.    **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure and any Local Rules of the Bankruptcy Court, as amended from time to time.

16.    **"Bar Date" or "Bar Dates"** means any one or more of the General Bar Date, the Governmental Unit Bar Date, the Consumer Bar Date and the Rejection Bar Date, as applicable.

17.    **"Bar Date Order"** means the Order Establishing Bar Dates for Filing Claims, Including Claims Under Section 503(b)(9) of the Bankruptcy Code entered by the Court on May 18, 2015 [Docket No. 178].

18.    **"BDO"** means BDO USA, LLP.

19.    **"Borrower" or "Borrowers"** means FOHG, Group, Parent, Frederick's and Stores.

20.    **"Business Day"** means any day other than a Saturday, Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

21.    **"Cash"** means legal tender of the United States of America and equivalents thereof.

22.    **"Causes of Action"** means all Claims and all other claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims, and crossclaims of any Debtor and/or any of the Estates against any Entity, now owned or hereafter acquired by the Debtors, whether arising under the Bankruptcy Code or other federal or state law, or based in equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, and any and all commercial tort claims against any party.

23.    **"CBIZ"** means CBIZ MHM, LLC.

24.    **"Challenge"** or **"Challenges"** means a timely filed and timely commenced proceeding or appropriate pleading commencing a proceeding or other contested matter, originated by the Committee, any chapter 7 trustee, or any party-in-interest with standing and requisite authority, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in Paragraph 14 of the DIP Financing Order) challenging the Prepetition Lien and Claim Matters (as defined in the DIP Financing Order) solely against FSR.

25.    **"Challenge Deadline"** means, with respect to bringing a Challenge, (i) for the Committee, the earlier of the date that the Confirmation Order becomes a Final Order and the Effective Date, or (ii) for all other parties-in-interest, July 6, 2015.

26.    **"Chapter 11 Cases"** means the procedurally consolidated cases under chapter 11 of the Bankruptcy Code commenced by the Debtors, styled as Old FOH, Inc. (f/k/a as Frederick's of Hollywood, Inc.), *et al.*, under Case No. 15-10836 (KG), currently pending in the Bankruptcy Court.

27.    **"Claim"** shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

28.    **"Claims and Balloting Agent"** means Kurtzman Carson Consultants LLC.

29.    **"Claims Objection Deadline"** means the earlier of (i) one hundred and eighty (180) days after the Effective Date or such later date as may be approved by the Bankruptcy Court and (ii) the date that all of the Chapter 11 Cases are closed.

30.    **"Class"** means any group of substantially similar Claims or Equity Interests classified by the Combined Disclosure Statement and Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

31.    **"Clerk"** means the clerk of the Bankruptcy Court.

32.    **"Closing Date"** means June 11, 2015, which is the date that the Sale closed.

33.    **"Combined Disclosure Statement and Plan"** means this combined disclosure statement and chapter 11 plan of liquidation including, without limitation, all exhibits, supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time.

34.    **"Committee"** means the Official Committee of Unsecured Creditors appointed by the United States Trustee on April 28, 2015 [Docket No. 92].

35.    **"Committee Support Letter"** means that certain letter from the Committee expressing its support for the Combined Disclosure Statement and Plan and urging the holders of Class 4 claims to vote in favor of the Combined Disclosure Statement and Plan. A copy of the Committee Support Letter is attached to this Combined Disclosure Statement and Plan as Exhibit B.

6

36.    **"Confirmation Date"** means the date on which the Confirmation Order is entered on the Docket.

37.    **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court to consider (i) approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code, and (ii) confirmation of the Combined Disclosure Statement and Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

38.    **"Confirmation Order"** means the Order of the Bankruptcy Court confirming the Combined Disclosure Statement and Plan pursuant to section 1129 of the Bankruptcy Code.

39.    **"Consortium"** means HGI Funding, Tokarz Investments, LLC, TTG Apparel, LLC, Arsenal Group, LLC, Fursa Alternatives Strategies LLC, and William F. Harley III.

40.    **"Consumer Bar Date"** means the July 20, 2015 deadline established in the Bar Date Order for Holders of Gift Card / Merchandise Credit Claims to file proofs of claim on account of such Claims against any of the Debtors.

41.    **"Creditor"** means any Person that is the Holder of a Claim against any of the Debtors.

42.    **"Debtors"** means, collectively, FOHG, Group, Parent, Frederick's, Stores, and Mail Order.

43.    **"DIP Agent"** means SCP, as administrative agent and collateral agent for the DIP Lender.

44.    **"DIP Credit Agreement"** means that Credit and Security Agreement, dated as of April 21, 2015, by and between the Debtors, the DIP Agent, and the DIP Lender, as the same may have been further amended, modified, ratified, extended, renewed, restated or replaced.

7

45.    **"DIP Credit Agreement Claim"** means any Claim arising under or related to the DIP Credit Agreement and which were indefeasibly paid in full at the closing of the Sale pursuant to the Global Settlement.

46.    **"DIP Facility"** means the financing facility provided to the Debtors pursuant to the terms of the DIP Credit Agreement and the DIP Financing Order.

47.    **"DIP Financing Order"** means the Court's Final Order (I) Authorizing Post-Petition Financing Pursuant to Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), (II) Authorizing the Debtors to Use Cash Collateral Pursuant to Section 363 of the Bankruptcy Code; (III) Providing Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, and 363 of the Bankruptcy Code; (IV) Modifying the Automatic Stay Pursuant to Section 362(d) of the Bankruptcy Code; and (IV) Providing Related Relief [Docket No. 270], entered on June 16, 2015.

48.    **"DIP Lender"** means Salus CLO.

49.    **"DIP Motion"** means the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Secured Financing Pursuant to Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), and 503(b) of the Bankruptcy Code, (II) Authorizing the Debtors to Use Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Providing Adequate Protection to the Prepetition Lenders Pursuant to Sections 361, 362, and 363 of the Bankruptcy Code, (IV) Modifying the Automatic Stay Pursuant to Section 362(d) of the Bankruptcy Code, (V) Scheduling a Final Hearing, and (VI) Providing Related Relief [Docket No. 14], filed on the Filing Date.

50.    **"Disallowed"** means any Claim or any portion thereof that (i) has been disallowed by a Final Order, (ii) is Scheduled as zero or as contingent, disputed or unliquidated

and as to which no proof of claim or Administrative Expense Request has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or otherwise deemed timely Filed under applicable law or the Combined Disclosure Statement and Plan, (iii) is not Scheduled and as to which no proof of claim or Administrative Expense Request has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Order or otherwise deemed timely Filed under applicable law or the Combined Disclosure Statement and Plan, (iv) has been withdrawn by agreement of the Debtors and the Holder thereof or (v) has been withdrawn by the Holder thereof.

51.    **"Disputed"**  means any Claim or any portion thereof (except for Allowed Gift Card Claims) that (i) has not been Scheduled by the Debtors or has been Scheduled as unknown, contingent, unliquidated, disputed or at zero, whether or not such Claim is the subject of a proof of Claim, (ii) is the subject of a proof of Claim that differs in nature, amount or priority from the Schedules or (iii) is the subject of an objection interposed by the Claims Objection Deadline or such other time period fixed by the Bankruptcy Court, which has not been withdrawn or overruled by a Final Order; provided, however, that a Claim shall not be a Disputed Claim to the extent it becomes an Allowed Claim or a Disallowed Claim.

52.    **"Distribution"**  means any distribution to the Holders of Allowed Claims.

53.    **"Docket"**  means the docket in the Chapter 11 Cases maintained by the Clerk.

54.    **"Effective Date"**  means the date established pursuant to Article XIV.B. of the Combined Disclosure Statement and Plan.

55.    **"Entity"**  means an entity as defined in section 101(15) of the Bankruptcy Code.

RLF1 13190551v.1

56.    **"Equity Interests"** means all equity interests in the Debtors including, but not limited to, all issued, unissued, authorized or outstanding shares or membership interests together with any warrants, options or contract rights to purchase or acquire such interests at any time.

57.    **"Estates"** means the estates of the Debtors created upon the commencement of the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

58.    **"Executory Contract"** means any executory contract or unexpired lease as of the Filing Date between the Debtors and any other Person or Entity.

59.    **"File"**, **"Filed"**, or **"Filing"** means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Cases.

60.    **"Filing Date"** means April 19, 2015.

61.    **"Final DIP Hearing"** means the hearing held before the Bankruptcy Court on June 16, 2015 to determine whether to grant the relief requested in the DIP Motion and Supplemental DIP Motion on a final basis.

62.    **"Final Order"** means an Order of the Bankruptcy Court or a Court of competent jurisdiction to hear appeals from the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal, to petition for certiorari, or to move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending.

63.    **"First Day Declaration"** means the Declaration of William Soncini in Support of Chapter 11 Petitions and First Day Pleadings of Frederick's of Hollywood, Inc. and its Affiliated Debtors and Debtors in Possession [Docket No. 4].

64.    **"First Rejection Motion"** means the Debtors' First Omnibus Motion for Entry of an Order Authorizing the Debtors (I) to Reject Certain Unexpired Non-Residential Real

10

Property Leases Pursuant to 11 U.S.C. § 365, Effective Nunc Pro Tunc to the Petition Date, and (II) Abandon Any Remaining Personal Property Located at the Leased Premises [Docket No. 20], Filed on April 20, 2015.

65.     **"FOHG"** means FOHG Holdings, LLC.

66.     **"Frederick's"** means Old FOH, Inc. (f/k/a Frederick's of Hollywood, Inc.).

67.     **"FSR"** means Front Street Re (Cayman) Ltd.

68.     **"General Bar Date"** means June 22, 2015 at 5:00 p.m. Pacific Time, as stated in the Notice of Deadlines for Filing Proofs of Claim, Including Claims Under Section 503(b)(9) of the Bankruptcy Code, Against Debtors [Docket No. 200], filed May 21, 2015.

69.     **"General Unsecured Claim"** means any Claim against the Debtors that arose or is deemed by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Filing Date and that is not an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, Intercompany Claim, Prepetition Lenders Secured Claim or Other Secured Claim.

70.     **"General Unsecured Creditor Cash Distribution"** means any and all Cash Distributions to Holders of Allowed General Unsecured Claims from the Unsecured Creditor Fund after the payment of (i) the Debtors' working capital needs not paid under the DIP Facility through the Effective Date; (ii) all payments required to be made to Holders of Allowed Administrative Expense Claims, Priority Tax Claims, Other Secured Claims and Priority Non-Tax Claims pursuant to this Combined Disclosure Statement and Plan; and (iii) amounts necessary to fund the wind-down of the Debtors' estates.

RLF1 13190551v.1

71.    **"Gift Card / Merchandise Credit Claim"** means any Claim on account of gift cards (including any Allowed Gift Card Claims), gift certificates or merchandise credits purchased prior to the Filing Date.

72.    **"Global Settlement"** means the settlement agreed to by the Settlement Parties, which settlement was initially embodied in that certain plan term sheet that was attached to the DIP Financing Order and is now embodied in the Combined Disclosure Statement and Plan.

73.    **"Governmental Unit"** shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

74.    **"Governmental Unit Bar Date"** means October 16, 2015, which is the deadline for Governmental Units to file proofs of claim on account of pre-petition Claims against any of the Debtors.

75.    **"Group"** means FOH Group Inc. (f/k/a Frederick's of Hollywood Group Inc.).

76.    **"HGI Entities"** means, collectively, HGI Global and HGI Funding.

77.    **"HGI Funding"** means HGI Funding, LLC.

78.    **"HGI Global"** means HGI Global Funding, LLC.

79.    **"Holder"** means the beneficial holder of any Claim or Equity Interest.

80.    **"Intercompany Claim"** means any Claim by a Debtor against another Debtor.

81.    **"Interim Compensation Order"** means the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals [Docket No. 173].

82.    **"IRS"** means Internal Revenue Service.

83.    **"KCC"** means Kurtzman Carson Consultants LLC.

84.    **"Mail Order"** means Hollywood Mail Order, LLC.

85.    **"Order"** means an order or judgment of the Bankruptcy Court as entered on the Docket.

86.    **"Other Secured Claims"** means any Claim that is secured by any Assets other than a Claim in Class 1 (Prepetition Lenders Secured Claims); provided, however, that, for the avoidance of doubt, Other Secured Claims do not include any Claims arising under or relating to the Prepetition Credit Agreement and/or the Prepetition Credit Facility, which (other than the Prepetition Lenders Secured Claims) have been paid in full from the proceeds of the Sale pursuant to the Global Settlement.

87.    **"Parent"** means FOH Holdings, Inc.

88.    **"Person"** shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

89.    **"Plan Administrator"** means the person appointed pursuant to Article IX of the Combined Disclosure Statement and Plan.

90.    **"Plan Proponents"** means the Debtors, the Committee, and FSR.

91.    **"Priority Non-Tax Claim"** means a Claim that is accorded priority in right of payment under section 507 of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Expense Claim.

92.    **"Priority Tax Claim"** means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

93.    **"Prepetition Credit Agreement"** means that certain Credit and Security Agreement dated as of May 31, 2012 (as amended, restated, supplemented or otherwise modified from time to time), by and among the Borrowers, as borrowers, the lenders party thereto, and SCP, in its capacity as administrative and collateral agent.

13

94.    **"Prepetition Credit Facility"**  means the credit facilities under the Prepetition Credit Agreement, including the term loans, the revolving loans and the FILO (first in last out) advances.

95.    **"Prepetition Lenders"**  means (i) before entry of the DIP Financing Order, Salus CLO and FSR and (ii) after entry of the DIP Financing Order, FSR.

96.    **"Prepetition Lenders Secured Claim"**  means any Claim held by FSR arising under or relating to the Prepetition Credit Agreement and the Prepetition Credit Facility.

97.    **"Professional"**  means any professional person employed in the Chapter 11 Cases pursuant to section 327, 328 or 1103 of the Bankruptcy Code pursuant to an Order of the Bankruptcy Court and to be compensated for services rendered pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.  The term "Professional" does not include any ordinary course professionals that were retained and compensated pursuant to the Order Authorizing the Debtors to Employ and Compensate Professionals Utilized in the Ordinary Course of Business, Effective *Nunc Pro Tunc* to the Petition Date [Docket No. 172], entered on May 18, 2015.

98.    **"Professional Claims"**  means all Claims for compensation and reimbursement of expenses by Professionals to the extent Allowed by the Bankruptcy Court.

99.    **"Pro Rata"**  means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class.

100.   **"Rejection Bar Date"**  means the deadline to file a proof of claim for damages relating to the rejection of an Executory Contract or unexpired lease, which, pursuant to the Bar Date Order, is the later of (a) the General Bar Date or (b) twenty-one (21) days after service of any Order authorizing the rejection of such contract or lease.

101.   "**Related Parties**" means, with respect to any Person or Entity, such Person's or Entity's current and former members, managers, subsidiaries, affiliates, directors, officers, employees, agents, designees, attorneys, financial advisors, investment bankers, accountants, and other professionals or representatives. For purposes of this definition, the term "manager" shall mean a manager of the board of managers of a limited liability company.

102.   "**Released Parties**" means the following Entities, each in their capacity as such, (a) the DIP Agent; (b) the DIP Lender; (c) the HGI Entities; (d) FSR; (e) HRG Group, Inc.; (f) the Prepetition Agent; (g) the Prepetition Lenders; (h) the Committee; and (j) the Related Parties of the foregoing.

103.   "**Releasing Parties**" means the following Entities, each in their capacity as such, (a) the DIP Agent; (b) the DIP Lender; (c) the HGI Entities; (d) FSR; (e) HRG Group, Inc.; (f) the Prepetition Agent; (g) the Prepetition Lenders; (h) the Committee; and (j) the Related Parties of the foregoing.

104.   "**Revenue Sharing Agreement**" means that certain Revenue Sharing Agreement dated April 13, 2015, made by and between the Debtors, FSR and ABG, as such agreement was amended and restated on June 11, 2015.

105.   "**Sale**" means the sale of the Assets to ABG pursuant to the Asset Purchase Agreement consummated on the Closing Date.

106.   "**Sale Motion**" means the Debtors' Motion for Entry of an Order (I)(A) Approving Procedures in Connection with Sale of Substantially All of Certain Debtors' Assets, (B) Approving Stalking Horse Protections, (C) Scheduling Related Auction and Hearing to Consider Approval of Sale, (D) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (E) Approving Form and Manner of

15

Notice Thereof, and (II)(A) Authorizing Sale of Substantially All of Certain Debtors' Assets Pursuant to Successful Bidder's Asset Purchase Agreement, Free and Clear of Liens, Claims, Encumbrances, and Other Interests, and (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto [Docket No. 16], filed on April 20, 2015.

107.    "**Sale Order**" means the Order (A) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, Except as Provide in the Successful Bidder's Asset Purchase Agreement; (B) Authorizing and Approving the Asset Purchase Agreement; (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (D) Granting Related Relief [Docket No. 248], entered on June 3, 2015.

108.    "**Salus CLO**" means Salus CLO 2012-1, Ltd.

109.    "**Salus Entities**" means, collectively, Salus CLO and SCP.

110.    "**Schedules**" means the schedules of assets and liabilities and the statement of financial affairs Filed by each of the Debtors on May 19, 2015, and any and all amendments and modifications thereto.

111.    "**SCP**" means Salus Capital Partners, LLC.

112.    "**Second Rejection Motion**" means the Debtors' Second Omnibus Motion for Entry of an Order Authorizing the Debtors to (I) Reject Certain Unexpired Non-Residential Real Property Leases Pursuant to 11 U.S.C. § 365 Effective Nunc Pro Tunc to June 30, 2015 and (II) Abandon Any Remaining Personal Property Located at the Leased Premises [Docket No. 288], Filed on June 22, 2015.

113.    **"Settlement Parties"** means the Debtors, the DIP Agent, DIP Lender, the Prepetition Agent, the Prepetition Lenders, FSR, the HGI Entities, the Committee and the members of the Committee.

114.    **"Stores"** means FOH Stores, Inc. (f/k/a Frederick's of Hollywood Stores, Inc.).

115.    **"Supplemental DIP Motion"** means the Debtors' Supplemental Emergency Motion for Entry of Final DIP Financing Order Providing for General Release of Certain Parties and Termination of the Challenge Period as to Such Released Parties [Docket No. 250], Filed on June 5, 2015.

116.    **"Tax Code"** means the Internal Revenue Code of 1986, as amended.

117.    **"Third Rejection Motion"** means the Debtors' Third Omnibus Motion for Entry of an Order Authorizing the Debtors to Reject Certain Executory Contracts Pursuant to 11 U.S.C. § 365 Effective Nunc Pro Tunc to June 30, 2015 [Docket No. 296], Filed on June 30, 2015.

118.    **"United States Trustee"** means the Office of the United States Trustee for the District of Delaware.

119.    **"Unsecured Creditor Fund"** means the sum of $1,800,000.00 plus any Additional Estate Cash, subject to the $2 Million Cap.

120.    **"Unclaimed Distribution"** means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

121.    **"Unclaimed Distribution Deadline"** means ninety (90) days from the date the Plan Administrator makes a Distribution of Cash or other property under the Combined Disclosure Statement and Plan to a holder of an Allowed Claim.

**B.**    **Interpretation; Application of Definitions and Rules of Construction**

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter. Unless otherwise specified, all section, article, schedule or exhibit references in the Combined Disclosure Statement and Plan are to the respective section in, Article of, Schedule to, or Exhibit to the Combined Disclosure Statement and Plan. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Combined Disclosure Statement and Plan as a whole and not to any particular section, subsection or clause contained in the Combined Disclosure Statement and Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Combined Disclosure Statement and Plan. A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code. The headings in the Combined Disclosure Statement and Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Combined Disclosure Statement and Plan.

### III. BACKGROUND AND DISCLOSURES

On the Filing Date, the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code and, since that date, have operated as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

A.      **General Background**[3]

1.      The Debtors' Businesses

---

[3]    Further information regarding the Debtors' business, assets, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in detail in the First Day Declaration, which is incorporated by reference herein. Copies of the First Day Declaration and all other filings in the Chapter 11 Cases can be obtained (and viewed) free of charge at the following web address: http://www.kccllc.net/fredericks.

The Debtors sold high quality women's apparel and related products under their proprietary Frederick's of Hollywood® brand. The Debtors' major merchandise categories were foundations (including various types of undergarments), lingerie (including daywear and sleepwear), ready-to-wear (dresses and sportswear), and accessories (including shoes, handbags, jewelry, personal care products, and novelties). The Debtors' target consumer base was women aged 18-45, and their exclusive product offerings and collections included Seduction by Frederick's of Hollywood and the Hollywood Exxtreme Cleavage® bra.

The origins of the Debtors' businesses can be traced to 1946, when Frederick Mellinger started a mail order catalog selling lingerie. One year later, Mr. Mellinger opened a retail store in Hollywood, California selling lingerie and other women's fashion apparel under the store name "Frederick's of Hollywood." From its small beginnings, the Frederick's of Hollywood brand gained enormous popularity, and, by the 1950's, was modeled by several Hollywood icons, including Betty Page. From there, the Debtors expanded, and continued to grow their brand, their mail order catalog business, and their retail store presence. At its height, the Debtors operated over 200 retail stores across the United States, as well as maintained a robust mail catalog and an e-commerce business through their website at www.fredericks.com. Since their inception, the Debtors were a market leader and innovator in the female fashion and lingerie industry.

2.     Previous Chapter 11 Cases

In September 1997, the Debtors' retail and direct businesses were sold pursuant to a highly leveraged buyout, pursuant to which approximately $70 million was paid to the Debtors' former shareholders and to professionals in connection with the transaction. Following the leveraged buyout, however, the Debtors suffered losses in profits and were unable

to service their debt obligations. Facing a cash flow crisis, the Debtors commenced chapter 11 cases in the United States Bankruptcy Court for the Central District of California in July 2000 and listed approximately $66.3 million in assets and $67 million in liabilities (consisting of approximately $32 million in secured debt). In December 2002, the bankruptcy court confirmed the Debtors' chapter 11 plan of reorganization which provided, among other things, the Debtors' then-existing secured lenders with 80% of the reorganized company's common stock, two tranches of new term loans, and 70% of litigation proceeds. The plan also provided holders of general unsecured claims with 6% of the reorganized company's common stock and 30% of the proceeds of certain litigation claims. The reorganized company emerged from bankruptcy on January 7, 2003.

Thereafter, in January 2008, a subsidiary of Movie Star, Inc., a designer and wholesale manufacturer of women's intimate apparel, including sleepwear, robes, leisurewear, and daywear, merged with and into Parent. Upon consummation of the merger, Movie Star, Inc. was renamed Frederick's of Hollywood Group Inc. and was subsequently publicly traded on the American Stock Exchange under the symbol "FOH."

3.      Going-Private Transaction

In February 2013, the Debtors' stock was suspended from the American Stock Exchange due to continued non-compliance with that exchange's stockholder's equity requirements. Upon delisting from the American Stock Exchange, the Debtors' stock was publicly listed on the OTCQB as Frederick's of Hollywood Group Inc. (symbol: "FOHL"). On May 30, 2014, in the face of growing liquidity issues and concerns about their ability to continue operating as a publicly listed company and a going concern, the Debtors were taken private by the Consortium for an aggregate transaction value of approximately $24.8 million.

Under the terms of this going-private transaction, each member of the Consortium, which had already beneficially owned approximately 88.9% of the Debtors' common stock in the aggregate, agreed to exchange the preferred and/or common shares it held in the Debtors for equity units in FOHG. In order for the Consortium to acquire a 100% stake in the Debtors, the Debtors' remaining other shareholders were cashed out in the going-private transaction at a price of $.27 per share. The going-private transaction resulted in the Debtors' becoming privately-held by the Consortium and the Debtors' stock no longer being registered with the SEC or listed on OTCQB.

4.      Organizational Structure

FOHG, a Delaware limited liability company formed to effectuate the going-private transaction, owns 100% of the interests in Group, a New York corporation. Group, in turn, owns 100% of the interests in Parent, a Delaware corporation. Parent, in turn, owns 100% of the interests in Frederick's, a Delaware corporation. Frederick's owns 100% of the equity in both (i) Mail Order, a Nevada limited liability company that manages the Debtors' e-commerce business, and (ii) Stores, a Nevada corporation that manages all of the Debtors' retail stores.

**B.      Events Leading to Commencement of the Chapter 11 Cases**

1.      Pre-Petition Liquidity and Operational Concerns

Notwithstanding their prominence in the female apparel industry, over the course of the past decade, the Debtors experienced a significant overall decline in their financial performance. This downturn was attributed to declining revenues as a result of poor sales, increasing expenses, and the burden of servicing their debt. The Debtors' sales were in a sustained period of decline due, in large part, to increased competition from other apparel retailers and brands, decreased foot traffic in shopping malls (where most of the Debtors' retail stores were located), as well as weak discretionary spending by the Debtors' target consumers

21

due to the lackluster economic environment since the economic recession in 2008. As sales declined, the Debtors' expenses increased as a result of several onerous leases, and the rising cost of wholesale inventory.

As a result of these and other factors, the Debtors did not have a profitable fiscal year since fiscal year 2007. The following chart illustrates the Debtors' recent financial performance:

| Summary Results of Operations (Dollars in Millions) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Fiscal Year Ending July | | | | | | | | | Cumulative Net Loss |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015[4] | |
| Total Revenue | $182.2 | $141.8 | $133.9 | $119.6 | $111.4 | $86.5 | $81.0 | $50.5 | |
| Net Loss[5] | $(15.4) | $(13.5) | $(8.8) | $(10.3) | $(6.4) | $(22.5) | $(29.7) | $(57.4) | $(164.0) |

As indicated above, in each year beginning with fiscal year 2009, the Debtors' aggregate sales have decreased from the prior year, and in each year starting in fiscal year 2008, the Debtors have generated cumulative net losses totaling $165.9 million through February 2015.

2.    Initial Turnaround Activities

In July 2014, after nearly a decade of declining financial performance outlined above, the Debtors hired Lori Greeley, a former executive at Victoria's Secret for 24 years, as Chief Executive Officer, and Bill Soncini, as Chief Operating Officer, to spearhead a revitalization of the Debtors' brand and businesses. Ms. Greeley and Mr. Soncini looked to restore to the Frederick's of Hollywood brand the confidence, wit, and irreverence for which it was known for in its heyday, and to capture a larger part of the $16 billion American lingerie industry.

---

[4]    The reference to 2015 refers to the seven months ended March 28, 2015.

[5]    The net losses do not include losses from discontinued operations of $20.6 million, $12.4 million, and $1.7 million in 2009, 2010, and 2011, respectively.

Consistent with that goal, and due to the Debtors' significant indebtedness, the magnitude of overall losses, and the pervasiveness of losses across their store base, in the fall of 2014, the Debtors' management and board of directors began a review of strategic options that resulted in the closing of 25 stores. The Debtors ultimately retained liquidation firm Great American Group, LLC to assist in liquidating inventory from their closing retail stores. In addition to the store closings, the Debtors reduced the size of their corporate senior management staff by 6 and corporate staff by 35, focused on reducing store payroll and staff rescheduling, cut store expenses, and renegotiated certain of their leases with the assistance of A&G Realty Partners, a real estate consulting group specializing in, among other things, retail dispositions, asset sales, and lease restructurings.

3.      Strategic Review and Sale Process

In December 2014, the Debtors' management and board of directors concluded that the Debtors' store portfolio was unlikely to produce positive cash flow in the foreseeable future, and the Debtors would need a significant infusion of capital. Absent a significant infusion of new capital, it was unlikely that the Debtors' retail stores could continue to be operated as a going concern, and sale options would need to be explored.

As a result, the Debtors engaged Consensus to conduct a review of the Debtors' strategic alternatives, including an exploration of possible refinancing, restructuring, or sale options. The Debtors directed Consensus to develop, with the Debtors, informational materials about the Debtors and reach out to parties who were likely to find the Debtors' brand name and other intellectual property valuable to their core businesses and who could add strategic or operational value (in addition to capital) to the business going forward.

Consensus's efforts in this endeavor were substantial, and included tasks such as (i) developing a contact list of over 70 potentially interested parties meeting this criteria, (ii) developing with management an 18-page marketing document describing the Debtors' history, brand attributes, and strategic opportunities, (iii) contacting nearly all of the potentially interested parties set forth on the contact list (plus others who later emerged), (iv) negotiating to completion 24 confidentiality agreements, (v) compiling, managing, and revising an online data room where interested parties who signed confidentiality agreements could review financial information, contracts, leases, intellectual property, and other data pertaining to the Debtors, and (vi) holding multiple conversations with potentially interested parties and negotiating terms with those interested in transacting.

In mid-February 2015, Consensus, on behalf of the Debtors, invited 21 parties who had signed confidentiality agreements to submit strategic proposals to the Debtors. The Debtors received five written and one verbal strategic proposal submissions on or around March 2, 2015. With the exception of one proposal, which merely offered strategic operating assistance, all proposals received contemplated acquiring all or a portion of the Debtors' assets. None of the proposals contemplated a viable refinancing or recapitalization of the Debtors' capital structure. Following receipt of these proposals, the Debtors and Consensus participated in multiple meetings and calls with the various parties, and explored a multitude of factors related to each potential transaction, including certainty of closing, financial wherewithal, speed of the transaction, closing conditions, as well as purchase price and other consideration.

After extensive analysis of the benefits and risks of each proposed transaction, the Debtors ultimately determined that the offer presented by ABG was the best available alternative to maximize value for the Debtors' stakeholders under the circumstances. While the Debtors had

24

explored all possible restructuring scenarios, including options that would have enabled them to maintain or sell their retail stores as a going concern, given the sustained and ongoing losses associated with the operation of such stores, the Debtors determined that ABG's offer was superior to any other available alternative and provided the best opportunity to minimize ongoing losses and maximize value for their stakeholders.[6]  Therefore, following substantial and good-faith negotiations, the Debtors and ABG agreed to the terms of the Asset Purchase Agreement and the Revenue Sharing Agreement on April 13, 2015.   The Asset Purchase Agreement contemplated commencing the Chapter 11 Cases and seeking approval of the Sale pursuant to Section 363 of the Bankruptcy Code.

**C.      The Chapter 11 Cases**

The following is a brief description of certain material events that have occurred during these Chapter 11 Cases.

1.      First Day Motions and Orders (Other than the DIP Motion and DIP Financing Order)

On the Filing Date, in addition to the voluntary petitions for relief filed by the Debtors under chapter 11 of the Bankruptcy Code, the Debtors also filed a number of routine motions and applications seeking certain "first day" relief, including the following:

- *Debtors' Motion for Entry of Order Directing Procedural Consolidation and Joint Administration of Chapter 11 Cases.* The Debtors sought entry of an Order directing the joint administration of the Chapter 11 Cases and consolidation thereof for procedural purposes only.  On April 21, 2015, the Bankruptcy Court entered an Order granting the relief requested in the motion [Docket No. 48].

- *Debtors' Motion for Entry of Order Authorizing the Debtors to File Consolidated List of Creditors in Lieu of Submitting Separate Mailing Matrix for Each Debtor.*  The Debtors sought entry of an Order

---

[6]     In the fiscal year ended July 2014, the Debtors' physical retail stores generated an operating loss of $6.6 million on sales of $51.0 million.

authorizing the Debtors to file a consolidated list of creditors in lieu of a separate mailing matrix for each Debtor.   On April 21, 2015, the Bankruptcy Court entered an Order granting the relief requested in the motion [Docket No. 49].

- *Debtors' Application for Entry of Order Authorizing Employment and Retention of Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective* Nunc Pro Tunc *to the Petition Date.* The Debtors sought authorization to retain and employ KCC as their claims and noticing agent for the Chapter 11 Cases.   On April 21, 2015, the Bankruptcy Court entered an Order granting the relief requested in the application [Docket No. 50].[7]

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Operating Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Performing and Granting Administrative Priority for Intercompany Transactions, (II) Granting the Debtors an Extension to Comply with the Requirements of Section 345(b), and (III) Scheduling a Final Hearing.* The Debtors sought entry of interim and final orders (i) authorizing the Debtors to (a) continue operating their cash management system, (b) honor certain fees and charges in connection with the ordinary course operation of their cash management system, (c) maintain existing business forms, and (d) continue intercompany transactions in the ordinary course of business and provide administrative expense priority to intercompany transactions, and (ii) granting the Debtors a 45-day extension to comply with the requirements of section 345(b) of the Bankruptcy Code.   The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on April 21, 2015 [Docket No. 51] and thereafter entered an Order granting the relief requested in the motion on a final basis on May 18, 2015 [Docket No. 166].

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, and Other Compensation, and Employee Benefits, and (B) Continue Existing Employee Benefit Plans and Programs, (II) Authorizing Banks and Financial Institutions to Pay all Checks and Electronic Payment Requests Relating to the Foregoing, and (III) Scheduling a Final Hearing.* The Debtors sought entry of interim and final orders (i) authorizing the Debtors, in their sole discretion, to pay (a) amounts relating to certain prepetition employee obligations (as more fully set forth in the motion) and (b) continue existing employee benefit programs (as more fully set forth in the motion), and

---

[7]   Additionally, on May 18, 2015, the Bankruptcy Court entered an Order [Docket No. 174] authorizing the Debtors to retain KCC, pursuant to section 327(a) of the Bankruptcy Code, to serve as administrative agent to the Debtors.

RLF1 13190551v.1

(ii) authorizing banks and other financial institutions to receive, process, honor, and pay all checks and electronic payment requests relating to the foregoing.  The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on April 21, 2015 [Docket No. 52] and thereafter entered an Order granting the relief requested in the motion on a final basis on May 18, 2015 [Docket No. 167].[8]

- *Debtors' Motion for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Scheduling a Final Hearing.*  The Debtors sought entry of interim and final orders (i) determining adequate assurance of payment for future utility services, (ii) prohibiting certain utility companies from altering, refusing, or discontinuing services, and (iii) establishing procedures for determining adequate assurance of payment.  The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on April 21, 2015 [Docket No. 53] and thereafter entered an Order granting the relief requested in the motion on a final basis on May 18, 2015 [Docket No. 168].

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Debtors' Insurance Programs, (B) Pay Certain Obligations in Respect Thereof Postpetition, (II) Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Relating to the Foregoing, and (III) Scheduling a Final Hearing.*  The Debtors sought entry of interim and final orders (i) authorizing, but not directing, the Debtors, in their sole discretion, to (a) maintain and continue to honor insurance programs described in the motion and (b) pay the insurance obligations described in the motion, on an uninterrupted basis, consistent with the Debtors' practices in effect prior to the commencement of the Chapter 11 Cases, whether such insurance obligations relate to the period prior to or after the commencement of the Chapter 11 Cases, and (ii) authorizing banks and other financial institutions to receive, process, honor, and pay all checks and electronic payment requests relating to the foregoing.  The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on April 21, 2015 [Docket No. 54] and thereafter entered an Order granting the relief requested in the motion on a final basis on May 18, 2015 [Docket No. 169].

---

[8]    Following the Closing Date, HGI Funding and certain of the Debtors' executives (the "Executives") entered into Release & Payment Agreements (the "Payment Agreements").  Pursuant to the Payment Agreements, HGI Funding agreed to provide the Executives with cash payments (the "Payments") in lieu of any other payments or amounts owed to the Executive by HGI Funding and/or the Debtors, whether pursuant to the Executive's employment or termination of employment or otherwise.  In consideration for the Payments, the Executives provided to HGI Funding and the Debtors certain releases as set forth in the Payment Agreements.  The Payments to the Executives were paid by HGI Funding but channeled through the Debtors for administrative convenience.

- *Debtors' Motion for Entry of Order (I) Authorizing Debtors to Remit and Pay Certain Prepetition Taxes, Governmental Assessments, and Fees, and (II) Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Relating to the Foregoing.* The Debtors sought entry of an Order (i) authorizing the Debtors, in their sole discretion, to remit and pay prepetition taxes and fees (as more fully described in the motion) and (ii) authorizing banks and other financial institutions to receive, process, honor, and pay all checks and electronic payment requests in respect of those taxes and fees. On April 21, 2015, the Bankruptcy Court entered an Order granting the relief requested in the motion [Docket No. 55].

- *Debtors' Motion for Entry of Order (I) Authorizing Debtors to (A) Maintain Certain Customer Programs and (B) Honor or Pay Certain Prepetition Obligations Related Thereto, and (II) Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Relating to the Foregoing.* The Debtors sought entry of an Order (i) authorizing, but not directing, the Debtors, in their sole discretion, to (a) continue their customer-targeted practices described in the motion and (b) honor and pay certain prepetition obligations related to such practices arising prior to the Filing Date, and (ii) authorizing banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing. On April 21, 2015, the Bankruptcy Court entered an Order granting the relief requested in the motion [Docket No. 56].

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Certain Lien Holders, and (B) Critical Vendors and Service Providers, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, and (III) Scheduling a Final Hearing.* The Debtors sought entry of interim and final orders, (i) authorizing the Debtors, in their sole discretion, to pay claims by their various service providers, goods providers, and other vendors in connection with their e-commerce operations and their certain key vendors, in each case subject to the caps provided for in the motion and (ii) authorizing banks and financial institutions to honor and process check and electronic transfer requests relating to the foregoing. The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on April 21, 2015 [Docket No. 57] and thereafter entered an Order granting the relief requested in the motion on a final basis on May 18, 2015 [Docket No. 175].

2.    Post-Petition Financing

RLF1 13190551v.1

On the Filing Date, the Debtors also filed the DIP Motion, asking the Court to, among other things, authorize the Debtors to obtain the DIP Facility from the DIP Lender, authorize the Debtors to use "cash collateral," as such term is defined in the section 363 of the Bankruptcy Code, grant the DIP Agent a senior, priming lien on certain prepetition collateral (described in the motion) securing the DIP Facility, and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Agreement. The Court granted the relief requested in the motion on an interim basis on April 21, 2015 [Docket No. 58] and granted a second interim Order on May 18, 2015 [Docket No. 176]. As the parties negotiated the terms of a final order, the Court entered a third interim Order on June 3, 2015 [Docket No. 245].

On June 5, 2015, the Debtors filed the Supplemental DIP Motion. The Supplemental DIP Motion sought entry of an Order expanding the relief requested in the DIP Motion to include additional releases and shorten the Challenge Deadline as to the Salus Parties. After the Final DIP Hearing, the Court entered the DIP Financing Order.

3.    Employment and Compensation of Debtors' Professionals and Advisors

On May 18, 2015, the Bankruptcy Court entered Orders authorizing the Debtors to retain Milbank, Tweed, Hadley & McCloy LLP as bankruptcy counsel [Docket No. 170] and Richards, Layton & Finger, P.A. as bankruptcy co-counsel [Docket No. 171]. Additionally, on that same date, the Court entered Orders authorizing the Debtors to retain Consensus as financial advisor and investment banker [Docket No. 179]. Consensus filed its first and final fee application on June 25, 2015 [Docket No. 300]. The Court entered an Order on July 20, 2015 [Docket No. 345] granting Consensus's first and final fee application and authorizing the

Debtors to pay Consensus the compensation agreed to in its engagement letter, as modified by the Order.[9]

Finally, on July 10, 2015, the Court entered an Order authorizing the Debtors to retain CBIZ as accounting services provider [Docket No. 329]. Each Professional listed in this subsection was paid pursuant to the respective Order retaining such Professional and/or the Interim Compensation Order.

4.    Appointment of Committee

On April 28, 2015, the United States Trustee appointed the Committee [Docket No. 92]. The members of the Committee are as follows: (a) Longray Intimates LLC; (b) Montelle Intimates Inc.; (c) GGP Limited Partnership; (d) National Corset Supply House; (e) Ascension Lingerie & Swimsuit; (f) Wonder Form Imports Inc.; and (g) Simon Property Group.

To assist the Committee in carrying out its duties, the Committee selected Cooley LLP as its lead counsel and Bayard, P.A. as its co-counsel. Further, the Committee selected BDO as its financial advisor. The Court entered Orders retaining all three firms on May 29, 2015 [Docket Nos. 233, 234 and 235].

5.    Rejection of Executory Contracts and Unexpired Leases

Prior to the Filing Date, the Debtors vacated all of their retail stores and, as such, had no need for any of the leases for such stores. Accordingly, on April 20, 2015, the Debtors filed the First Rejection Motion to reject the leases of the Debtors' seventy-four (74) retail stores

---

[9]    Subject to the aggregate payment limitations set forth in Consensus's engagement letter, the Debtors are obligated to pay Consensus a fee equal to five percent (5%) of the revenues actually received by the Debtors under the Revenue Sharing Agreement.

and certain executory contracts related thereto.  The Court entered an Order [Docket No. 177] approving such motion on May 18, 2015.[10]

Further, on June 22, 2015, the Debtors filed the Second Rejection Motion seeking to reject the leases of the Debtors' offices in California and their warehouse in Arizona.  The Court entered an Order [Docket No. 328] approving such motion on July 10, 2015.  By way of this Order, the Debtors effectively closed all of their operating locations and terminated any accruing expenses relating to any of their leased premises.

Finally, on June 30, 2015, the Debtors filed the Third Rejection Motion, seeking to reject substantially all of their contracts because such contracts were no longer needed due to the closing of Sale.  The Court entered an Order [Docket No. 336] approving such motion on July 13, 2015.

     6.    Claims Process and Bar Date

     a.    Section 341(a) Meeting of Creditors

On May 27, 2015, the United States Trustee presided over the section 341(a) meeting of creditors in the Chapter 11 Cases.

     b.    Schedules and Statements

The Debtors filed with the Bankruptcy Court their Schedules on May 19, 2015.

     c.    Bar Date

On April 29, 2015, the Debtors filed the Debtors' Motion for Entry of an Order Establishing Bar Dates for Filing Claims, Including Claims Under Section 503(b)(9) of the Bankruptcy Code [Docket No. 93], seeking entry of an Order establishing the General Bar Date, the Consumer Bar Date, the Governmental Unit Bar Date, and the Rejection Bar Date.  The

---

[10]  Certain of the landlords whose leases were originally subject to the First Rejection Motion separately entered into stipulations with the Debtors that provided for the rejection of such landlords' leases. See Docket No. 21, 124, and 132.

RLF1 13190551v.1

Bankruptcy Court entered the Bar Date Order, which granted the relief requested in the motion, on May 18, 2015 [Docket No. 178].

      7.     The Sale of Substantially All of the Debtors' Assets

As more fully described in the First Day Declaration, the Debtors and ABG entered into the Asset Purchase Agreement on April 13, 2015. The Asset Purchase Agreement provided for a purchase price of (a) $22,500,000 in cash (subject to certain purchase price reductions)[11] plus (b) amounts to be paid to the Debtors pursuant to the terms of the Revenue Sharing Agreement.[12]

      a.     Sale Motion and Bid Procedures

On April 20, 2015, the Debtors filed the Sale Motion with the Bankruptcy Court. The Sale Motion sought (i) approval of the bid procedures in connection with the Sale and (ii) approval of the Sale to ABG or the winning bidder at an auction.

On May 6, 2015, the Bankruptcy Court held a hearing on the bid procedures portion of the relief requested in the Sale Motion and, that same day, entered an Order [Docket No. 120] approving such relief.

Pursuant to such Order, the Debtors were to conduct an auction on May 28, 2015 if they received any qualified bids (other than ABG's bid). The Debtors did not receive any such bids and, therefore, filed a notice [Docket No. 222] cancelling the auction and announcing ABG as the winning bidder for the Assets.

---

[11]  As a result of an amendment to the Asset Purchase Agreement [See Docket No. 260], the cash portion of the purchase price under the Asset Purchase Agreement was reduced to $20,050,000.

[12]  Pursuant to the Revenue Sharing Agreement, ABG and its affiliate (the "ABG Affiliate") have agreed to make certain payments to the Debtors (and their successors), including payments based on, among other things, certain transactions with respect to the equity or assets of the ABG Affiliate and net revenues of the ABG affiliate related to all sales of products bearing the "Frederick's of Hollywood" brand.

The Bankruptcy Court approved the Sale to ABG at the sale hearing and entered the Sale Order on June 3, 2015.

The Sale closed on the Closing Date and distributions contemplated by the Sale Motion were made on or about the time of the closing of the Sale.  Soon after the Closing Date, pursuant to the terms of the Asset Purchase Agreement, the Debtors filed the Debtors' Motion for Entry of an Order Approving Name and Caption Change [Docket No. 295] for the authority to change certain of the Debtors' names to remove any reference to "Frederick's of Hollywood". The Court entered an Order granting the relief requested in the motion on July 13, 2015 [Docket No. 337].

D.    **Certain Federal Income Tax Consequences**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Combined Disclosure Statement and Plan to the Debtors and to Holders of Allowed General Unsecured Claims (other than the Salus Entities, FSR, the HGI Entities, and each of their respective affiliates, successors and assigns).  The following summary does not address the U.S. federal income tax consequences to any other Holder of Claims or to Holders of Equity Interests.

The following summary is based on the Tax Code, Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Combined Disclosure Statement and Plan are complex and are subject to significant uncertainties.  The Plan Proponents have not

RLF1 13190551v.1

requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Combined Disclosure Statement and Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.  In addition, this summary addresses neither the foreign, state, or local income or other tax consequences of the Combined Disclosure Statement and Plan, nor the U.S. federal income tax consequences of the Combined Disclosure Statement and Plan to special classes of taxpayers (such as foreign taxpayers, broker dealers, traders that mark-to-market their securities, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, real estate investment trusts, retirement plans, taxpayers whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, tax-exempt organizations, individual retirement and other tax-deferred accounts, persons holding Claims as part of a hedge, integrated constructive sale, conversion transaction or straddle, and investors that are, or hold Claims through, partnerships or other pass-through entities for U.S. federal income tax purposes).

The following discussion generally assumes that the Combined Disclosure Statement and Plan will be treated as a plan of liquidation of the Debtors for U.S. federal income tax purposes and that all Distributions to Holders of Claims will be taxed accordingly. Additionally, this discussion assumes that the various debt and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form.

*The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim.*

1.    Consequences to the Debtors

For U.S. federal income tax purposes, the Debtors, other than FOHG, are members of an affiliated group of corporations of which Group is the common parent, which files a single consolidated U.S. federal corporate income tax return (the "FOH Group"). FOHG is treated as a partnership for U.S. federal income tax purposes and so is not itself subject to U.S. federal income tax. The FOH Group reported net operating loss ("NOL") carryforwards for U.S. federal income tax purposes of approximately $106.6 million as of July 26, 2014. The amount of the NOL carryforwards of the FOH Group remain subject to audit by the IRS.

The Debtors will remain in existence following the Effective Date; however, the sole purpose of their remaining in existence is the liquidation of any remaining assets and the winding-up of their affairs. Accordingly, the Plan Proponents intend to treat the Combined Disclosure Statement and Plan as a plan of liquidation of the Debtors for U.S. federal income tax purposes.

Due to the lack of direct authoritative guidance as to the survival and utilization of NOL carryforwards and the timing of recognition of cancellation of indebtedness in the context of a bankruptcy plan of liquidation, there is a risk that certain of the FOH Group's favorable tax attributes (such as any NOL carryforwards, any NOLs incurred through the end of the taxable year in which the Combined Disclosure Statement and Plan becomes effective, and possibly tax basis) may be substantially reduced, eliminated, or subjected to significant limitations as the result of implementation of the Combined Disclosure Statement and Plan. The Debtors believe that, notwithstanding the potential for attribute reduction, elimination or limitation, implementation of the Combined Disclosure Statement and Plan should not cause them to incur a material amount of U.S. federal income tax, since substantially all of the Debtors' assets have

already been liquidated.  However, the Debtors expect that the FOH Group will owe U.S. federal alternative minimum tax as a result of the Sale, in which case such tax will be paid as an Administrative Expense Claim.

2.    Consequences to Holders of Allowed General Unsecured Claims

Pursuant to the Combined Disclosure Statement and Plan, Holders of Allowed General Unsecured Claims (Class 4) will receive their Pro Rata share of the General Unsecured Creditor Cash Distributions.

a.    Gain or Loss

In general, a Holder of an Allowed General Unsecured Claim will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received by the Holder in respect of its Claim (other than any Claim for accrued but unpaid interest, and excluding any portion required to be treated as imputed interest due to the post-Effective Date distribution of such Cash) and (ii) the Holder's adjusted tax basis in its Claim (other than tax basis attributable to accrued but unpaid interest).  See "Distributions in Satisfaction of Accrued but Unpaid Interest," below.

Due to the possibility that Holders of Allowed General Unsecured Claims may receive additional Cash Distributions subsequent to the Effective Date upon a subsequent disallowance of Disputed Claims, the imputed interest provisions of the Tax Code may apply to treat a portion of such subsequent Distributions as imputed interest.  Additionally, because Distributions may be made to Holders after the Effective Date, any loss and a portion of any gain realized by such Holder may be deferred until such time as such Holder has received its final Distribution.  All Holders of Allowed General Unsecured Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method"

36

of reporting any gain that may be recognized by such Holder in respect of its Allowed General Unsecured Claim.

Where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the Holder previously claimed a bad debt deduction. A Holder of an Allowed General Unsecured Claim that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

b.    Distributions in Satisfaction of Accrued but Unpaid Interest

In general, to the extent that any consideration received pursuant to the Combined Disclosure Statement and Plan by a Holder of an Allowed General Unsecured Claim is received in satisfaction of interest accrued but unpaid during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the holder's gross income). Conversely, a Holder generally recognizes a deductible loss to the extent that any accrued interest claimed was previously included in its gross income and is not paid in full.

Pursuant to the Combined Disclosure Statement and Plan, all distributions in respect of Allowed General Unsecured Claims will be allocated first to the principal amount of

37

such Claims, as determined for U.S. federal income tax purposes, and thereafter, to the portion of such Claim, if any, representing accrued but unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. Each Holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

      c.      Information Reporting and Backup Withholding

All Distributions to Holders of Allowed Claims (including Allowed General Unsecured Claims) under the Combined Disclosure Statement and Plan are subject to any applicable withholding (including employment tax withholding). Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate (currently 28%). Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is timely supplied to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

RLF1 13190551v.1

Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Combined Disclosure Statement and Plan would be subject to these regulations and require disclosure on the Holder's tax returns.

*The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a Distribution under the Combined Disclosure Statement and Plan are urged to consult their tax advisors concerning the federal, state, local, and foreign tax consequences applicable under the Combined Disclosure Statement and Plan.*

**E.    Alternative Plan**

If the Combined Disclosure Statement and Plan is not confirmed, the Debtors, the Committee, or any other party in interest could attempt to formulate a different plan.  However, the additional costs, all of which would constitute Administrative Expense Claims may be so significant that one or more parties in interest could request that the Chapter 11 Cases be converted to cases under chapter 7.   Accordingly, the Debtors believe that the Combined Disclosure Statement and Plan enables creditors to realize the best return under the circumstances.

**F.    Global Settlement**

Since the Filing Date, the Settlement Parties engaged in negotiations with the goal of consensually resolving the Chapter 11 Cases.  These negotiations were ultimately successful and resulted in the Global Settlement that was announced at the Final DIP Hearing and initially embodied in a plan term sheet that was attached to the DIP Financing Order.  Such term sheet sets forth the material terms and formed the basis for this Combined Disclosure Statement and Plan.  The key terms of the Global Settlement are as follows: (i) FSR shall receive the Debtors' interest in the Revenue Sharing Agreement, (ii) Distributions to Holders of Allowed Claims will be made from the Additional Estate Cash that would otherwise be payable to FSR, (iii) the

release and exculpation provisions set forth herein and (iv) the waiver of Avoidance Actions. Such terms, including the benefits of the Global Settlement, are discussed at length in Articles III.G. and III.H. below and in the Committee Support Letter, which is incorporated by reference herein and attached hereto as Exhibit B.

## G.    Best Interests Test and Liquidation Analysis

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an impaired Claim or Equity Interest either (a) accept the Combined Disclosure Statement and Plan or (b) receive or retain under the Combined Disclosure Statement and Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  A hypothetical chapter 7 liquidation analysis is attached to this Combined Disclosure Statement and Plan as Exhibit A.  The value of any Distributions if the Debtors' Chapter 11 Cases were converted to cases under Chapter 7 of the Bankruptcy Code would be less than the value of Distributions under the Combined Disclosure Statement and Plan for a variety of reasons.  First, and most importantly, conversion of the Chapter 11 Cases to chapter 7 cases would eviscerate the Global Settlement among the Settlement Parties, pursuant to which, inter alia, (i) Distributions to Holders of Allowed Claims will be made from the Additional Estate Cash that would otherwise be payable to FSR, and (ii) Avoidance Actions against Creditors will not be pursued.  But for the Global Settlement, Avoidance Actions against Creditors would likely be pursued for the exclusive benefit of FSR on account of alleged diminution in its collateral and cash collateral following the Sale.  Second, conversion of the Chapter 11 Cases to chapter 7 cases would require the appointment of a chapter 7 trustee, and in turn, such chapter 7 trustee's likely retention of new professionals.  The "learning curve" that the trustee and new professionals would be faced with comes with

potentially additional costs to the Estates and with a delay compared to the time of Distributions under the Combined Disclosure Statement and Plan (and prosecution of Causes of Action). Third, a chapter 7 trustee would be entitled to statutory fees relating to the Distributions of the already monetized assets made to creditors.  Accordingly, a portion of the cash currently available for Distribution to Holders of Claims, including unsecured creditors, would instead be paid to the chapter 7 trustee.

As a result, the Plan Proponents believe that the Estates would have fewer funds to be distributed in a hypothetical chapter 7 liquidation than they would if the Combined Disclosure Statement and Plan is confirmed, and therefore Holders of Claims in all impaired Classes will recover less than in the hypothetical chapter 7 cases.  In addition, the Combined Disclosure Statement and Plan contains a number of concessions by certain of the Settlement Parties that will result in a greater recovery for the Holders of Allowed Claims.  Among other things, FSR has agreed to allow the Debtors to use their cash collateral to fund the Unsecured Creditor Fund, which fund provides for the payment of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, Allowed Priority Non-Tax Claims, wind down costs through the Effective Date and, to the extent the foregoing amounts are less than the Unsecured Creditor Fund, the Distribution of any remaining Cash to the Holders of General Unsecured Claims.  As noted above, this consideration would not be available in a hypothetical chapter 7 liquidation, thereby reducing potential recoveries to the Holders of Allowed Claims.

Moreover, without the structure of the Combined Disclosure Statement and Plan, and the settlements contained therein, all of the Creditors with Claims of lower priority than secured Claims would likely receive a diminished recovery on account of their Claims.

41

Accordingly, the Plan Proponents believe that the "best interests" test of Bankruptcy Code section 1129 is satisfied.

### H.      Releases by the Debtors and Third Parties

The release provisions set forth in Articles X.II.B. and X.II.C. of this Combined Disclosure Statement and Plan are an integral part of the Global Settlement which formed the basis for this Combined Disclosure Statement and Plan.  Absent such releases, the Settlement Parties would not have agreed to the terms of the Global Settlement and the Holders of Allowed Claims would receive a diminished (or, in some cases, no) recovery on account of such Claims.

### I.      Estimated Effective Date and Date of Distributions

The Debtors estimate that the Effective Date will occur on the date that the Confirmation Order is entered, which is expected to be November 3, 2015.  The Debtors further estimate that all Distributions to the Holders of Allowed Claims will be completed prior to December 31, 2015.

### IV. SUMMARY OF DEBTORS' ASSETS; SUMMARY OF OF TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES

### A.      Summary of Assets

The following chart provides a summary of the Debtors' assets and the estimated value of such assets:

| Asset | Estimated Value |
|---|---|
| Additional Estate Cash | $2,379,000.00 |
| Debtors' Interest in the Revenue Sharing Agreement | Unknown[13] |

---

[13]    The value of the Debtors' interest in the Revenue Sharing Agreement cannot be estimated with any degree of certainty.  Any valuation would require an extremely complex analysis that would necessarily be subject to numerous assumptions.  Moreover, even if the Debtors ascribed a value to such interest, the actual value may vary materially from the estimated value.  Accordingly, the Plan Proponents have indicated herein that the estimated value of the Debtors' interest in the Revenue Sharing Agreement is unknown.